UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ALAN HALL AND JAMES DEPALMA, | §<br>§<br>§ | CIVIL ACTION NO. 4:16-CV-00978<br>JUDGE MAZZANT/JUDGE JOHNSON |
| PLAINTIFFS, | § | |
| v. | §<br>§ | PROPOSED CLASS ACTION |
| RENT-A-CENTER, INC., ROBERT D.<br>DAVIS, AND  GUY J. CONSTANT, | §<br>§<br>§ | JURY TRIAL DEMANDED |
| DEFENDANTS. | §<br>§<br>§ | |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS**

## **TABLE OF CONTENTS**

I.     NATURE OF THE ACTION .................................................................................... 1

II.    JURISDICTION AND VENUE ............................................................................. 9

III.   PARTIES ............................................................................................................... 9

IV.   CONTROL PERSON ALLEGATIONS.............................................................. 11

V.    SUBSTANTIVE ALLEGATIONS ...................................................................... 13

      A.     RAC'S Business.......................................................................................... 13

      B.     RAC Internally Develops a POS System .................................................. 16

      C.     Defendants Orchestrate the Roll-Out of SIMS Despite its Severe
            Deficiencies and Poor Test Results In Order to Avoid Recognizing a Loss
            From a Write-Down of the Entire System ............................................... 20

            1.     The Rollout Helped Avoid a Material Write-Down on SIMS ................. 20

            2.     The POS System Was Not Ready to be Implemented and the
                  Rollout Was Plagued with Problems ....................................................... 23

      D.     Defendants Failed to Disclose Information Required Under Item 303 of
            SEC Regulation S-K ................................................................................. 28

VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
      AND OMISSIONS ................................................................................................ 30

      A.     Fourth Quarter and Full Year 2014 Results............................................. 30

      B.     First Quarter Fiscal 2015 Results............................................................. 34

      C.     Second Quarter Fiscal 2015 Results ........................................................ 37

      D.     Third Quarter Fiscal 2015 Results ........................................................... 39

      E.     The Truth Begins to Emerge, But Defendants Continue to Mislead the
            Market On the Severity and Impact of the POS Issues........................... 42

            1.     Details of the Severity of POS System Implementation Problems
                  Slowly Emerge........................................................................................ 42

                  (a)     Results for Year Ended December 31, 2015 (Partial
                          Corrective Disclosure) .................................................. 42

|  |  | (b) | First Quarter Ended March 31, 2016 (Partial Corrective Disclosure) ................................................................................. 47 |

|  |  | (c) | Second Quarter Ended June 30, 2016 (Partial Corrective Disclosure) ................................................................................. 52 |

|  | 2. |  | Raymond James N.A. Equities Conference – September 13, 2016 .......... 59 |

VII. THE FULL TRUTH IS REVEALED ............................................... 60

VIII. POST-CLASS PERIOD EVENTS ................................................ 62

IX. ADDITIONAL EVIDENCE OF SCIENTER ................................. 66

    A. Growth in RAC's Core U.S. Segment Was Extremely Important to the Company's Success ............................................................... 67

    B. The Termination of Both of the Individual Defendants within Two Months of the End of the Class Period Also Provides Strong Evidence of Scienter ......... 68

    C. The Rushed Rollout of SIMS Prevented RAC From Taking a Material Write-Down on Capitalized Costs Relating to the Failed Project ....................... 69

X. CLASS ACTION ALLEGATIONS ............................................... 70

XI. LOSS CAUSATION/ECONOMIC LOSS ...................................... 72

XII. PRESUMPTION OF RELIANCE.................................................. 75

XIII. INAPPLICABILITY OF STATUTORY SAFE HARBOR .......................................... 77

XIV. CLAIMS FOR RELIEF ............................................................. 77

    COUNT I For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ............................... 77

    COUNT II For Violations of Section 20(a) of the Exchange Act Against Defendants Davis and Constant .......................................................... 80

PRAYER FOR RELIEF ............................................................... 82

JURY DEMAND ........................................................................ 83

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System and additional named plaintiff City of Hollywood Employees' Retirement Fund (together, "Plaintiffs"), by their undersigned attorneys, hereby bring this Consolidated Amended Class Action Complaint ("Complaint") against Rent-A-Center, Inc. ("RAC" or the "Company"), Robert D. Davis ("Davis"), and Guy J. Constant ("Constant"),  (together, "Defendants"). The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by RAC; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; and interviews of former employees of RAC and other persons with knowledge of the matters alleged herein.[1]  Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows.

## I.      NATURE OF THE ACTION

1.      This is a federal securities class action brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) against RAC, its former Chief Executive Officer ("CEO") Davis and its former Executive Vice President of Finance, Chief Financial

---

[1]   Confidential witnesses ("CWs") will be identified herein by number (CW-1, CW-2, etc.). All CWs will be described in the masculine to protect their identities.

Officer ("CFO") and Treasurer, Constant on behalf of all persons and entities that purchased or otherwise acquired RAC publicly traded common stock during the period from February 2, 2015 through October 11, 2016, inclusive (the "Class Period") and who were damaged thereby.

2.      RAC is one of the largest rent-to-own operators in North America. At RAC's stores, customers can rent-to-own electronics, appliances, furniture and other durable items. Customers pay weekly, semi-monthly, or monthly amounts for the rental of durable goods, often with an ability to purchase the product. Customers can also return items to stop payment and terminate their agreement.  RAC refers to its rent-to-own agreements as flexible because its customers are not incurring a long-term obligation as they can return the rent-to-own merchandise at any time (subject to certain limitations).

3.      During this Class Period, RAC generated revenue from four operating segments: Core U.S., Acceptance Now, Mexico, and Franchising. Core U.S. was RAC's largest segment, operating between 2,400 to 2,800 company-owned stores in the United States, Canada and Puerto Rico. The Core U.S. segment comprised approximately 72% of the Company's consolidated net revenues during the Class Period. The Company disclosed in its SEC filings, including its Form 10-K for the year ended December 31, 2014, that RAC is "highly dependent on the financial performance of our Core U.S. operating segment" and that "[a]ny significant decrease in the financial performance of the Core U.S. segment may also have a material adverse impact on our ability to implement our growth strategies."

4.      Approximately 85% of RAC's Core U.S. rent-to-own agreements were on weekly terms.  Pursuant to such terms, RAC's customers were required to make payments either electronically (over the phone or in person) or by cash or credit in one of RAC's stores. However, since RAC's key customer demographic was "unbanked," and without credit, most of

its customers paid by cash in the store each week. If a customer could not or did not elect to continue their rent-to-own agreement, they were able to return the merchandise at any time subject to certain conditions. The Company estimates that approximately 75% of rent-to-own items were returned and re-rented, with only 25% reaching full term such that the customer took ownership of the product. The financial status of RAC's customer demographic also required RAC to devote significant resources to collection efforts.  RAC regularly monitored customer accounts for missed payments and employed a variety of tactics to timely collect on past due accounts. The Company's primary and most time-intensive collection method involved staff from each store using the in-store computer system to identify past due accounts and to access contact information for each account. Store staff would then contact customers on a weekly basis in order to collect payments or schedule merchandise returns. If the customers were not available or responsive, customers' references (including friends, family, and employers) would be contacted in order to collect payment.

5.     Beginning in the fourth quarter of 2014, the Company began rolling out "SIMS," its proprietary point-of-sale ("POS") management information system, which had been in development since at least 2009.  "SIMS,"[2] an acronym for Store Information Management Systems, was a new POS system purportedly designed to centralize and manage sales, inventory, collections, customer relationship management, and payment tracking on a Company-wide basis, and provided RAC headquarters with real-time access to each store's sales and collection data. Prior to the rollout of SIMS, each store was required to download and transmit to RAC headquarters all store data at least twice daily.

_____

[2] "SIMS" and "POS" or the "POS system" are used interchangeably herein.

6.      At the beginning of the Class Period, on February 2, 2015, RAC announced that the new POS system was fully operational at its first store "following the system-wide implementation of the back office solution." Other than announcing that SIMS was live in one store, RAC provided little other information about the new system, including challenges it was facing with developing and implementing the system and the system's importance to the Company's revenues and strategic growth initiatives. Specifically, Defendants knew but failed to inform investors that SIMS had a long history of stability and functionality problems which had not been remediated at the time of the rollout and which jeopardized many of the strategic initiatives that RAC was promising, including improvements to RAC's inventory management and account collection functions, and new flexible pricing and e-commerce projects, all which relied on the successful implementation of SIMS.

7.      Throughout 2015, the Company proceeded on pace with the rollout of SIMS to an increasing number of stores.  By April 28, 2015, the POS system had been rolled out in 34 stores; by July 28, 2015, the system was in 150 stores; by October 26, 2015 the system was in approximately 215, or 8.5% of RAC's stores, and by December 31, 2015, the system was deployed in 385 stores.

8.      However, despite being in possession of test results including Root Cause Analysis Reports, Incident Reports, and other information that should have caused Defendants to either halt the Company-wide rollout of SIMS or at least undertake a system-wide revamp before proceeding with a full rollout, Defendants steadfastly refused to do either.  Defendants also failed to inform investors of the ongoing problems, despite knowing internally that these issues would likely result in financial losses. Instead, Defendants repeatedly assured the market that the system was fully operational and ready to go.  When problems with SIMS started to seriously

impact RAC collection efforts, Defendants reassured investors that those problems were only short-term hiccups that had been addressed.

9.      After slowly rolling SIMS out to pilot stores in early 2015, and promising the market it would take a measured approach to future rollouts based on reaching certain milestones, Defendants rushed out a full rollout of the POS system Company–wide in the first half of 2016, going from 385 stores on December 31, 2015 to 887 on March 31, 2016, and then completing the rollout to all 2,478 Core U.S. stores by June 30, 2016.

10.      The truth about the severity of the problems with the POS implementation came to light through a series of partial disclosures that began on February 1, 2016 when the Company announced its results for the year ended December 31, 2015 after the market closed that day. The next day, during the Company's earnings call, Defendants acknowledged problems with SIMS' implementation. The Company disclosed that for the first quarter of 2016 (ended March 31, 2016), RAC expected a decrease in year-over-year earnings in the critical Core U.S. segment due to "a pretty short-term impact. . . associated with putting in new point-of-sale system in the stores" and the impact of training RAC workers on the new POS system. However, Defendants falsely assured investors that the "little bit of impact to revenue" would "go away then in the back half of the year."  Defendants also falsely assured the market that RAC had "a very good knowledge of what we see in terms of the impact on the stores."  Despite these assurances, RAC's stock price dropped approximately 25% on February 2, 2016 on high trading volume. Nevertheless, the price of RAC's stock remained artificially inflated as the Company, and in-turn analysts, emphasized the expected short-term nature of the POS problems.

11.      Additional information about problems with the POS system's implementation was revealed on April 27, 2016 when, after the market closed, the Company announced

5

disappointing results for the first quarter ended March 31, 2016. The next day, during the Company's earnings call, Defendants disclosed that the implementation of the POS system had been delayed so that the Company could address a "greater-than-expected impact on sales." However, according to Defendants, the problems had been fully remediated by then and the POS rollout had been restarted with "approximately one-third of our core stores [] operating this new POS system." Defendants also assured investors that the Company was "constantly monitoring the results to make sure [the POS system] is landing well in our stores," that the overall impact to Core revenues was not going to be "any more significant" than originally disclosed, and that overall guidance for the year remained on track. In reaction to these revelations, RAC's common stock price fell approximately 12.8% from its close on April 27, 2016 of $15.71 per share to a close of $13.70 per share on April 28, 2016 on high trading volume. But, the price of RAC's stock remained artificially inflated as the Company emphasized its measured approach to the POS rollout and that it had addressed all system issues.

12.     The negative effects of the POS implementation on Core revenues were further revealed on July 27, 2016, after the market closed, when the Company announced its results for the second quarter ended June 30, 2016 and revealed that Core U.S. same-store sales decreased by 6.7% because of the "impact and acceleration of the point of sale system rollout."  Defendants also disclosed on July 28, 2016 that the "system performance and usability issues identified in the first quarter were fixed," but that "the distraction of the new system impacted our core portfolio and took time away from collections efforts which resulted in a hit to revenues." Nonetheless, Defendants represented that "the distraction of a major system roll-out is now behind us." As a result of these disclosures, on July 28, 2016, RAC's common stock price fell

approximately 17.6% from a close on July 27, 2016 of $13.26 per share to a close on July 28, 2016 of $10.92 per share on high trading volume.

13.     The full truth was finally revealed on October 11, 2016, when Defendants issued a press release announcing preliminary results for the third quarter ended September 30, 2016. According to the release, Core U.S. same-store sales were estimated to be down approximately 12% in the quarter due to performance issues with the POS system and peak-time Company-wide outages that "resulted in a larger than expected negative impact on Core sales." In reaction to this disclosure of the full extent of the problems with the POS implementation, RAC's common stock price fell by $3.70 per share, *or over 28%* on abnormally high trading volume.

14.     On October 27, 2016, during the third quarter earnings call, Defendant Davis explained that the Company had begun experiencing "capacity-related system slowness and outages" at the time the POS went fully live in all Core stores in the second quarter of 2016 and that these issues persisted throughout the third quarter with the frequency of the outages not subsiding until the end of the quarter.

15.     Shortly thereafter, on December 2, 2016, the Company announced the termination of Defendant Constant effective immediately.  And on January 9, 2017, the Company announced the "resignation" of Defendant Davis, a 24-year Company veteran and RAC Board member, also effective immediately.

16.     The statements of former RAC employees with knowledge of SIMS' development and implementation confirm that internally known, entrenched, and systemic issues seriously threatened the implementation of the POS system when it was initially rolled out in early 2015. For example, CW-1, a former Senior Systems Engineering Manager employed by RAC at its headquarters from November 2013 until June 2016 who managed a team of systems engineers

who were responsible for implementing SIMS, and who initially reported to the Director of IT Systems and Operations and then to the Senior Director of Technical Operations (both of whom reported to CTO Christi Liebe), stated that Defendants were aware that the operating system SIMS ran on was outdated prior to and during its initial rollout. According to CW-1, this severely limited its functionality, prevented enhancements and other necessary fixes, and caused SIMS to clash with current applications that RAC needed to keep the system operational. Notwithstanding, CW-1 said that the Company moved forward in an effort to avoid a write-down or write-off on the POS system, a capitalized asset which had been in development for approximately five years.

17.     CW-2 was employed by RAC for 19-years from 1997 until June 2016. From March 2007 to June 2016, he held the title of Senior Director of Information Security and IT Service Management, and reported directly to Chief Information Officer ("CIO), who was Herman Nell from December 2013 to April 2016, and then Angela Yochem starting in May 2016 when Nell retired. CW-2 was responsible for the information security of all RAC business units, including the Core U.S. segment, as well as litigation support, e-Discovery, and he was the custodian of all records at the Core store level. CW-2 was also a member of the project team that evaluated risks related to the SIMS rollout, and attended a "Go No-Go" meeting each time RAC rolled SIMS out to additional stores. CW-2 corroborated information provided by CW-1 about persistent problems with SIMS, including intermittent outages and other functional issues well before the system was fully implemented in the second quarter of 2016.

18.     As a result of Defendants' wrongful acts and omissions during the Class Period, the price of RAC's common stock collapsed by approximately 74% from its Class Period high of

$35.03 per share on February 2, 2015, the first day of the Class Period, to a low of $9.18 per share on October 11, 2016, the last day of the Class Period.

## II.    JURISDICTION AND VENUE

19.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

20.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a).

21.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  RAC is headquartered in this District and the violations of law complained of herein occurred in part in this District, including the dissemination of materially false and misleading statements complained of herein into this District.

22.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

23.    Court-appointed Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("OFPRS") is a defined-benefit pension plan headquartered in Oklahoma City, Oklahoma.  As set forth in the Certification previously submitted to the Court (ECF No. 11-1), OFPRS purchased RAC common stock at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

24.     Additional named plaintiff City of Hollywood Employees' Retirement Fund ("Hollywood ERF") is a defined-benefit pension plan headquartered in Hollywood, Florida that manages approximately $290 million in assets.   Hollywood ERF purchased RAC common stock at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. *See* Exhibit A.

25.     RAC has its principal executive offices at 5501 Headquarters Drive, Plano, Texas 75024.   The Company is one of the largest rent-to-own operators in North America, offering durable consumer products under flexible rent-to-own purchase agreements with no long-term obligation, and in many instances without running any credit check, to its customers.   During the Class Period, the Company operated between approximately 2,400 and 2,800 "brick and mortar" stores across all fifty states. The Company is incorporated in Delaware and its common stock is traded on the NASDAQ Global Select Market under ticker symbol "RCII."

26.     Defendant Davis was RAC's CEO and a member of RAC's Board of Directors from February 1, 2014 until his "resignation" effective January 9, 2017. Davis began his employment with RAC in 1993. Before serving as CEO, Davis served as: (a) Executive Vice President – Finance from February 2008 to January 31, 2014; (b) CFO from March 1999 to January 2008; (c) Treasurer from January 1997 to March 1999; and (d) in additional Finance positions before he served as Treasurer.   During the Class Period, Davis signed RAC's annual reports and quarterly and annual certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to RAC's internal control over financial reporting.

During the Class Period, Davis also participated in each of the Company's quarterly earnings conference calls described herein. Davis was a direct and substantial participant in the fraud.

27.     Defendant Constant was RAC's CFO, Executive Vice President – Finance, and Treasurer from June 2014 until he was fired by RAC's Board effective December 2, 2016. During the Class Period, Constant signed RAC's annual reports and quarterly and annual certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to RAC's internal control over financial reporting. During the Class Period, Constant participated in each of the Company's quarterly earnings conference calls described herein. Constant was a direct and substantial participant in the fraud.

28.     Defendants Davis and Constant are collectively referred to as the "Individual Defendants."  RAC and the Individual Defendants are referred to, collectively, as "Defendants."

## IV.     CONTROL PERSON ALLEGATIONS

29.     Davis and Constant, by virtue of their high-level positions with the Company, directly participated in the management of the Company, and were directly involved in the day-to-day operations of the Company at the highest levels.  The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

30.     During the Class Period, the Individual Defendants knew that the POS system implementation was experiencing serious problems and that the roll-out threatened to affect both store operations and collections.  The Individual Defendants followed, tracked, and were aware of the status of the implementation of the POS system and the problems being experienced in the

pilot or test stores.  These problems were not properly remediated before the system was rolled out Company-wide.

31.     The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

32.     The Individual Defendants, because of their positions of control and authority as senior executive officers (and as Director for Davis), had access to the adverse, undisclosed information about RAC's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held SIMS Executive Steering Committee and Change Management Meetings, as well as other management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

33.     As senior officers and controlling persons of a publicly-held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's common stock would be based

upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

34.     Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of RAC common stock during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omission) regarding the troubled implementation of the Company's new POS system, SIMS.   The scheme: (i) deceived the investing public regarding RAC's operations and the true value of RAC's common stock; and (ii) caused Plaintiffs and other members of the Class to purchase RAC common stock at artificially inflated prices, which fell as the truth concerning the material and sustained effect that the implementation of the POS system had on Core revenues ultimately became known.

35.     In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of RAC, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## V.      SUBSTANTIVE ALLEGATIONS

### A.      RAC'S Business

36.     RAC was established as Talley Leasing in 1987.  Through a series of mergers and acquisitions, RAC grew from a small appliance rental business to one of the largest rent-to-own operators in North America. RAC offers customers the opportunity to obtain ownership of durable consumer products, such as furniture, electronics, appliances, and smartphones, through rent-to-own agreements, without needing access to credit. RAC refers to its rent-to-own

agreements as "flexible" because its customers are not incurring a long-term obligation as they can return the rent-to-own merchandise at any time (subject to certain limitations).

37.     During the Class Period, RAC generated, on average approximately 85% of its revenue through rent-to-own agreements and associated fees, with 11% attributable to direct merchandise sales, and the remaining 4% earned through installment sales and its franchise business.  During this same period, RAC recognized revenue through four operating segments: (i) Core U.S.; (ii) Acceptance Now; (iii) Mexico; and (iv) Franchising. The Core U.S. segment was RAC's largest operating division (both prior to and during the Class Period), with 2,400 to 2,800 company-owned "brick and mortar" rent-to-own stores in the United States, Canada, and Puerto Rico. RAC's second largest segment, Acceptance Now, conducted rent-to-own transactions from kiosks and terminals located in approximately 1,700 third party partner stores, providing those partners' customers an alternative means to ownership if the customers were denied credit.  RAC's Mexico segment was similar to its Core U.S. business model, but operated from approximately 145 stores in Mexico during the Class Period. RAC's Franchise segment comprised approximately 180 - 230 franchises across the United States under various trade names, trademarks, and logos owned by RAC.

38.     The Core U.S. segment contributed, on average, approximately 72% of the Company's consolidated net revenues during the Class Period.

| Operating Segment Revenue Contributions (in millions) | | | | | | |
|---|---|---|---|---|---|---|
| Quarter End | Total Revenue | Core U.S. | Core % | Acceptance Now | Mexico | Franchise |
| 12/31/2014 | $796.5 | $600.5 | 75.4% | $169.2 | $19.6 | $7.3 |
| 3/31/2015 | $877.7 | $629.3 | 71.7% | $224.3 | $17.9 | $6.2 |
| 6/30/2015 | $815.3 | $593.5 | 72.8% | $200.4 | $16.3 | $5.1 |
| 9/30/2015 | $791.6 | $575.4 | 72.7% | $196.7 | $14.5 | $5.1 |
| 12/31/2015 | $793.8 | $573.8 | 72.3% | $196.9 | $15.0 | $8.1 |
| 3/31/2016 | $835.7 | $584.4 | 69.9% | $230.4 | $13.7 | $7.1 |
| 6/30/2016 | $749.6 | $530.6 | 70.8% | $199.5 | $13.3 | $6.2 |

| 9/30/2016 | $693.9 | $481.8 | 69.4% | $194.4 | $12.5 | $5.2 |
| 12/31/2016 | $684.1 | $472.9 | 69.1% | $193.5 | $11.4 | $6.2 |

39.     The Company disclosed in its SEC filings, including its Form 10-K for the year ended December 31, 2014, that RAC is "highly dependent on the financial performance of our Core U.S. operating segment" and that "[a]ny significant decrease in the financial performance of the Core U.S. segment may also have a material adverse impact on our ability to implement our growth strategies."

40.     During the Class Period, approximately 85% of RAC's Core U.S. rent-to-own purchase agreements were on weekly terms.  Weekly rent-to-own agreements required RAC's customers to make payments either electronically, by phone or in person, or by cash in one of RAC's stores.  RAC's target customer demographic was "unbanked," lacked general access to credit, and Constant stated on March 2, 2015 that "about 90% of our customers physically walk into a store every week to make their cash payment for their weekly model." If a customer discontinued their rent-to-own agreement, they could return the merchandise at any time subject to certain limitations. The Company estimates that approximately 75% of the products were returned and re-rented, with only 25% of first-time rent-to-own agreements reaching maturity.

41.     The financial status of RAC's customer demographic also required RAC to devote significant resources to collection efforts.  RAC regularly monitored customer accounts for missed payments and employed a variety of tactics to timely collect on past due accounts. The Company's primary and most time-intensive collection method involved staff from each store using the in-store POS computer system to identify past due accounts and to access contact information for each account. Store staff would then contact customers on a weekly basis in order to collect payments or schedule merchandise returns. If the customers were not available or

responsive, customers' references (including friends, family, and employers) would be contacted in order to attempt to collect payment.

**B.      RAC Internally Develops a POS System**

42.      In 2008, RAC undertook the development of a retail POS system with the goal of centralizing certain functions: (i) inventory management; (ii) customer collections; (iii) customer relationship management; and (iv) payment tracking. These functions had been previously decentralized across RAC's more than 2,400 Core segment stores. The rollout and success of the POS system was critically important to RAC because other "strategic initiatives" of the Company were dependent upon it, including centralized inventory management, e-commerce, and variable pricing (pricing specific to territories and states) projects. As discussed below, the Company's ability to manage inventory, monitor accounts payable, and collect payments from customers were critical to the Company's success. E-commerce and variable pricing were also two of the Company's most highly touted growth initiatives during the Class Period.

43.      According to CW-2, prior to the Class Period RAC used an off the shelf POS system designed for the rent-to-own market called Pro/Store[3] in its Core segment stores wherein sales and collection information would be stored and transmitted to RAC headquarters multiple times daily. CW-2 said that with Pro/Store, RAC headquarters did not have access to real-time, centralized information from its stores - all inventory and customer information was available only at each store until it was transmitted to headquarters. CW-2 also stated that Pro/Store was developed well before his arrival in 1997 and it could not meet the technological goals of RAC, including a centralized reporting system and e-commerce functionality.

---

[3] PRO/Store was a program offered by the company High Touch.

44.     CW-2 said that between 2009 and 2010, RAC utilized a combination of in-house and temporary engineers, coders, and developers, and IBM to develop its centralized POS system. CW-2 further stated that IBM worked with RAC for approximately 18 months developing components of SIMS, including the inventory management feature. However, CW-2 said that IBM's engagement was cancelled when little progress was made on the system despite considerable expense. Thus, according to CW-2, RAC reverted to attempting to develop the POS system on its own starting around late 2010 (after IBM was terminated).

45.     According to CW-1, the version of SIMS that was implemented during the Class Period was developed on an outdated Oracle Linux-based operating system[4] that was already considered to be at "end of life" before SIMS was rolled out to the first store in Plano, Texas. CW-1 explained that newer software was increasingly unable to interact with SIMS' old Oracle-based operating system, making it more difficult and expensive to upgrade and repair.

46.     Because of a series of executive changes in the CIO position at RAC between 2010 and 2013 (four CIOs in four years), CW-2 said that ownership of the POS/SIMS project was bounced around from executive to executive until December 2013 when RAC hired a new CIO (Herman Nell) and a new CTO (Christi Liebe).[5] According to CW-2, Nell reported directly to Davis while Liebe reported to Nell until Nell retired from RAC in April of 2016. According to CW-2, when Nell retired Liebe reported directly to his successor Angela Yochem. CW-2 said that Nell was tasked with getting the POS system ready to be commercially deployed (despite all its flaws) with Liebe and Gary Peek (former Vice President of IT Solutions) assisting

_____

[4] Oracle Linux ("OL") was preceded by Oracle Enterprise Linux ("OEL"), and the OL / OEL nomenclature is sometimes used interchangeably.

[5] Shortly thereafter, in January 2014, RAC CEO Mark E. Speese retired as RAC's CEO and Robert Davis was promoted from CFO to CEO.  In June 2014, Guy Constant was hired to fill Davis' role as CFO.

with the development of the network servers, asset management, software licensing, database and network infrastructure, and "Dev/Ops" (cloud services).

47.     According to CW-1, Nell, Liebe, and their teams worked on SIMS for less than one year when the decision was made by RAC management to roll out the system in one local store near RAC's headquarters. CW-1 said that the timing of the rollout decision was predominantly based on concerns that if the Company did not commercialize the POS system soon, significant amounts of the capitalized software development costs associated with the project would need to be written off.  *See* discussion at ¶¶53-61. CW-2 also reported that before he left RAC in June 2016, he learned that the POS system had cost RAC at least $150 million to develop (and that was before it was even rolled out to all Core segment stores).

48.     However, at the end of 2014, CW-1 said that the system was still nowhere near ready for pilot testing in RAC's Core segment stores as serious capacity and performance issues were being experienced, including but not limited to: (i) network bandwidth issues; (ii) scalability problems; (iii) capacity problems including network capacity, database capacity, and old-technology capacity problems; (iv) functionality problems such as problems with credit card readers and POS terminals associated with the new system, and the need to upgrade internet access at many stores to handle the new system; and (v) "hundreds" of other issues of varying sizes.

49.     Moreover, CW-1 stated that many desired features and functionalities of the planned POS system eventually had to be abandoned as they could not be made to work on the outdated Oracle-based operating system, and were not ready for deployment by late 2015. Specifically, CW-1 recalled that instead of using a centralized database (as was intended from the outset), Defendants initially moved to a system where every three stores shared one server,

and those servers still had to sync with Company headquarters to transmit data and customer information. In addition, significant compromises in functionality were made such as those described below.

50.     According to CW-1, Liebe and Nell were aware of the serious problems surrounding the development and deployment of the POS system.  In addition to spearheading the POS deployment, Nell and Liebe both attended weekly SIMS status meetings during which changes, challenges, and problems related to SIMS were discussed.  CW-1 further stated that these weekly 9:00 A.M. meetings started being held well before the Class Period, in or around the first quarter of 2014, and continued on a weekly basis through his departure in June 2016.

51.     According to CW-1, Nell and Liebe would have communicated any significant problems and delays to Davis and Constant through, for example, color-coded SIMS incident reports (prepared by Director of Information Technology and SIMS Project Manager Vasanth Jonnalagadda and Michael Frawley, the Director of Application Development), and at SIMS Executive Steering Committee meetings which were attended quarterly by Liebe, Nell, Department Heads, SVPs, and the Individual Defendants, and more frequently as the rollout of the POS system progressed.

52.     CW-2 confirmed that Davis and Constant were aware of issues relating to the POs system implementation. CW-2 said that Defendants were on the SIMS Executive Steering Committee, and that Davis held weekly meetings with his CIOs, including Nell during the Class Period, where SIMS issues were always discussed.

**C.    Defendants Orchestrate the Roll-Out of SIMS Despite its Severe Deficiencies and Poor Test Results In Order to Avoid Recognizing a Loss From a Write-Down of the Entire System**

**1.    The Rollout Helped Avoid a Material Write-Down on SIMS**

53.    RAC invested at least $175 million in the development of SIMS prior to the Class Period. Pursuant to generally accepted accounting principles ("GAAP"), RAC was required to capitalize these costs provided the following criteria were met:

(a)    The preliminary project development stage had been completed for SIMS (e.g., conceptual formulation, determination reached that the Company needed the technology, and the selection of alternative technologies);

(b)    Management authorized and committed to fund the POS system; and

(c)    It was probable that the POS system would be completed and the software would be used to perform the intended function.[6]

54.    Consistent with this, RAC disclosed the following accounting policy under GAAP relating to its capitalization of internal use software, including the POS system, in its 2014 Annual Report on Form 10-K filed with the SEC on March 2, 2015:

> We have incurred costs to develop computer software for internal use. We capitalize the costs incurred during the application development stage, which includes designing the software configuration and interfaces, coding, installation, and testing. Costs incurred during the preliminary stages along with post-implementation stages of internally developed software are expensed as incurred. Internally developed software costs, once placed in service, are amortized over various periods up to 10 years.

55.    The amortization of capitalized costs associated with SIMS was required to begin once the software was ready for its intended use (ASC 350-40-35-6).  Based on the Company's

---

[6] Financial Accounting Standards Board Accounting Standards Codification ("ASC") 350-40-25-12.

accounting policy, RAC asserted that its capitalized software was ready for its intended use when it was placed into service in late 2014.

56.     RAC's capitalized software costs totaled approximately $174.6 million, before amortization, as of December 31, 2014.  RAC reported the following capitalized development costs associated with its SIMS as of each year ended December 31, 2014, 2015 and 2016:

| *(in millions of dollars)* **Capitalized Software** | **As of December 31,** | | | | |
|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** |
| Construction in Progress Balance | $37.8 | $47.8 | $54.8 | $86.3 | $73.4 |
| Cumulative Software Placed Into Service | $20.6 | $36.6 | $45.0 | $49.6 | $101.2 |
| Total Capitalized Balance, before depreciation | **$58.4** | **$84.4** | **$99.8** | **$135.9** | **$174.6** |

57.     GAAP mandates that RAC's internal use software, including its POS system, should be accounted for as an "abandoned" asset when it ceased to be used.[7]  Once abandoned, GAAP requires the Company to reduce the capitalized asset's carrying value to the greater of: (1) zero, or (2) its salvage value, if any.[8]  Further, if it was no longer probable that the POS system would be completed or placed into service, the capitalized asset would need to be reported at the lower of the carrying amount or fair value, if any, less costs to sell. A rebuttable presumption existed in GAAP that uncompleted software has a fair value of zero.[9]

58.     The impact of abandoning and writing off the POS system during 2014 would have been material to the Company's financial statements.  GAAP states that an item in financial statements is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the financial statements would have been changed or influenced by the inclusion or correction of the item.

---

[7]  ASC350-40-35-2.

[8]  ASC360-10-35-47 and 48.

[9]  ASC350-40-35-3.

GAAP further notes that an assessment of materiality requires an evaluation of both quantitative and qualitative factors.

59.     While no finite quantitative tolerance level exists in GAAP to determine when an item is quantitatively material, ASC 250-10-S99 provides a benchmark threshold of 5% of a financial statement item (e.g., operating profit, net earnings before tax, etc.) as an initial indicator of materiality.  As evident from the table below, applying this quantitative benchmark, RAC's financial statements would have been materially impacted had the Company abandoned and written off its POS system at December 31, 2014:

| ($ amounts in millions, except earnings per share) | | | Estimated | |
| 2014 Financial Statement Item | As Reported | As Adjusted | $ Impact | % Impact |
|---|---|---|---|---|
| *Relevant Balance Sheet Accounts at December 31, 2014 (1)* | | | | |
| Gross Property Assets | $773.3 | $598.7 | ($174.6) | -22.6% |
| Net Property Assets (2) | $332.7 | $183.4 | ($149.3) | -44.9% |
| *Annual 2014 Income Statement Accounts (1)* | | | | |
| Operating Profit (2) | $193.5 | $44.2 | ($149.3) | -77.2% |
| Earnings (Loss) Before Income Taxes (2) | $142.4 | ($6.9) | ($149.3) | -104.9% |
| Net Earnings (Loss) (3) | $96.4 | ($0.6) | ($97.0) | -100.6% |
| Diluted Earnings (Loss) Per Common Share (3) | $1.81 | ($0.01) | ($1.83) | -100.6% |
| *Q4'2014 Income Statement Account (1)* | | | | |
| Operating Profit (Loss) (2) | $47.7 | ($101.6) | ($149.3) | -313.0% |
| Earnings (Loss) Before Income Taxes (2) | $35.3 | ($114.0) | ($149.3) | -423.0% |
| Net Earnings (Loss) (3) | $25.6 | ($71.5) | ($97.0) | -379.8% |
| Diluted Earnings (Loss) Per Common Share (3) | $0.48 | ($1.35) | ($1.83) | -381.5% |
| (1) Assumes assets were abandoned and written off as of December 31, 2014 | | | | |
| (2) Assumes a ten year life of SIMS and amortization assuming that software placed into service occurred as of the beginning of each year | | | | |
| (3) Assumes a tax rate of 35% based upon the federal statutory rate to estimate the tax impact to Net Earnings and Earnings Per Share | | | | |

60.     The SEC staff also notes that there are numerous circumstances in which items below 5% of a financial statement account could be material after considering qualitative factors. The following qualitative factors identified in ASC 250-10-S99 are further demonstrative of the material financial statement impact of abandoning and writing off the value of RAC's POS system:

(a)     The abandonment and estimated write-off of the POS system would have turned RAC's annual and Q4' 2014 Net Earnings into respective Net Losses; and

(b)     The abandonment and estimated write-off of SIMS may have directly impacted management's compensation. For example, a portion of RAC's 2014 executive compensation, was based upon the Company's annual earnings before interest, tax, depreciation, and amortization ("EBITDA").  As noted within the Company's Proxy on Form DEF 14-A filed, RAC disclosed:

> [ … ]he Compensation Committee determined that the Company achieved (i) 86.4% of the EBITDA objective for 2014 resulting in payment of 30% of the 65% of the target bonus amounts attributable to the EBITDA condition pursuant to the 2014 annual cash incentive program, and (ii) 96.7% of the revenue objective for 2014 resulting in payment of 30% of the 25% of the target bonus amounts attributable to the revenue condition pursuant to the 2014 annual cash incentive program.

61.     As such, Defendants knew that a decision to abandon RAC's POS system would have materially affected the Company's fourth quarter and annual 2014 financial statements. Despite the extensive problems with SIMS, Defendants elected not to abandon the software.

## 2.     The POS System Was Not Ready to be Implemented and the Rollout Was Plagued with Problems

62.     As discussed herein, former RAC employees from the Company's technology department confirm that: (i) Defendants rolled out the POS system when the Company knew it contained material flaws, in an effort to avoid a write-down of at least several hundred million dollars on capitalized expenses for unused software; (ii) tests from the initial "pilot" POS implementation showed that it was plagued with problems which the Company could not and did not adequately address before proceeding with the rollout; (iii) the Company accelerated the implementation of the POS system to additional stores before remediating such problems, and (iv) the POS implementation problems were pervasive, and were neither short-term nor fixed in the first or second quarter of 2016.

63.     According to CW-1, it was very well known within the Company that the POS system was rolled out in December 2014 despite its flaws because that project was close to reaching its 5-year anniversary after having been started in 2009. CW-1 explained that, by December 2014, RAC had to roll SIMS out into production in order to continue holding it as an asset on its balance sheet. *See* discussion at ¶¶ 53-61. CW-1 further explained that if the Company failed to do so, it would be forced to take a substantial write off on SIMS, as its technology was already outdated by late 2014.  CW-1 added that instead of taking the write off, the Company decided to roll out what they had, and hoped to make it work as they went along.

64.     CW-1 also stated that it was common knowledge within RAC headquarters in Plano, Texas that the POS system was "not ready for primetime," and that internally the POS acronym was widely joked as standing for "Piece of S***." CW-1 said the POS system had "nothing but problems" before it was rolled out, and such problems continued as the Company rolled it out to additional RAC stores. CW-1 explained that before the SIMS system was pilot tested in 2014, the Oracle-based operating system and database the new POS ran on was already considered to be at "end of life." CW-1 added that this information was well-known internally.

65.     CW-1 further explained that a major problem with SIMS was that newer software was increasingly unable to interact with the old Oracle-based operating system, and that it became increasingly more difficult and expensive to develop fixes for and service the newer software to make it work. Before CW-1 left the Company in June 2016, his boss, the Senior Director of Technical Operations (who reported directly to CTO Liebe) stated that "we are not going to get [SIMS] on track."

66.     CW-1 recalled that SIMS was first tested in one RAC store in Plano, Texas, beginning in December 2014. CW-1 explained that this location was selected because of its

proximity to corporate headquarters, making it easier for IT personnel to arrive on location and troubleshoot as needed. CW-1 further stated that the new POS system:

(a)      did not meet RAC's needs at the first store in Plano, Texas, resulting in "hundreds of issues" which were reported in Root Cause Analysis Reports;

(b)      never improved much in terms of its overall functionality because as they were fixing one issue another one or two issues would arise;

(c)      did not work well in the 200 – 300 additional stores that it was rolled out to in the first half of 2015 and failed to meet the Company's initial base objective of having all stores reporting in real-time to a centralized corporate database; and

(d)      generally failed in the stores that it was rolled out to afterwards.

67.     CW-1 stated that he believed the "pilot program" referenced by Davis and Constant was the first 200 – 300 stores that the system was unsuccessfully implemented in during the first half of 2015. However, CW-1 said that he did not consider this to be an actual pilot program because that would consist of fixing major problems before a full rollout. CW-1 added that the Company did not fix the problems before implementation, and that major bugs were still being worked on through the end of his tenure in June 2016.

68.     CW-1 further recalled that the POS system was never successful even when RAC was telling the market that it was. CW-1 stated that Defendants used "Root Cause Analysis Reports," which CW-1 received and reviewed, to log issues that were encountered in the implementation of SIMS, and that these reports demonstrate the pervasive scope and type of issues the Company experienced. According to CW-1, these reports show that RAC was experiencing outages in the weeks prior and subsequent to the start of the Class Period – the

25

same time Defendants were reporting the successful implementation of SIMS in the first pilot store.

69.     According to CW-1, adequate security measures were not able to be properly implemented due to the old age of the operating system. CW-1 stated that the POS system had little ability to protect RAC customers' credit and personally identifying information because RAC was not Payment Card Industry ("PCI") compliant when he left the Company in June 2016.[10]  In order to adequately secure information on the system, CW-1 said that RAC would have had to first upgrade or migrate the system to later versions of the Oracle operating system at a significant cost - which the Company had chosen not to do.

70.     RAC  also initially intended to implement the new POS in the Company's Acceptance Now's kiosks which were, according to CW-1, then operating with outdated High Touch software. However, that plan was scrapped when the development and rollout of the POS was plagued with problems and, as a result, CW-1 said that RAC still continues to pay High Touch to keep Acceptance Now's systems functioning.

71.     CW-2 independently corroborated statements made by CW-1, including:

(a)     SIMS had been in development since approximately 2009;

(b)     witnessing problems with the POS system, including intermittent outages of varying lengths and degrees, throughout the testing and development process, as well as scalability issues and open defects, during his tenure (which ended when SIMS was rolled out to the final Core stores);

---

[10] The Payment Card Industry Data Security Standard (PCI DSS) applies to companies of any size that accept credit card payments. If a company accepts credit card payments, and stores, processes, and transmits cardholder data, it needs to host its data securely with a PCI compliant hosting provider.

(c)      the use by Defendants of color-coded SIMS reports, which employed a green/yellow/red coding system; and

(d)      that Individual Defendants would have been made aware of issues relating to the rollout of SIMS.

72.      CW-2 also stated that the POS system was essential to the Company's Core U.S. operations, including managing RAC's inventory, collections, customer relationships, general ledger, and payment tracking.  CW-2 confirmed that the idea behind SIMS was to centralize all of RAC's needs, instead of managing those needs on a store-by-store basis, and provide RAC with the ability to adjust pricing in real-time and conduct e-commerce.

73.      CW-2 confirmed that even <u>before</u> creating a timeline for the rollout, RAC had already spent at least $100 million dollars developing the POS system. CW-2 described the problems encountered by RAC in implementing the POS, including system outages and scalability issues, and said that because SIMS was a centralized system, it would logically have had more of an effect on RAC's overall revenue than the prior POS system, which was store-centric. The implementation of the new POS exposed the Company to systemic issues because, under the former operating system, IT issues were isolated to one store.  CW-2 reported that the Company knew that the risk of outages would be magnified once the POS was fully implemented if certain store level redundancies were not installed. These redundancies were still being discussed, but were not fully in place at the time CW-2 left RAC in June 2016.   This lack of redundancies did seriously and negatively affect collection efforts in the third quarter of 2016 when the system experienced Company-wide capacity outages.

74.      According to CW-2, Defendant Davis was involved in the POS project from "the onset." Davis and Constant were both members of and participated in meetings held by the

"SIMS Executive Steering Committee." CW-2 described this Committee as a "C-level meeting" wherein SIMS' progress and issues were discussed. CW-2 further recalled that Davis and Constant sometimes attended weekly SIMS project team meetings. CW-2 also recounted that Davis held weekly meetings with his CIO Nell until April 2016 where SIMS was always discussed. CW-2 stated that as the SIMS rollout accelerated, and more issues arose, Davis' involvement increased. CW-2 further stated that Davis and Constant were kept aware of any issues the technology team was encountering with implementing SIMS.

### D.   Defendants Failed to Disclose Information Required Under Item 303 of SEC Regulation S-K

75.     In addition, Item 303 of SEC Regulation S-K requires the Company's quarterly and annual SEC filings to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).

76.     Similarly, the regulation required the Company to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. § 229.303(a)(3)(i).

77.     In violation of Item 303, the Company's SEC filings during the Class Period failed to disclose that: (i) the POS system was running on an outdated Oracle- based operating system which made implementing any changes or upgrades extremely difficult and expensive and substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system; (ii) the POS system was not advanced enough in early 2015 even for pilot testing and still required substantial development efforts and

modifications to make it compatible for Company-wide use; (iii) the POS system lacked sufficient redundancies which would magnify any problems encountered during the implementation; (iv) by the first quarter of 2016, the problems with the POS system were serious enough to negatively impact the Company's collection efforts on a Company-wide basis, and, thus, negatively impact RAC's financial results; and (v) RAC's projected growth strategy was unsustainable if the Company was unable to adequately collect overdue amounts in its rent-to-own portfolio. Further, RAC failed to disclose not only the importance of the POS system to many of its other strategic initiatives.

78.    Moreover, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendants Davis and Constant signed certifications appearing in RAC's mandatory periodic filings with the SEC throughout the Class Period, stating those filings did not contain false and misleading statements. Defendants Davis and Constant signed these certifications in connection with RAC's:

      (a)    Form 10-K, filed March 2, 2015;

      (b)    Form 10-Q, filed May 1, 2015;

      (c)    Form 10-Q, filed August 10, 2015;

      (d)    Form 10-Q, filed November 9, 2015;

      (e)    Form 10-K, filed February 29, 2016;

      (f)    Form 10-Q, filed April 29, 2016; and

      (g)    Form 10-Q, filed August 1, 2016.

79.    Specifically, Defendants Davis and Constant certified that "the information contained in [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of the Company." Moreover, Defendants Davis and Constant certified that

these SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by [those] report."

## VI.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.   Fourth Quarter and Full Year 2014 Results

80.     The Class Period begins on February 2, 2015.  On that date, RAC issued a press release announcing financial results for the quarter and year ended December 31, 2014. Among other things, Davis was quoted in the press release stating, in part:

> ***New POS system is fully operational in its first site*** following the system-wide implementation of the back office solution.
>
> *      *      *
>
> As a result, our resolve is strengthened in the pursuit of that balance and the urgency remains high in delivering on the initiatives and results that we have promised. To that end, our focus is on improving operational execution by implementing a new labor model for our Core U.S. stores, developing a new supply chain and implementing a customer-focused value-based pricing strategy.[11]

81.     Then, on February 3, 2015, during the trading day, the Company hosted a conference call to discuss its fourth quarter 2014 earnings.  During the call, Defendants touted the successful implementation of RAC's new POS system. Specifically, Davis stated, in part:

> As you know, we have been in the development of a massive technology project, inclusive of our core business POS system, which is critical to supporting our growth. ***I am excited to say the new POS system is now fully operational in its first site.*** This follows the successful and limitation [sic] of the back-office portion of the project last fall.
>
> And in the coming days, the new POS system will be further deployed to its first district, with systemwide deployment to follow thereafter.

---

[11] All emphasis has been added unless otherwise noted.

*     *     *

Our key initiatives have moved from the planning stage to the implementation stage and are set to provide meaningful results in 2015.

82.     On March 2, 2015, the Company filed its annual report on Form 10-K for the quarter and year ended December 31, 2014.  In its Form 10-K, the Company discussed the various growth strategies, many of which were tied to the successful implementation of SIMS. However, the Company failed to mention the pervasive issues the Company was having with the development and rollout of SIMS and how the Enterprise corporate management system was linked to SIMS' performance:

> *Technology Investments-* We are also in the process of implementing our new store information management system and processes that extend and improve capabilities for store sales and operations. In the fourth quarter of 2014, we implemented our Enterprise corporate management system which integrates key corporate back-office systems, such as our financial reporting and inventory management systems, as well as collects and consolidates critical business data from all store operations.

83.     The 2014 Form 10-K also addressed certain risks relating to the POS system:

> Our operations are dependent on effective management information systems. Failure of these systems *could* negatively impact our ability to manage store operations, which *could* have a material adverse effect on our business, financial condition and results of operations.

> We utilize integrated management information systems. The efficient operation of our business is dependent on these systems to effectively manage our financial and operational data. The failure of our management information systems to perform as designed, loss of data or any interruption of our management information systems for a significant period of time *could* disrupt our business. *If* the management information systems sustain repeated failures, we *may not be able to* manage our store operations, which *could* have a material adverse effect on our business, financial condition and results of operations.

> We are currently investing in the development of new store information management systems and processes that extend and

31

improve capabilities for store sales and operations. Such enhancements to or replacement of our store information management systems **could** have a significant impact on our ability to conduct our core business operations and increase our risk of loss resulting from disruptions of normal operating processes and procedures that **may** occur during the implementation of new technology. We can make no assurances that the costs of investments in our new store information management systems will not exceed estimates, that such systems and processes will be implemented without material disruption, or that such systems and processes will be as beneficial as predicted. **If** any of these events occur, our results of operations **could** be harmed.

\*       \*       \*

Changes in Internal Control over Financial Reporting

We are in the process of implementing a new store management information technology system. As a part of this effort, during the year ended December 31, 2014, we implemented internally-developed computer software for our Enterprise corporate management system. The Enterprise system manages integrations with key corporate back-office systems such as our financial reporting and inventory management systems as well as collects and consolidates critical business data from all store operations.

The implementation of the Enterprise system resulted in changes to our business processes and related internal controls over financial reporting. Management took steps to update the design and documentation of internal control processes and procedures relating to the system update to supplement and complement existing internal controls. Management will continue to monitor, evaluate and update the related processes and internal controls as necessary to ensure adequate internal control over financial reporting.

Other than as described above, for the year ended December 31, 2014, there have been no changes in our internal control over financial reporting . . . that, in the aggregate, have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

84.     On April 20, 2015, Laura Champine of Cantor Fitzgerald issued an analyst report titled "Catalysts for Profit Margin Expansion Are in Place; Initiating [coverage] with a Buy and $38 [Price Target]." In her report, Ms. Champine reported the following:

Already a leader in the $9B U.S. rent-to-own market, the company is undergoing multiple initiatives that we believe will drive substantial profit margin expansion over the next five years.

\*     \*     \*

At 12x our 2015 EPS estimate and 8x 2015E EV/EBITDA, shares do not appear to fully reflect the operating margin expansion we anticipate over the next five years.

\*     \*     \*

Since Robert Davis was named CEO in February 2014 and CFO Guy Constant arrived in June 2014, the company has launched a number of initiatives that we believe will drive significant profitability gains over the next five years.

\*     \*     \*

Any disruption in the rollout of the company's new POS system could negatively impact sales and inventory.

85.     Defendants' statements, set forth in ¶¶ 80-83 above, were false and misleading when made because, as described in ¶¶ 43-52, 62-74 above, Defendants knew but failed to disclose that:

(a)     the POS system was running on an outdated Oracle operating system that made implementing any changes or upgrades both extremely difficult and expensive and substantially increased the likelihood of   problems, including system outages and incompatibilities, during the general rollout of the system;

(b)     the POS system lacked sufficient store-level redundancies, which magnified the problems encountered during the implementation;

(c)     the POS system was not advanced enough in early 2015 even for pilot testing and still required substantial development efforts and modifications to make it compatible for Company-wide use; and

(d)      the problems with the POS system, including intermittent outages, were serious enough to at least warrant additional testing before the program was expanded to other pilot stores.

86.      Further, the Company's disclosures in ¶ 83 about the risks of the implementation of the POS system were materially false and misleading when issued as the Defendants knew or were reckless in not knowing that the Company was not "at risk" of the POS not performing as designed or sustaining failures but this was already happening during in-house testing and in the pilot stores where the system was implemented. Further, Defendants knew or were reckless in not knowing that the Oracle-based operating system the new POS system ran on were already considered to be at "end of life." Further, Defendants knew or were reckless in not knowing that the age of the Oracle-based operating system that SIMS was built on was causing it to clash with the current versions of software that it needed to interact with.

**B.      First Quarter Fiscal 2015 Results**

87.      On April 27, 2015 the Company issued a press release announcing its financial results for the quarter ended March 31, 2015.  The press release disclosed that the POS system was now ***"fully operational"*** in 34 stores. Davis stated, in part: "Our multi-year plan to improve the profitability and performance of our Core business continues to build momentum on a number of fronts."

88.      On April 28, 2015,  before the market opened, the Company hosted a conference call to discuss its results for the first quarter ended March 31, 2015.  During the call, with respect to the Company's implementation of SIMS, Davis stated, in part:

> Following the successful pilot tests of our new POS system last quarter, today I'm proud to say that 34 stores are running the new system exclusively as an expanded pilot. General deployment of our new POS system through the remainder of our Core US RTO stores

will start midyear and continue throughout this year, giving us the tools to understand and serve customers like never before.

89.     After the question and answer portion of the conference call (the "Q&A"), Davis stated, in part:

> As you can see by the results, we are pleased with the quarter. However, we recognize there's opportunity for continued improvement in some of the areas we discussed: margins, losses that continue to trend more positively than it has last couple of quarters. So, overall very pleased, and *we are on the cusp of -- the next couple of quarters -- some of our strategic initiatives coming online and having a meaningful impact to the Business*.

90.     On April 28, 2015, Laura Champine of Cantor Fitzgerald issued a "Company Update" in a report titled: "We Are Raising Our Price Target To $43 As Momentum Builds." In her report, Ms. Champine justified the 13% target price increase from $38 (initiated just eight days prior),  based on a DCF, or discounted cash flow model, as well as RAC's Q1 2015 results.

91.     On May 1, 2015, the Company filed its quarterly report on Form 10-Q for the first quarter ended March 31, 2015. The 10-Q contained the same disclosures regarding the POS implementation as the December 31, 2014 Form 10-K, with one exception. The 10-Q stated, in part:

> We are also in the process of implementing our new store information management system and processes that extend and improve capabilities for store sales and operations. This system is fully operational in ten stores at March 31, 2015, with general deployment starting mid-year.

92.     Defendants' statements, set forth in ¶¶ 87-89, 91 above, were false and misleading when made because, as described in ¶¶ 43-52, 62-74 above, Defendants knew but failed to disclose that:

(a)     the POS system was running on an outdated Oracle operating system that made implementing any changes or upgrades both extremely difficult and expensive and

substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system;

(b)    the POS system lacked sufficient store-level redundancies which magnified the problems encountered during the implementation;

(c)    the POS system was not advanced enough for pilot testing or larger scale implementation and still required substantial development efforts and modifications to make it compatible for Company-wide use;

(d)    the problems with the POS system, including intermittent outages, were serious enough to at least warrant additional testing before the program was expanded to other pilot stores; and

(e)    although the Company had rolled SIMS out to 34 stores, it was only functional at some level in 10 stores.

93.    Further, the Company's disclosures in ¶ 91 about the risks of the implementation of the POS system were materially false and misleading when issued as the Defendants knew or were reckless in not knowing that the Company was not merely "at risk" of the POS not performing as designed or sustaining "repeated failures" as this was already happening during in-house testing and in the pilot stores where the system was implemented. Further, Defendants knew or were reckless in not knowing that the Oracle-based operating system the new POS system ran on was already considered to be at "end of life." Further, Defendants knew or were reckless in not knowing that the age of the Oracle operating system that the POS system was built on was causing it to clash with current versions of software that it needed to interact with.

C.     **Second Quarter Fiscal 2015 Results**

94.     On July 27, 2015, the Company issued a press release announcing its financial results for the quarter ended June 30, 2015.  The press release stated, in part:  "New point-of-sale system - the pilot has been expanded to approximately 150 stores."

\*          \*          \*

> *We continue to see progress toward transforming our Core business* . . . . Our Core U.S. business had a second consecutive quarter of positive same store sales, and lower costs helped us achieve improved profitability.

95.     On July 28, 2015, before the market opened, the Company hosted a conference call to discuss its second quarter 2015 results.  During the call, with respect to the Company's implementation of SIMS, Davis stated, in part:

> Regarding our new point-of-sale system, the pilot has been expanded with 150 core US stores running the new system exclusively. We expect general deployment of our new POS system to the remainder of our core US RTO stores to be complete by year-end, pending success at specific milestones. Our new system will provide us with tools to better serve our customers.

96.     After the Q&A portion of the call, Davis stated: "Again, we are very pleased with our second-quarter results and optimistic about our future, again, particularly given that two of our largest strategic initiatives are just now getting started in earnest."

97.     Following the earnings call, Laura Champine of Cantor Fitzgerald issued a Company Update on July 28, 2015 titled: "Initiatives Position RCII for Substantial Margin Expansion; [Price Target] Increases to $45." In her report, Ms. Champine stated the following:

> We remain bullish on Rent-A-Center shares, and we are adjusting our price target higher to $45 as 2Q results were in line with our estimates, *and the company continues to make progress on multiple initiatives we expect will drive substantial EBIT margin expansion over the next five years*.

\*          \*          \*

37

We are raising our price target to $45 from $43 based on our discounted NOPAT model. ***This reflects an average increase of 6% to our long-term EBIT projections***.

98.     On August 10, 2015, the Company filed its quarterly report on Form 10-Q for the second quarter ended June 30, 2015. The 10-Q contained the same disclosures regarding the POS implementation as the December 31, 2014 Form 10-K, with one exception. That is, the 10-Q stated, in part:

We are also in the process of implementing our new store information management system and processes that extend and improve capabilities for store sales and operations. ***This system is operational in 34 stores at June 30, 2015, with general deployment starting in the second half of 2015 pending success at specific milestones***.

99.     Defendants' statements, set forth in ¶¶ 94-96, 98 above, were false and misleading when made because, as described in ¶¶ 43-52, 62-74 above, Defendants knew but failed to disclose that:

(a)     the POS system was running on an outdated Oracle operating system which made implementing any changes or upgrades both extremely difficult and expensive and substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system;

(b)     the POS system lacked sufficient store-level redundancies which magnified the  problems encountered during the implementation;

(c)     the POS system was experiencing significant problems during testing and still required substantial development efforts and modifications to make it compatible for Company-wide use;

(d)     the problems with the POS system were serious enough to at least warrant additional testing before the program was expanded to any additional stores; and

(e)     although the Company had rolled SIMS out to 150 stores, it was only functional at some level in 34 stores.

100.    Further, the Company's disclosures in ¶ 98 about the risks of the implementation of the POS system were materially false and misleading when issued as the Defendants knew or were reckless in not knowing that the Company was not merely "at risk" of the POS not performing as designed or sustaining "repeated failures" as this was already occurring during in-house testing and in the pilot stores where the system was implemented. Further, Defendants knew or were reckless in not knowing that the Oracle-based operating system the new POS system ran on was already considered to be at "end of life." Further, Defendants knew or were reckless in not knowing that the age of the Oracle operating system that the POS system was built on was causing it to clash with current versions of software that it needed to interact with.

### D.     Third Quarter Fiscal 2015 Results

101.    On October 26, 2015 the Company issued a press release announcing its financial results for the quarter ended September 30, 2015.  The press release stated, in part that "Core U.S. same store sales decreased by 0.2 percent, representing an improvement of 340 basis points compared to prior year" and that the "New point-of-sale system - the pilot has been expanded and is now in 8.5 percent of Core U.S. stores." Again, Defendants failed to mention any issues with the POS implementation.

102.    On October 27, 2015, before the market opened, the Company hosted a conference call to discuss its third quarter 2015 financial results. When asked why the Company's earnings guidance for Q4 2015 had decreased from the previous quarter and whether "something else is happening impacting the guidance," Constant failed to disclose the pervasive issues that the Company was experiencing with SIMS' implementation, as well as its effect on collections, instead replying:

> No, it's really those three factors I mentioned in my remarks . . . it's the Core comp expectation being just a little bit lower than we might have thought, related to the portfolio question I got earlier; a little clarification on where we're going to be with Acceptance Now comps, as we get more color into the lap of the 90-day option; and then the losses related to Acceptance Now.

103.    When pressed for clarification on the drivers of the negative impact to Core U.S. sales  in Q4 2015, Constant again failed to disclose the true reasons behind the reduced guidance, stating only:

> I think I mentioned earlier, Laura [Champine of Cantor Fitzgerald], I think the portfolio's not quite as good as it was at the start of the quarter, and I don't want that to sound alarming. ***It's not in bad shape. But it's not quite as good as it was at the start of the quarter.*** And so, that's why we've made what I call more of an adjustment down from expecting flat comps to being flat to down 1%. It's not a dramatic reduction in our expectation, but it is more in line with what we expect now.

104.    On November 9, 2015, the Company filed its quarterly report on Form 10-Q for the quarter ended September 30, 2015. The 10-Q repeated the same disclosures regarding the POS implementation as in the December 31, 2014 10-K, with one exception. The 10-Q stated, in part:

> We are also in the process of implementing our new store information management system and processes that extend and improve capabilities for store sales and operations. ***This system is operational in 8.5% of our Core U.S. stores at September 30, 2015, with general deployment starting in early 2016 to minimize impact on our fourth quarter holiday season.***

105.    Defendants' statements, set forth in ¶¶ 101-104 above, were false and misleading when made because, as described in ¶¶ 43-52, 62-74 above, Defendants knew but failed to disclose that:

(a)    the POS system was running on an outdated Oracle-based operating system which made implementing any changes or upgrades both extremely difficult and

expensive and substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system;

(b)     the POS system lacked sufficient store-level redundancies which magnified the problems encountered during the implementation;

(c)     the POS system was experiencing significant problems during testing and still required substantial developmental efforts and modifications to make it compatible for Company-wide use;

(d)     the problems with SIMS were serious enough to at least warrant additional testing before the program was expanded to other stores; and

(e)     although the system had been implemented in 8.5% of stores, it was not "operational" in the majority of those stores at that time.

106.    Further, the Company's disclosures in ¶ 104 about the risks of the implementation of the POS system were materially false and misleading when issued as the Defendants knew or were reckless in not knowing that the Company was not just "at risk" of the POS not performing as designed or sustaining "repeated failures" as this was already being witnessed during in-house testing and at the pilot stores where the system was implemented, though not fully "operational." Further, Defendants knew or were reckless in not knowing that the Oracle-based operating system that SIMS ran on was already considered to be at "end of life." Further, Defendants knew or were reckless in not knowing that the age of the technology that the POS system was built on was causing it to clash with current versions of software that it needed to interact with.

### E.     The Truth Begins to Emerge, But Defendants Continue to Mislead the Market On the Severity and Impact of the POS Issues

#### 1.     Details of the Severity of POS System Implementation Problems Slowly Emerge

##### (a)     Results for Year Ended December 31, 2015 (Partial Corrective Disclosure)

107.     On February 1, 2016, after the market closed, the Company issued a press release announcing financial results for the quarter and year ended December 31, 2015.  In a partial disclosure of the truth, the Company disclosed that in the fourth quarter 2015, RAC took a massive one-time impairment charge against its intangible asset "goodwill" of $1.17 billion. The Company's press release focused largely on the resultant impact, but did not address the serious and persistent problems the Company was facing with SIMS' implementation. Instead, the Company only revealed that its financial results were lower than expected:

> Our results are not where we want them to be, however, the Rent-A-Center team has made significant progress on a number of fronts. We are now two years into our multi-year transformation and we are making the necessary changes to improve our profitability to drive the long-term success of Rent-A-Center. Our goals continue to be delivering improved profitability in our Core rent-to-own business, maximizing the Acceptance Now revenue growth and profit opportunity, and optimizing our Mexico business.
>
> *          *          *
>
> Quarterly Operating Performance
>
> CORE U.S. fourth quarter revenues of $573.8 million decreased 4.5 percent year over year primarily due to the continued rationalization of our Core U.S. store base and lower same store sales. Gross profit as a percent of total revenue was negatively impacted by lower gross profit margin on merchandise sales. Labor, as a percent of store revenue, was positively impacted by improved labor productivity, the flexible labor initiative, and lower incentive compensation. Other store expenses, as a percent of store revenue, were negatively impacted by higher advertising expenses, partially offset by lower losses and lower gas prices.

108.    On February 2, 2016, before the market opened, the Company hosted a conference call to discuss its quarterly and annual results for the period ended December 31, 2015 and its outlook for fiscal 2016.   During the call, Davis made a number of reassuring comments about the Company's strategic initiatives, including:

> We do believe that we are making the necessary changes to address this changing environment and improve our overall profitability for the future success of Rent-A-Center. *We're now two years into our multi-year transformation strategy, with the plan to deliver improved profitability in our core rent-to-own business*, maximize the Acceptance Now revenue growth and profit opportunity and optimize our Mexico business.

109.    As part of his prepared remarks, Constant delivered a less rosy outlook for 2016, including the first partial acknowledgement of issues with the POS implementation:

> We expect the year-over-year declines in core revenues to the weakest in the first quarter, coming in at approximately $575 million to $590 million, *as we absorb the short-term impact* <u>as seen in tests of the rollout of our new point-of-sale system to our core store network. This will result in a projected first quarter year-over-year earnings-per-share decrease of over 20%.</u>[12]

110.    During the Q&A portion of the call, Constant was asked for more details about the material negative impact expected from the POS rollout, including the expected 20% decrease in year-over-year earnings in RAC's critical Core U.S. segment. Constant replied:

> <u>Yes, that's correct, we expect the EPS to be down more than 20%.</u> It's basically related to revenues in the core business that we think will come in between $575 million and $590 million. *What we've seen as we have tested the rollout of our new point-of-sale system is we see a pretty short-term impact, just given the activity associated with putting in new point-of-sale system in the stores*.
>
> Very quickly the stores get up to speed and we end up with a better point-of-sale system that allows them to be more efficient to process transactions quicker and to deal with customers better. But, as with any change of that significance in the store, you do get a little bit of a short-term impact. So as we roll that out in full force here in the first

---

[12]   Underlined text indicates corrective language in the cited disclosures.

quarter, we would expect to see a little bit of impact to revenue which would go away then in the back half of the year. [13]

111.    In responding to a question concerning the rationale for the expected losses on the POS implementation, Davis refused to acknowledge the persistent systemic issues with the POS system, blaming losses only on installation and training time.  Davis also assured investors that all issues encountered during POS testing had been fixed:

> We've tested in 385 locations now, so pretty substantial test and so we have a very good knowledge of what we see in terms of the impact on the stores. **We've done numerous upgrades and additions to the system through the testing process that's improved any of the areas where we were seeing challenges.**
>
> No, the commentary is more around just the change that occurs when you're asking people that are operating the point-of-sale system every day to change what they're doing. Even though it's much more intuitive and much easier to use than the old system was, there will be a period of change. And so that distraction that we see for a fairly short period of time is what we factored into the commentary around first-quarter revenue.

112.    In reaction to these disclosures, RAC's stock price fell from a close on February 1, 2016 of $13.28 per share to a close on February 2, 2016 of $9.89 per share or approximately 25% on unusually high trading volume of 7.8 million shares, as compared with average year-to-date daily volume of 1.2 million shares prior to the announcement, and 2.0 million shares per day during the remainder of February 2016.

113.    Following the earnings release and conference call with management, on February 2, 2016 Bradley B. Thomas of KeyBanc issued an analyst report on RAC entitled "RCII: 4Q Results Soft; Dividend Lowered."  Thomas reported that:

> For the 1Q, management expects EPS to be down at least 20%. This implies 1Q EPS of $0.41 or lower, which compares to the current consensus of $0.51. Total sales in the core segment are expected to be

---

[13] Although Defendants may claim this is a forward-looking statement, Plaintiffs allege that it was made with actual knowledge of its falsity.

down 6-9% (to $575 million-$590 million), partially as a result of sales disruptions associated with the rollout of the Company's new POS system. The rollout is expected to be completed by the late-1Q/early-2Q.

114.    On February 29, 2016, the Company filed its annual Form 10-K for the year ended December 31, 2015. In its 10-K, RAC adjusted its disclosure concerning the POS implementation:

Our operations are dependent on effective management information systems. Failure of these systems *could* negatively impact our business, financial condition and results of operations.

\* \* \*

We are currently investing in new information technology systems and implementing modifications and upgrades to existing systems to support our growth plan. These investments include replacing legacy systems, making changes to existing systems, building redundancies, and acquiring new systems and hardware with updated functionality. ***We are taking appropriate actions to ensure the successful implementation of these initiatives, including the testing of new systems and the transfer of existing data, with minimal disruptions to the business***. These efforts ***may*** take longer ***and may*** require greater financial and other resources than anticipated, ***may cause distraction*** of key personnel, ***may cause disruptions*** to our existing systems and our business, ***and may not provide*** the anticipated benefits. The disruption in our information technology systems, or our inability to improve, upgrade, integrate or expand our systems to meet our evolving business requirements, ***could*** impair our ability to achieve critical strategic initiatives and ***could*** materially adversely impact our business, financial condition and results of operations.

115.    The Form 10-K also contained an updated internal controls section specifically relating to the new POS system which stated:

Changes in Internal Control over Financial Reporting

We are in the process of implementing a new Store Information Management System in all of our Core U.S. rent-to-own stores. We have approximately 385 of our 2,627 Core U.S. rent-to-own stores on the new system as of December 31, 2015, and we expect to complete the roll out to the remaining stores in 2016. The Store Information Management System manages key business processes in the store such

45

as sales, customer account management, cash management and inventory management and will result in changes to these business processes and related internal controls over financial reporting. In addition, as a result of the transition to a third-party logistics model in 2015, there were inventory-related business process changes, resulting in changes to certain internal controls over inventory. ***Management took the necessary steps to update the design and documentation of internal control processes and procedures relating to both the system update and the new distribution network to supplement and complement existing internal controls.*** Further, management will continue to monitor, evaluate and update the related processes and internal controls as necessary during the system implementation period to ensure adequate internal control over financial reporting.

116.    Defendants' statements, set forth in ¶¶ 107-111, 114-115 above, were false and misleading when made because, as described in ¶¶ 43-52, 62-74 above, Defendants knew but failed to disclose that:

(a)     the POS system was running on an outdated Oracle-based operating system which made implementing any changes or upgrades both extremely difficult and expensive and substantially increased the likelihood of  problems, including system outages and incompatibilities, during the general rollout of the system;

(b)     the "upgrades and additions to the system" implemented by the Company in the fourth quarter of 2015 had not ameliorated the pervasive performance issues and compatibility problems with the POS system and the system still required substantial modifications to make it compatible for Company-wide use;

(c)     the problems with the POS system were serious enough to negatively impact the Company's collection efforts on a Company-wide basis, and, thus, negatively impact RAC's rent-to-own portfolio and its financial results;

(d)     the success of SIMS was linked to many of the Company's strategic initiatives, and its failure would directly and negatively impact those initiatives; and

(e)     RAC's projected growth strategy was unsustainable if the Company was unable to adequately monitor and collect overdue amounts in its rent-to-own portfolio.

117.    Further, the Company's disclosures in ¶ 114 about the risks of the implementation of the POS system were materially false and misleading when issued as the Defendants knew or were reckless in not knowing that the Company was not just "at risk" of the POS not performing as designed or sustaining "repeated failures" as this was already happening during in-house testing and in the pilot stores where the system was implemented. Further, Defendants knew or were reckless in not knowing that the Oracle-based operating system the new POS system ran on was already considered to be at "end of life." Further, Defendants knew or were reckless in not knowing that the age of the operating system that SIMS was built on was causing it to clash with current versions of software and other technology that it needed to interact with.

### (b)     First Quarter Ended March 31, 2016 (Partial Corrective Disclosure)

118.    On April 27, 2016, after the market closed, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2016.  The press release stated, in part:

> CORE U.S. first quarter revenues of $584.4 million decreased 7.1 percent year over year primarily due to lower same store sales and the continued rationalization of our Core U.S. store base. In addition, the new point of sale system was rolled out to fewer locations than expected in the quarter, *which allowed for implementation of identified system enhancements*. Gross profit as a percent of total revenue increased 40 basis points and was positively impacted by our pricing and supply chain initiatives, and revenue mix.

119.    On April 28, 2016, before the market opened, the Company hosted a conference call to discuss its second quarter 2016 financial results.  During the call, Davis stated, in part:

> Our sales results were negatively impacted by the further deterioration in [oil]-affected markets, including our Texas stores across both core and Acceptance Now which were down 10% each as well as the

impact of the onset of the new point-of-sale system roll out in the quarter. Additionally we made a deliberate decision to be more disciplined, selective and strategic with our pricing and promotional strategies, which as expected, impacted sales but benefited gross margins.

*     *     *

Last quarter we got into lower core sales in Q1 because of the impact of our new point-of-sale system. During the initial roll out phase, we experienced a greater-than-expected impact of sales so we made the decision to delay the timing of the roll out *and address opportunity areas*. *We have made those changes* and have restarted the POS roll out this quarter with the plan to have the system fully implemented by the end of Q3. Today approximately one-third of our core stores *are operating* this new POS system.

120.    Constant also discussed details concerning the Company's credit segment, stating,

in part:

Our total US same-store sales, combining the Acceptance Now and core segments decreased 2.5% versus a year ago but on a two-year basis US same-store sales increased 5.5%. We continue to face headwinds in our oil-impacted markets with Texas stores down approximately 10% across both segments, as well as the onset in Q1 of the roll out of our new point-of-sale system. Looking at sales performance in our core segment more closely, total revenues were down 7.1% driven by a same store sales decline of 3.8% and a 5.6% reduction in store count from the prior period.

121.    During the Q&A portion of the call, in response to a question regarding the plan

for the continued rollout of the POS and how that might impact results, Constant stated:

[A]s we look at rolling out the POS system, we obviously want to a manage the impact we have on the stores and reduce the potential transition period impact over all to results. So, as we roll out stores every week, we are constantly monitoring the results to make sure it is landing well in our stores. Because it is a big change. While it is a system we believe provides better ease of use for our store co-workers and certainly gives us a platform to do a lot of things that we haven't been able do with our older system, there is a transition period, so we have to watch that very closely.

Now that being said, we don't anticipate now that the impact is going to be any more significant than we originally did, but clearly the

timing is a little bit different than we originally expected. So, your point that perhaps we didn't see as large an impact as we expected in Q1, we are likely to see a larger impact than we expected in Q2, but our overall guidance for the year has remained the same. So it is really just a shift of in terms of when the impact happened.

122.    Constant was asked to quantify the impact of the POS rollout on the overall decline in Core U.S. sales. In response, Constant listed a host of other reasons for the disappointing performance in the Core segment - downplaying problems with the POS system:

We didn't talk about that specifically, Brian, but we did talk a little about the specific categories. I think when you look at all the factors, computers still being down sort of to similar levels that we saw last quarter is a big driver. The performance in the oil-affected markets is a big driver.

As you might recall Texas is about 10% of our system in the core business and we saw sales in that market down over 10% which is an acceleration of where it was last quarter. So the math alone on that would tell you 100 basis points of the sales decline was specifically impact by oil affected markets.

And then what is a much more temporary impact, is that we saw a decline in Smartphones simply because we were not as in stock with the phones for the reasons Robert referenced on the call. You probably saw a similar impact related to the fact we were not in stock with Smartphones which we expect to see that rectified over the coming months. ***Those were the primary drivers of the sales decline in addition to the point of sale rollouts***.

123.    On April 28, 2016, RAC's stock price fell from its close on April 27, 2016 of $15.71 per share to a close of $13.70 per share on April 28, 2016 or approximately 12.8% on unusually high trading volume of 4.35 million shares as compared with 1.38 million shares per day in 2016 year-to-date.

124.    Following the earnings release and conference call with management, on April 28, 2016, Bradley Thomas of KeyBanc Capital Markets issued an analyst report on RAC entitled "RCII: Headwinds Persist, Numerous Efforts to Improve Profitability." In the report, Thomas wrote: "Management remains on plan for its full-year targets, but the POS rollout has been

pushed through to 3Q, given a greater than expected sales disruption in the 1Q."   Based on information disclosed during the earnings call, Thomas did not include "problems with the POS implementation" as one of the "headwinds" the Company was facing, and KeyBanc even increased the its earnings per share estimate for the RAC, stating: "RCII has numerous initiatives to support profitability for several years, including improved sourcing, labor optimization, improved supply chain, pricing and growth of ecommerce."

125.   On April 29, 2016, the Company filed its quarterly report on Form 10-Q for the first quarter ended March 31, 2016, which confirmed the financial results in the April 27 – 28, 2016 press release and earnings call. However, in explaining the decreased revenues in the Core U.S. segment, the Company made no mention of the POS rollout. Instead, the 10-Q pointed to "continued declines in the computer/tablet category, the impact resulting from the ongoing recast of the smartphone category, further deterioration in oil affected markets and lower merchandise sales revenue."   Also in the April 29, 2016 10-Q, the Company adjusted the disclosure made in the December 31, 2015 10-K concerning internal controls over the POS system. The Company replaced the prior, disclosure ¶ 83, with the following:

> *Changes in internal controls.* We are in the process of implementing a new Store Information Management System in all of our Core U.S. rent-to own stores in 2016. The Store Information Management System manages key business processes in the store such as sales, customer account management, cash management and inventory management and will result in changes to these business processes and related internal controls over financial reporting.

126.   Defendants' statements, set forth in ¶¶ 118-122, 125 above, were false and misleading when made because, as described in ¶¶ 43-52, 62-74 above, Defendants knew but failed to disclose that:

(a)   the POS system was running on an outdated Oracle-based operating system which made implementing any changes or upgrades both extremely difficult and

expensive and substantially increased the likelihood of  problems, including system outages and incompatibilities, during the general rollout of the system;

(b)      the "upgrades and additions to the system" implemented by the Company in the fourth quarter of 2015 had not ameliorated the pervasive performance issues and compatibility problems with the POS system and the system still required substantial modifications to make it compatible for Company-wide use;

(c)      the problems with the POS system were serious enough to negatively impact the Company's collections efforts on a Company-wide basis, and, thus, negatively impact RAC's rent-to-own portfolio and its financial results;

(d)      the success of SIMS was linked to many of the Company's strategic initiatives, and its failure would directly and negatively impact those initiatives; and

(e)      the POS system had failed on myriad occasions, including during the fourth quarter of 2015 and the first quarter of 2016;

(f)      the system performance and usability issues surrounding the POS system were not fixed prior to the restart of the rollout at the end of the quarter;

(g)      because of the focus on accelerating the roll out of the system despite its problems, the Company was not "constantly monitoring the results to make sure [SIMS was] landing well in our stores;"

(h)      the problems with the POS implementation were the primary driver of the bad results in Q1 2016;

(i)      the problems were not a mere "distraction," not due to human error or training, nor short-term in nature, and Defendants expected the implementation to negatively impact the Company's financial results for several quarters;

51

(j)    the problems with the POS system were serious enough to negatively impact the Company's collection efforts on a Company-wide basis, and, thus, negatively impact RAC's financial results; and

(k)    RAC's projected growth strategy was unsustainable if the Company was unable to adequately monitor and collect overdue amounts in its rent-to-own portfolio.

### (c)    Second Quarter Ended June 30, 2016 (Partial Corrective Disclosure)

127.    On July 27, 2016, after the market closed, in a partial corrective disclosure of the truth regarding the POS system rollout, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2016.  The press release stated, in part that "Core U.S. revenue decreased by 10.6 percent driven by the continued rationalization of our store base and same store sales. Core U.S. same store sales decreased by 6.7 percent driven by the impact and acceleration of the point of sale system rollout."  The Company also lowered its full-year guidance due to the negative impact of the POS implementation on Core revenues and portfolio growth.  Davis stated, in part:

> Although I am pleased with the progress made in several areas of our transformation, I am disappointed in our top line performance. The point of sale implementation negatively impacted Core revenue in the second quarter and reduced our portfolio making it necessary to revise our outlook for the year. ***However, the benefits of the system will play an important role in helping reinvigorate Core revenue in the future by enabling eCommerce and unlocking new pricing capabilities."***

128.    The press release went on to report:

> CORE U.S. second quarter revenues of $530.6 million decreased 10.6 percent year over year primarily due to lower same store sales and the continued rationalization of our store base. In addition, the new point of sale system implementation was completed earlier than expected and resulted in a negative impact on revenue. Gross profit as a percent of total revenue increased 120 basis points and was positively impacted by our pricing and supply chain initiatives, revenue mix, and a reduction in smartphone loss reserves. Labor, as a percent of store

52

revenue, was negatively impacted by sales deleverage, partially offset by improved labor productivity, and lower incentive compensation.

*       *       *

The Company now expects the following for the full year:

- Core revenue down 8.5% to 11.5% and Core same store sales down 5% to 8% due to the ongoing impact of the lower Core segment portfolio balance at the end of the quarter, <u>which was impacted primarily by the point of sale system rollout, and the continued rationalization of our store base</u>.

129.    On July 28, 2016, before the market opened, the Company hosted a conference call to discuss its second quarter 2016 financial results.  During the call, Davis stated, in part:

As you know, we have been very focused on our multi-year transformational strategy and I am pleased with the progress that we are making in several areas as we focus on profitable growth. However, I am extremely disappointed in our top-line performance and the short-term revised outlook. Our operational execution needs to improve in order to capitalize on opportunity areas to rebuild the top line while continuing to capture the revenue and productivity benefits from our key initiatives.

First, let me touch on a few of the items that impacted our top-line performance this quarter and the steps we are taking to improve the business. After our initial delay, in Q2 we completed the roll-out of our new POS system in the core business. Last quarter, we had said that the new system would be installed in all stores by Q3. However, ***given the dependencies of other critical initiatives and future anticipated benefits from those initiatives on completing the implementation, we decided to accelerate the roll-out, which was completed in its entirety in Q2***.

Despite our team's efforts to mitigate the negative impact of accelerating the implementation of the new system, the decline in core top-line results was more significant than we expected, making up over half of the second-quarter decline in core same-store sales. ***Although the system performance and usability issues identified in the first quarter were fixed, the distraction of the new system*** <u>impacted our core portfolio and took time away from collections efforts which resulted in a hit to revenues. Given the impact to the portfolio, we expect it to be a few quarters before we fully recover.</u>

53

That said, the distraction of a major system roll-out is now behind us, and we believe that longer-term benefits of our new system will outweigh the short-term costs. The new POS enables us to move forward with several growth opportunities to address the broader challenges in the core business.

\*     \*     \*

The new POS system also enables us to be more prescriptive on pricing, so that we can customize pricing elements by region and by product category to ensure our value proposition continues to be relevant to our customers. Although we are not happy with the negative impact from ***the distraction related to the roll-out of new POS system**, **we are excited about the opportunities it will continue to bring well into the future***.

\*     \*     \*

***Now that the fundamental work is completed***, our sourcing and distribution and flexible labor initiatives, as well as the POS roll-out distribution, we can shift more of our focus to these top-line opportunities.

130.     Constant also discussed the details concerning the Company's losses, and how those losses impacted RAC going forward, stating in part:

Looking at sales performance in our core US segment more closely, total revenues were down 10.6%, driven by a same-store sales decline of 6.7% and an 11.5% reduction in store count from the prior year. The same-store sales decline was primarily due to the accelerated roll-out of our point of sale system, as Robert described earlier, and the top-line impact associated with the recast of our smartphone category.

\*     \*     \*

As we look forward to the balance of 2016, we now expect the full-year core revenue to be down 8.5% to 11.5% and core same-store sales to be down between 5% and 8%. This is due to the ongoing impact of the lower core segment portfolio balance at the end of the second quarter, impacted primarily by the point of sale system roll-out and the continued rationalization of the store base.

131.     During the Q&A portion of the call, in responding to a question regarding whether staffing, and, specifically, the flexible (supplemental part-time employee) labor plan the Company was implementing was affecting results, Davis stated:

> Certainly there is some transition period that occurs as co-workers are coming into the new role. It requires some additional training and things of that nature. However, <u>it was evident to us as we moved through the second quarter, as we were rolling out the POS system, our deliveries were down as compared to prior periods during the roll-out phase as well as our collections efforts. So we believe that primarily the portfolio and the revenue is primarily impacted by the POS acceleration of the roll-out.</u>

132.    In response to a question regarding further risks from the POS implementation, and how the Company might recover, Constant replied, in part:

> You're right, the primarily impact that we're expecting for the balance of the year comes from the deterioration of the portfolio that you experience as you go through the transition to this new point of sale system. So that is the primary driver as we move forward. Not to mention some of the broader macro issues that are impacting the business, like credit availability, that don't appear to be lessening in any way.
>
> *   *   *
>
> We have the e-commerce initiative that's coming on, that we're piloting more right now. More from an operational point of view, just to make sure that it works and it functions properly when a customer does a transaction online. We expect to be able to roll that out fully to the system in the fourth quarter.
>
> And then I think the one that's perhaps not as obvious, but could be very meaningful, is Robert's point about how we are now past some of the major change that we've asked our operators to undergo in the last year or so. We've asked them to do a lot and to absorb a lot, to put the business in a better situation.
>
> And now that we're through that distraction, once we start to pour some sales into this model, the resulting profitability of it will be much better. We now believe our store co-workers will be able to focus much more so on the customer experience than they ever could before now that we're through the supply chain, labor, point of sale roll-out, store closure changes that we've made over the last 6 to 12 months.

133.    Davis replied to the final set of questions from an analyst regarding how the POS implementation could cause such financial harm *and* why the Company elected to expedite the

POS rollout if it has been projecting issues, including significant deterioration of earnings, since at least the beginning of 2016. Davis responded as follows:

> Yes, I think you eluded to it a little bit as to part of the rationale, we've been working on this system for a number of years. And as I mentioned in my prepared comments, there's a number of capabilities that we are unlocking by getting the POS system fully implemented and in place.
>
> And so it's really a two-part answer. One is just getting it behind us and eliminating the distraction and not allowing it to drag on throughout the balance of the year. So that's part of the answer. The second part is unlocking the pricing capabilities and opportunities that we have around tweaking our value proposition by market, by category, by region, by store that we've never been able to do before. As well as the e-commerce initiative.
>
> The fact that we're up in pilot in Q2 as a result of getting the POS system implemented allows us to learn sooner rather than later. And with e-commerce being a long-term benefit and revenue driver and providing the experience for consumers who like to shop online, we wanted to get the distraction behind us and get going sooner on these new capabilities. Those are the two reasons.

134.    The analyst again asked how the sales disruptions, which she believed would be short-term in nature based on statements made by Defendants during previous earnings calls, "led to such [a] significant sales drop-off." In response, Davis falsely reassured the market that the issues were corrected:

> I think with any large major system implementation, ***these things happen from time to time.*** But I think from our perspective, obviously with the benefit of 20/20 hindsight, the early-on pilots and ***the approach that we took to learn in the early stages had a lot more care and feeding, if you will, and hand-holding and oversight from multi-levels of management.***
>
> And as we accelerated the pilot, that opportunity to have that kind of care and feeding dissipated. The distraction at the store level, our multi-unit managers were not able to focus on their entire portfolio of stores and really focused on the conversions of the store that was transitioning to the new system. It really was a big burden, and that resulted in the result that we're reporting and the outlook that we have for the balance of the year.

> *Having said all that, that distraction is behind us*. The opportunities that we have moving forward, we're optimistic about it and excited for it. So it's unfortunate, but we're looking into the future and making sure that we're addressing the needs of the business and learning from these new capabilities.

135. Despite Defendants' attempts to reassure the market that the implementation issues were behind the Company, the partial revelation led to RAC's stock price falling from a close on July 27, 2016 of $13.26 per share to a close on July 28, 2016 of $10.92 per share – a decline of approximately 17.6% - on unusually high trading volume of 3.7 million shares as compared with the 2016 year-to-date daily average of 1.16 million shares preceding the partial disclosure.

136. Following the earnings release and conference call with management, on July 28, 2016, Bradley Thomas of KeyBanc Capital Markets issued an analyst report on RAC entitled "RCII: Results Pressured, Guidance Lowered." Thomas wrote:

> RCII reported soft 2Q EPS, as revenue and margins were below expectations. Comps in both the core and Acceptance Now segments decelerated, down 6.7% and 1.5%, respectively. Half of the decline in core comps was due to POS rollout, which was completed in 2Q. Going forward, we expect softer revenues (considering the lower base of merchandise out on rent), but we are optimistic that RCII will benefit from a focus on day-to-day "blocking and tackling," following a number of quarters of notable operational changes (including the POS rollout, labor model changes, and smartphone offer refinements).

> Outlook. Despite near-term revenue headwinds, RCII has numerous initiatives to support profitability for several years, including improved sourcing, labor optimization, improved supply chain, pricing, and growth of e-commerce. While we are hopeful that these opportunities can again drive profit growth at RCII, we believe the underlying fundamental headwinds are also likely to persist. These include pressure from a number of factors: 1) the health of the low-end customer; 2) cannibalization from growth of RTO kiosks; 3) broad trickle down of credit, both as a direct competitive threat and a factor negatively affecting customer debt levels; and 4) deflation in televisions, computers and tablets (which represented 42% of sales of core RCII in 2015).

137.    On August 1, 2016, the Company filed its quarterly report on Form 10-Q for the quarter ended June 30, 2016, which confirmed the financial results reported in the July 27 – 28, 2016 press release and earnings call. In explaining the decreased revenues in the Core U.S. segment during the quarter, the Company listed the problem with the POS rollout as primary reason for the revenue decline:

> The decrease in revenues for the three- and six-month periods ended June 30, 2016, was driven primarily by a decrease in rentals and fees revenue of $56.1 million and $93.7 million, respectively, as compared to 2015. This decrease is primarily due to the decrease in same store revenue for the period and the continued rationalization of our Core U.S. store base. The decrease in same store revenue was driven primarily by the acceleration and impact of our store information management system rollout, the impact resulting from the ongoing recast of the smartphone category, continued declines in the computer/tablet category, further deterioration in oil affected markets, and merged stores reentering the comp base. Same store revenue generally represents revenue earned in stores that were operated by us for 13 months or more.

138.    Defendants' statements, set forth in ¶¶ 127, 129, 132-134 above, were false and misleading when made because, as described in ¶¶ 43-52, 62-74 above, Defendants knew but failed to disclose:

(a)    the POS system was running on an outdated Oracle-based operating system which made implementing any changes or upgrades both extremely difficult and expensive and substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system;

(b)    the severity of the problems experienced during the accelerated rollout of the POS system, including that RAC was continuing to experience system-wide POS system outages, and that SIMS had failed on a myriad of occasions including during the first and second quarters of 2016;

(c)     the system performance and usability issues surrounding the POS system were not fixed prior to the accelerated rollout in the second quarter of 2016;

(d)     the problems were not a mere "distraction," not due to human error or training, nor short-term in nature, and Defendants expected the implementation to negatively impact the Company's financial results for several quarters;

(e)     the problems with the POS system were serious enough to negatively impact the Company's collection efforts on a Company-wide basis, and, thus, negatively impact RAC's financial results;

(f)     RAC's projected growth strategy was unsustainable if the Company was unable to adequately collect overdue amounts in its rent-to-own portfolio; and

(g)     problems with the POS rollout were not "behind" the Company, and were escalating at the time when Defendants tried to reassure the market that the issues were fixed.

## 2.     Raymond James N.A. Equities Conference – September 13, 2016

139.    On September 13, 2016, Defendants Davis and Constant presented at the Raymond James North American Equities Conference. Less than one month before the Company finally revealed the whole truth concerning the nature and extent of the damage sustained from the POS rollout, Davis made the following statement, in part:

> When it comes to the core, we're really focused across the spectrum in order to continue to try and improve the business. And while we don't think the core business will be a mid-single digit comp sales grower in the future, we do think that there remains a lot of ability to stabilize those sales and then utilize that cash flow to invest in other growth areas of the business.
>
> We recently rolled out a new store information management system. ***While that's having a short-term negative impact on sales***, it does set us up very well in the future to continue to grow the business. It provides us with a significant amount of flexibility now to price our transaction in a way that's attractive to our customers in order to drive

future sales as well as allowing us to manage our inventory in the store much more effectively.

140.   Davis' statements in ¶ 139 were materially false and misleading and omitted to disclose that by this point in the quarter, Davis knew or was reckless in not knowing that the losses from the POS implementation were the result of systemic outages, that resulted in its inability to take electronic payments and hindered RAC's ability to make collections, all of which resulted in material losses to the Core U.S. segment which would take "several quarters to fully recover from."

## VII.   THE FULL TRUTH IS REVEALED

141.   The full truth about the troubled POS implementation and its effects on the Company's revenues was not revealed until October 11, 2016 when the Company issued a press release announcing preliminary unaudited results for the third quarter ended September 30, 2016. The press release stated, in relevant part:

> The Company estimates Core U.S. same store sales for the three months ended September 30, 2016 to be down approximately 12%, and Acceptance Now same store sales to be essentially flat. Core U.S. gross profit, as a percent of total revenue, is estimated to be flat compared to the third quarter of last year as ongoing benefits from the changes made to the Company's sourcing model were offset by a third-quarter clearance event focused on previously-rented product. Diluted earnings per share for the third quarter 2016 on both a GAAP basis and excluding special items are expected to be between $0.05 and $0.15.
>
> 'Following the implementation of our new point-of-sale system, we experienced system performance issues and outages that resulted in a larger than expected negative impact on Core sales,' said Robert D. Davis, Chief Executive Officer of Rent-A-Center, Inc. 'While we expect it to take several quarters to fully recover from the impact to the Core portfolio, system performance has improved dramatically and we have started to see early indicators of collections improvement.'

142.   The market reaction was swift and negative. On October 11, 2016, RAC's stock price fell from a close on October 10, 2016 of $12.88 per share to a close on October 11, 2016 of

$9.18 per share – a decline of approximately 28.7% - on unusually high trading volume of 11.99 million shares as compared with the 2016 year-to-date daily average volume of 1.07 million shares.

143.     Following the Company's disclosure of the whole truth, on October 11, 2016 Bradley B. Thomas of KeyBanc issued an analyst report on RAC entitled  "RCII: 3Q Below Expectations, POS Issues."  There, Mr. Thomas reported that:

> This morning, RCII pre-announced its preliminary 3Q sales and expected EPS, below expectations with pressure from its recent POS rollout. . . . RCII attributed the miss to performance issues and outages from a new POS system (rolled out last quarter). While RCII valuation is inexpensive, we remain on the sidelines given the top-line challenges.
>
> *        *        *
>
> We are lowering our 2016 and 2017 estimates to reflect pre-announced 3Q16 results. Our 3Q16 and 4Q16 EPS estimates go to $0.12 and $0.32 from $0.39 and $0.42, respectively. As such, our 2016 EPS estimate goes to $1.32 from $1.70. For 2017, our EPS estimate goes to $1.32 from $1.75.

144.     Also on October 11, 2016, Wright Investors' Service issued a research report on RAC, making the following observations:

> During the second quarter of 2016, sales at [RAC] totalled [sic] $749.62 million. This is a drop of 8.1% from the $815.34 million in sales at the company during the second quarter in 2015. This was the biggest quarterly decline in sales at Rent A Center Incorporated in the previous 35 quarters.
>
> *        *        *
>
> In recent years, this stock has performed terribly. In 2013, the stock traded as high as $40.81, versus $12.72 on 10/7/2016. For the 52 weeks ending 10/7/2016, the stock of this company was down 49.5% to $12.72. During the past 13 weeks, the stock has increased 0.6%. During the past 52 weeks, the stock of Rent A Center Incorporated has performed worse than the three comparable companies, which saw changes between -37.7% and 12.7%. During the 12 months ending

> 6/30/2016, the company has experienced losses totalling [sic] $16.63 per share.

## VIII.   POST-CLASS PERIOD EVENTS

145.   Shortly after the disclosure, on October 13, 2016, Nick Mitchell and Sam Snyder of Northcoast Research Partners, LLC issued an analyst report entitled  "RCII: Another Quarter, Another Setback." Mitchell and Snyder stated:

> Rent-A-Center released disappointing preliminary 3Q16 results on Tuesday. Comparable sales in the Core U.S. segment slid ~12.0% in the period versus our estimate for a 6.4% decline.
>
> \*        \*        \*
>
> Management noted that the results were negatively impacted by the ongoing implementation of the new POS system. Specifically, the proprietary software did not perform optimally in the period, especially at peak usage, as the stores lost access to the platform numerous times throughout the quarter. This disruption hampered collection activities, which in turn pressured sales trends and past due balances. The company's decision to manage the past due accounts in-line with historical risk-management practices resulted in increased returns/pick-ups, which reduced the chain's inventory on-rent balance. While it sounds as if the glitches have been largely resolved, the incremental contraction in the rental portfolio will clearly weigh on revenue trends going forward given the recurring nature of the rental stream.

146.   On October 26, 2016, two-weeks after the Company issued the October 11, 2016 press release announcing preliminary results and disclosing the severity of the effect of the impact of the POS implementation on Core revenues, the Company issued a press release announcing its final results for the quarter ended September 30, 2016.  The press release stated, in part:

> Core U.S. same store sales decreased by 12.0 percent driven by the impact of the store information management system implementation and system outages, and other factors including the recast of the smartphone category, and declines in televisions, computers and tablets

* * *

As previously announced, our third quarter operating results were negatively impacted by unexpected capacity-related system outages following the full implementation of our new store information management system within our Core U.S. stores.

* * *

'Toward the end of the third quarter we had seen significant improvement in system availability and a reduction in the frequency of system outages. However, over the past two weeks on a couple of instances we have experienced system slowness and outages similar to but less impactful than what we saw earlier in the third quarter. Despite these recent challenges, over the past 6 weeks, past due percentages have been lower than they were a year ago,' said Robert D. Davis.

147.   On October 26, 2016 Kyle Joseph from Jefferies issued an analyst report entitled "First Look, Qtr Consistent with Pre-Announce but EPS Guidance Below Forecast."   Mr. Joseph's report exemplifies how the recent disclosures regarding issues with the POS system were unexpected by the market, including the following:

As was disclosed in the pre-announcement, SSS declined 12% as a result of the POS issues. The company reduced its store count by 9 stores to 2,469 in the quarter, which is down 8.5% YoY. The gross margin increased 10 bps YoY to 71.2%, ahead of our forecast and in spite of clearance sales on previously rented merchandise in the quarter. From the call, we look for color on the time frame to completely resolve POS issues and for an understanding of how quickly the company will be able to rebuild its rental book and stabilize the core business.

148.   On October 27, 2016, during the trading day, the Company hosted a conference call to discuss its third quarter 2016 financial results.  During the call, Davis stated, in part:

As previously announced, our third-quarter operating results were negatively impacted by unexpected capacity-related system outages following the full implementation of our new store information management system within our core US stores.

*       *       *

63

Around the time that the last stores went live on our new system, we experienced unexpected capacity-related system slowness and outages, which we attributed to the increased usage of the system. When the system was down, which was typically during our peak days and hours, we could not take electronic payments and other key activity, such our account management process, was severely limited by the system issues. Within the rent-to-own business, these collections activities are a critical business process that enables us to serve financially challenged customers by helping them stay on track with payments and mitigate losses. Stores typically made hundreds of calls every week to contact customers, in order to manage collections appropriately.

As a result of the system outages in the third quarter, many customers that rely on phone calls to make payments electronically over the phone, or as a reminder that their payment is due, fell behind on their agreements. This situation resulted in less revenue collected from customers in the current period and a lower portfolio balance of customers, since some were not able to catch up on their payments and instead returned the product.

*       *       *

As issues are identified that have caused outages, we have been able to quickly address them. Several software releases have been implemented to improve stability, and additional hardware capacity has been added to help mitigate the overutilization issues.

Toward the end of the third quarter, we went several weeks with significant improvement in system availability and a reduced frequency of system outages. However, over the past two weeks on a couple of instances we have experienced system slowness and outages, similar though of shorter duration to what we saw earlier in the third quarter.

149.    Constant further revealed the details concerning the Company's losses, and how those losses impacted the Core U.S. segment going forward:

As outlined in the release, consolidated total revenues were $693.9 million, which represents a 12.3% decrease versus last year. This decrease was driven primarily by a core same-store sales decline of 12%. Our total US same-store sales -- combining the Acceptance Now and core US segments -- decreased 8.7% versus a year ago, and on a two-year basis, US same-store sales decreased 3.5%.

> Looking at sales performance in our core US segment more closely, total revenues were down 16.3% driven by a same-store sales decline of 12% and an 8.5% reduction in store count from the prior year. The same-store sales decline was primarily due to the accelerated rollout of our point-of-sale systems, the unexpected capacity-related system outages, and weakness in our electronics categories.

150.    During the Q&A portion of the call, Constant quantified the impact the failed rollout of the POS system had on the decrease in same store sales of 12%, stating, in part:

> I think of the core same-store-sales decline, about two-thirds of it -- call it 7% to 8% of the decline -- we think was related to the rollout of the new point-of-sale system. Some of that was the absorption factor that we expected as a result of co-workers getting used to the new system and the resulting impact to the portfolio of that absorption. But the remainder is related to the outages that both Robert and I referred to in our comments.

151.    On November 30, 2016, Constant again discussed the POS implementation problems at the Bank of America Merrill Lynch America Leveraged Finance Conference, stating, in part:

> So, we rolled out a new system in our stores, really in earnest, at the end of the second quarter of the year. We had some system challenges, more than just the typical changes you would see anytime you bring on a new system. People are going to take time to absorb to that new system. But we also had some situations where we simply had system outages and had to wrestle with that.

> \* \* \*

> We had a couple minor incidents or recurrences in early October that we talked about, but they were much less severe than what we saw earlier in the year . . . .

152.    On December 5, 2016, RAC filed a Report on Form 8-K disclosing that Guy Constant had been terminated from his position at the Company - CFO, Treasurer, and Executive VP of Finance - effective as of December 2, 2016.  The Company announced that Maureen B. Short, the Company's current Senior Vice President - Finance, Investor Relations and Treasury, would serve as Interim CFO.

153.    On January 9, 2017, the Board of Directors of RAC announced Davis' "resignation" as CEO and board member effective immediately. Board Chairman Mark E. Speese, the Company's founder and former CEO was appointed interim CEO of RAC.

154.    Constant was terminated by Davis on December 2, 2016, less than 60 days after the Company announced the truth regarding the failed POS system implementation and its negative impact on the Company's long-term financial status. Less than five weeks later, Davis was terminated by the Board in what was referred to by one of RAC's largest institutional investors, Engaged Capital, LLC, as a "reactive" decision.

155.    In the Company's April 10, 2017 Strategic Plan (attached to a Report on Form 8-K filed the same day), the Company notes that RAC's "operational challenges" were "exacerbated under the previous management regime." The Plan also referred to the departure of Constant and Davis as a change aimed at improving shareholder value.

## IX.    ADDITIONAL EVIDENCE OF SCIENTER

156.    Throughout the Class Period, the Individual Defendants held themselves out to investors as the persons most knowledgeable about RAC's business. The Individual Defendants voluntarily and repeatedly chose to speak on these issues throughout the Class Period and in doing so either knew or recklessly disregarded that their statements were contrary to the underlying facts alleged herein while making the specific and detailed statements alleged herein.

157.    RAC and the Individual Defendants participated in a scheme to defraud investors about the implementation of the Company's POS systems and the serious problems that plagued the implementation during the Class Period. The Individual Defendants were personally aware of, designed, and implemented the deceptive practices detailed herein.

158.    Statements by CWs corroborate the conclusion that Defendants knew or were reckless in not knowing of the serious problems with the Company's internally-developed POS

system which the Company rolled out to their stores in order to avoid massive asset impairment charges on the write-down of the system.   CW-1 attended a number of weekly "SIMS status meetings" together with the CTO and CIO, both of whom would have apprised Davis and Constant of issues with the SIMS rollout. CW-2 stated that both Davis and Constant were on the SIMS Executive Steering Committee, which met quarterly and then more frequently during as the SIMS rollout progressed. CW-2 also said that Davis held weekly meetings with his CIO, during which issues with SIMS' implementation would always be discussed.

### A. Growth in RAC's Core U.S. Segment Was Extremely Important to the Company's Success

159.    During the Class Period, RAC generated approximately 85% of its revenue through rent-to-own agreements for durable consumer goods and associated fees, 12% via direct sales of merchandise, and the remaining 2-3% via installment sales and its franchise business.

160.    During this same period, RAC's largest operating segment, the "Core U.S." segment, was responsible for 70% - 73% of the Company's consolidated net revenues. Core U.S. also had the largest footprint of any segment, operating between 2,400 to 2,800 company-owned stores in the United States, Canada and Puerto Rico during the Class Period.

| Operating Segment Revenue Contributions (in millions) | | | | | | |
|---|---|---|---|---|---|---|
| *Quarter End* | *Total Revenue* | *Core U.S.* | *Core %* | *Acceptance Now* | *Mexico* | *Franchise* |
| 12/31/2014 | $796.5 | $600.5 | 75.4% | $169.2 | $19.6 | $7.3 |
| 3/31/2015 | $877.7 | $629.3 | 71.7% | $224.3 | $17.9 | $6.2 |
| 6/30/2015 | $815.3 | $593.5 | 72.8% | $200.4 | $16.3 | $5.1 |
| 9/30/2015 | $791.6 | $575.4 | 72.7% | $196.7 | $14.5 | $5.1 |
| 12/31/2015 | $793.8 | $573.8 | 72.3% | $196.9 | $15.0 | $8.1 |
| 3/31/2016 | $835.7 | $584.4 | 69.9% | $230.4 | $13.7 | $7.1 |
| 6/30/2016 | $749.6 | $530.6 | 70.8% | $199.5 | $13.3 | $6.2 |
| 9/30/2016 | $693.9 | $481.8 | 69.4% | $194.4 | $12.5 | $5.2 |
| 12/31/2016 | $684.1 | $472.9 | 69.1% | $193.5 | $11.4 | $6.2 |

161.    The Core U.S. segment was so critical to the operations and financial results of the Company, that it consistently disclosed as a "Risk Factor" in its SEC filings, including its Form 10-K for the quarter and year ended December 31, 2014, that RAC is "highly dependent on the financial performance of our Core U.S. operating segment." Further, the Company disclosed that "[a]ny significant decrease in the financial performance of the Core U.S. segment may also have a material adverse impact on our ability to implement our growth strategies."

162.    Given the foregoing disclosures, all of which were signed by Defendants Davis and Constant as part of the SEC reporting process, as well as the size and importance of this segment to the Company, generally, it is unreasonable to think that the Individual Defendants, both of whom were also responsible for generating, tracking, and/or reporting revenue by segment, would be unaware of the financial significance of the Core U.S. segment.

163.    Given the size of the Core Segment and its critical importance to RAC's overall business, the problems detailed herein could not have occurred without the Individual Defendants' knowledge and approval.

**B.    The Termination of Both of the Individual Defendants within Two Months of the End of the Class Period Also Provides Strong Evidence of Scienter**

164.    On December 5, 2016, RAC announced that Guy Constant had been fired from his CFO position at the Company effective as of December 2, 2016.

165.    On January 9, 2017, the Board of Directors of RAC announced Davis' "resignation" as CEO and board member effective immediately.

166.    Although the Company referred to the foregoing terminations as "resignations" the market understood the departures as terminations.

(a)    Jefferies published an equity research report on January 10, 2017 that listed the departures of Constant and Davis, following "recent[] challenges with a POS system

roll-out," as part of the reason that the Company "appears to be in a rebuilding phase." The report further stated that "given the lack of a permanent management team, it is difficult to gauge the potential for a near-term turn-around."

(b)     Then, on January 18, 2017, Northcoast Research published a report that stated: "Last week, Rent-A-Center announced that its former CEO, Robert Davis was relieved of his duties effective immediately."

(c)     On February 14, 2017, one of RAC's largest institutional shareholders, Engaged Capital, LLC, published the letter it sent RAC's Board that day.  Therein, Engaged Capital asserted: "CEO Robert Davis terminated his CFO Guy Constant on December 2, 2016 only to find himself severed from the Company one month later."

(d)     Then on May 2, 2017, Engaged Capital called the termination of Davis a "reactionary" move by RAC's Board of Directors.

167.    The fact that RAC replaced its two senior-most executives at the Company (Constant and Davis), firing Constant and forcing Davis into "resigning" is compelling evidence of scienter.

168.    In the Company's April 10, 2017 Strategic Plan (attached to a Report on Form 8-K filed the same day), the Company notes that RAC's "operational challenges" were "exacerbated under the previous management regime." The Plan also referred to the departure of Constant and Davis as a change aimed at improving shareholder value.

## C.    The Rushed Rollout of SIMS Prevented RAC From Taking a Material Write-Down on Capitalized Costs Relating to the Failed Project

169.    When SIMS was initially rolled out to the first pilot store in December 2014, RAC had invested at least $175 million in the POS system's development. Because GAAP accounting rules required RAC to capitalize such costs prior to the Class Period, the Company

would have had to write this off as an "abandoned" project if it were not put into production and/or utilized.

170.    If SIMS was abandoned as of December 31, 2014, the resultant write-down would have been material to the Company's 2014 financial statements.   As evident below, RAC's annual and Q4 2014 financial statements would have been materially and negatively impacted:

| ($ amounts in millions, except earnings per share) | | | Estimated | |
| 2014 Financial Statement Item | As Reported | As Adjusted | $ Impact | % Impact |
|---|---|---|---|---|
| *Relevant Balance Sheet Accounts at December 31, 2014 (1)* | | | | |
| Gross Property Assets | $773.3 | $598.7 | ($174.6) | -22.6% |
| Net Property Assets (2) | $332.7 | $183.4 | ($149.3) | -44.9% |
| *Annual 2014 Income Statement Accounts (1)* | | | | |
| Operating Profit (2) | $193.5 | $44.2 | ($149.3) | -77.2% |
| Earnings (Loss) Before Income Taxes (2) | $142.4 | ($6.9) | ($149.3) | -104.9% |
| Net Earnings (Loss) (3) | $96.4 | ($0.6) | ($97.0) | -100.6% |
| Diluted Earnings (Loss) Per Common Share (3) | $1.81 | ($0.01) | ($1.83) | -100.6% |
| *Q4'2014 Income Statement Account (1)* | | | | |
| Operating Profit (Loss) (2) | $47.7 | ($101.6) | ($149.3) | -313.0% |
| Earnings (Loss) Before Income Taxes (2) | $35.3 | ($114.0) | ($149.3) | -423.0% |
| Net Earnings (Loss) (3) | $25.6 | ($71.5) | ($97.0) | -379.8% |
| Diluted Earnings (Loss) Per Common Share (3) | $0.48 | ($1.35) | ($1.83) | -381.5% |
| (1) Assumes assets were abandoned and written off as of December 31, 2014 | | | | |
| (2) Assumes a ten year life of SIMS and amortization assuming that software placed into service occurred as of the beginning of each year | | | | |
| (3) Assumes a tax rate of 35% based upon the federal statutory rate to estimate the tax impact to Net Earnings and Earnings Per Share | | | | |

171.    The result of this abandonment and write-off of SIMS would have turned RAC's Q4' 2014 Net Earnings of $96.4 million and $25.6 million into Net Losses of approximately $0.6 million and $71.5 million, respectively.

172.    The abandonment and estimated write-off of SIMS may also have directly impacted Davis' and Constant's annual compensation, as such was tied to RAC's annual EBITDA results for 2014.

173.    That Defendants continued to push SIMS system-wide deployment despite its pervasive negative results is compelling evidence of scienter.

## X.    CLASS ACTION ALLEGATIONS

174.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that purchased or otherwise

acquired RAC publicly traded common stock during the Class Period and that were damaged thereby (the "Class").   Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of RAC during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) RAC's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

175.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, RAC stock actively traded on the NASDAQ Global Select Market (the "NASDAQ") under the ticker symbol "RCII."  As of the Company's Report on Form 10-Q for the quarter ended September 30, 2016, filed on October 28, 2016, RAC had 53,149,617 shares outstanding, owned by thousands of persons.

176.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     whether the Exchange Act was violated by Defendants;

(b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or were reckless in not knowing that their statements were false and misleading;

(e)     whether the price of RAC common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

177.    Lead Plaintiff's claims are typical of the claims of members of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

178.    Lead Plaintiff will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Lead Plaintiff has no interests that conflict with those of the Class.

179.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.     LOSS CAUSATION/ECONOMIC LOSS

180.    During the Class Period, as detailed herein, RAC and the Individual Defendants engaged in a course of conduct that artificially inflated the price of RAC common stock and operated as a fraud or deceit on the Class Period purchasers of RAC common stock by making the materially false and misleading statements and omissions recited above.

181.    When the truth was disclosed and became known to the market, the price of RAC common stock declined precipitously as the prior artificial inflation was removed from the price of the stock. As a result of their purchases of RAC common stock at artificially inflated prices during the Class Period, Plaintiffs and other members of the Class suffered a substantial

economic loss (i.e., damages under the federal securities laws). The price decline in RAC common stock was a direct result of the nature and extent of the materially false and misleading statements and omissions revealed to investors and the market. Thus, the Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and the Class.

182.    The truth about RAC's business was disclosed through a series of corrective disclosures regarding issues with the implementation of the POS system beginning on February 2, 2016 with the release of the Company's fourth quarter fiscal 2014 results and concluding on October 11, 2016, with the announcement of the Company's third quarter fiscal 2016 results in which Defendants acknowledged outages in the POS system that contributed to the deterioration of the Company's rent-to-own portfolio and a significant decrease in revenues and earnings for fiscal 2016.

183.    ***February 2, 2016 – First Partial Disclosure***

(a)     The release of the Company's financial results for the quarter and year ended December 31, 2015 on February 1, 2016 after the market closed was a partial corrective disclosure in which the Company disclosed that its EPS would be down due to the "short-term impact" associated with putting the new POS system in stores and associated upgrades of the system.

(b)     In reaction to these disclosures, RAC's stock price fell from a close on February 1, 2016 of $13.28 per share to a close on February 2, 2016 of $9.89 per share or approximately 25% on unusually high trading volume. However, the Company's stock price remained artificially inflated after this partial disclosure of fraud as Defendants led the market to believe the POS problems were short term and already corrected.

73

184. ***April 28, 2016 – Second Partial Disclosure***

(a) The release of the Company's financial results for the first quarter ended March 31, 2016 on April 27, 2016 after the market closed was a partial corrective disclosure in which the Company disclosed that during the initial roll out phase of the POS system, the Company had experienced a greater-than-expected impact on sales and had thus delayed the timing of the general roll-out to address additional problems. Because of this delayed roll-out, the new POS system had been implemented in fewer locations than expected in the quarter.

(b) In reaction to these disclosures, on April 28, 2016, RAC's stock price fell from its close on April 27, 2016 of $15.71 per share to a close of $13.70 per share on April 28, 2016 or approximately 12.8% on unusually high trading volume. However, the Company's stock price remained artificially inflated after this partial disclosure of fraud as Defendants continued to represent that the problems with the implementation of the POS had been addressed.

185. ***July 28, 2016 – Third Partial Disclosure***

(a) The release of the Company's financial results for the second quarter ended June 30, 2016 on July 27, 2016 after the market closed was a partial corrective disclosure in which the Company disclosed that Core U.S. revenue decreased by 10.6% driven in part by lower same store sales caused by the impact and acceleration of the POS rollout to all stores.

(b) In reaction to these disclosures, on July 28, 2016, RAC's stock price fell from a close on July 27, 2016 of $13.26 per share to a close on July 28, 2016 of $10.92 per share – a decline of approximately 17.6% on unusually high trading volume. However, the Company's stock price remained artificially inflated after this partial disclosure of fraud as Defendants continued to represent that the problems with the implementation of the POS had been addressed.

186.   ***October 11, 2016 – Final Corrective Disclosure***

(a)   The release of the Company's preliminary results for the third quarter ended September 30, 2016 on October 11, 2016, was the final corrective disclosure in which the Company disclosed serious and persistent ***"system performance issues and outages that resulted in a larger than expected negative impact on Core sales***."

(b)   The market reaction was swift and negative. On October 11, 2016, RAC's stock price fell from a close on October 10, 2016 of $12.88 per share to a close on October 11, 2016 of $9.18 per share – a decline of approximately 28.7% on unusually high trading volume.

## XII.   PRESUMPTION OF RELIANCE

187.   Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The omissions and misrepresentations were material;

(c)   The Company's common stock traded in an efficient market;

(d)   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)   Lead Plaintiff and other members of the Class purchased or acquired RAC common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

188.   At all relevant times, the market for RAC common stock was efficient for the following reasons, among others:

(a)   As a regulated issuer, RAC filed periodic public reports with the SEC;

75

(b)      RAC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)      RAC was followed by several securities analysts employed by major brokerage firm(s) including (1) JPMorgan Chase & Co.; (2) Deutsche Bank; (3) Jefferies LLC; (4) Barclays Capital; (5) Wells Fargo Securities; (6) Bank of America Merrill Lynch; (7) KeyBanc Capital Markets; (8) Cantor Fitzgerald; (9) Roe Equity Research; (10) Sidoti & Company; (11) Stephens Inc.; (12) Raymond James; (13) Northcoast Research Partners, LLC; (14) Stifel Nicolaus; and (15) BB&T Capital Markets, which wrote reports which were distributed to those brokerage firms' sales force and certain customers and which were publicly available and entered the public marketplace; and

(d)      RAC common stock was actively traded in an efficient market, the NASDAQ, where the Company's common stock trades under the ticker symbol "RCII."

189.    As a result of the foregoing, the market for RAC common stock promptly digested current information regarding RAC from all publicly available sources and reflected such information in RAC common stock.   Under these circumstances, all purchasers and acquirers of RAC common stock during the Class Period suffered similar injury through their purchases or acquisitions of RAC common stock at artificially inflated prices, and the presumption of reliance applies.

190.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its operations, Lead Plaintiff is entitled to a

presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## XIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

191.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements pled in this complaint.   The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances.   To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, RAC and the Individual Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of RAC who knew that those statements were false and misleading when made.

## XIV.   CLAIMS FOR RELIEF

**COUNT I**
**For Violations of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder Against All Defendants**

192.   Plaintiffs repeat, incorporate, and reallege paragraphs 1 to 191 by reference.

193.   This Count is asserted against RAC and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

194.     During the Class Period, RAC and the Individual Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.

195.     Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of RAC common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire RAC common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

196.     Pursuant to the above plan, scheme, conspiracy and course of conduct, and by the use of means or instrumentalities of interstate commerce and/or of the mails, each of the Defendants made statements in quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for RAC common stock.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about RAC's finances and business prospects, including the serious problems with the POS implementation.

197.     As described above, RAC and the Individual Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations

and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

198.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of RAC.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to RAC's businesses, operations, future financial condition and future prospects.

199.    As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of RAC common stock was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning RAC's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased RAC common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the securities and/or upon statements disseminated by RAC and the Individual Defendants, and were damaged thereby.

200.    During the Class Period, RAC common stock was traded on an active and efficient market.   Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which RAC and the Individual Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of RAC common stock at prices artificially inflated by Defendants' wrongful conduct.

201.     Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of RAC common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of RAC common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

202.     By reason of the conduct alleged herein, RAC and the Individual Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

203.     As a direct and proximate result of the wrongful conduct of RAC and the Individual Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### Against Defendants Davis and Constant

204.     Plaintiffs repeat, incorporate, and reallege paragraphs 1 to 191 by reference.

205.     During the Class Period, the Individual Defendants participated in the operation and management of RAC, and conducted and participated, directly and indirectly, in the conduct of RAC's business affairs.  Because of their senior positions, they knew the adverse non-public information about RAC's business prospects, including the problems plaguing the POS system rollout.

206.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to RAC's

financial condition and results of operations, and to correct promptly any public statements issued by RAC which had become materially false or misleading.

207.    Because of their positions of control and authority as senior officers of RAC, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, public filings, and other statements which RAC made and disseminated in the marketplace during the Class Period concerning RAC's results of operations.  In their capacities as senior officers of RAC, the Individual Defendants had direct involvement in the day-to-day operations of the Company and reviewing and approving the Company's public statements. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause RAC to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of RAC within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of RAC common stock.

208.    Each of the Individual Defendants, therefore, acted as a controlling person of RAC.  By reason of their senior management positions and/or being directors of RAC, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, RAC to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of RAC and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

209.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by RAC.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.      Awarding Plaintiffs and the members of the Class damages and interest;

C.      Awarding Plaintiffs reasonable costs, including attorneys' fees; and

D.      Awarding such equitable, injunctive, or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: May 5, 2017

By: */s/ Guillaume Buell*
Guillaume Buell, Texas Bar No. 24080813
**HICKS DAVIS WYNN, PC**
Guillaume Buell—Lead Attorney
State Bar No. 24080813
Pamela Hicks
State Bar No. 24007002
Scott Davis
State Bar No. 24059660
3700 Buffalo Speedway, Ste. 1111
Houston, Texas 77098
Telephone: 713-589-2240
E-mail: gbuell@hdwlegal.com
phicks@hdwlegal.com
sdavis@hdwlegal.com

*Liaison Counsel for Oklahoma Firefighters
Pension and Retirement System, City of
Hollywood Employees' Retirement Fund, and the
Proposed Class*

Jonathan Gardner (*pro hac vice*)
Marisa N. DeMato (*pro hac vice* forthcoming)
Christine M. Fox (*pro hac vice*)
Christopher L. Mooney (*pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jgardner@labaton.com
mdemato@labaton.com
cfox@labaton.com
cmooney@labaton.com

*Lead Counsel for Oklahoma Firefighters Pension
and Retirement System, City of Hollywood
Employees' Retirement Fund, and the Proposed
Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, May 5, 2017, I electronically filed the above

Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws, using

the CM/ECF system, which will automatically send email notification of such filing to all

attorneys of record.

 *s/ Guillaume Buell*
Guillaume Buell
