**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **ALAN HALL and JAMES DEPALMA, individually and on behalf of all others similarly situated,** | § | |
| **Plaintiffs** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:16cv978** |
| | § | **JUDGE MAZZANT/JUDGE CRAVEN** |
| **RENT-A-CENTER, INC., ROBERT D. DAVIS, and GUY J. CONSTANT** | § | |
| **Defendants** | § | |

---

# AMENDED REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE[1]

---

The above-referenced cause of action was referred to the undersigned United States Magistrate Judge for pretrial purposes in accordance with 28 U.S.C. § 636. The following motion is before the Court:

> **Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Docket Entry #44).**

The Court, having reviewed the relevant briefing, recommends the motion be **DENIED**.

## I. BACKGROUND

This is a federal securities class action brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) against Rent-A-Center, Inc. ("RAC" or the "Company"); its former Chief Executive Officer ("CEO") Robert D. Davis ("Davis"); and its former Executive Vice President of

[1] The Court issues this Amended Report and Recommendation to add on page 68 the inadvertently omitted phrase "Defendants' assertions regarding" in the last sentence of the Court's discussion of Plaintiffs' § 20(a) claims.

Finance, Chief Financial Officer ("CFO"), and Treasurer Guy J. Constant ("Constant") (collectively "Defendants")[2] on behalf of all persons and entities that purchased or otherwise acquired RAC publicly traded common stock during the period from February 2, 2015 through October 11, 2016, inclusive (the "Class Period") and who were damaged thereby. The action involves Defendants' alleged collective failure to inform the market that the "pivotal initiative the Company undertook during the Class Period and had been promising Wall Street - the rollout of its proprietary point-of-sale ("POS") management information system, which had been in development for more than five years and cost the Company at least $175 million - was an abject failure fraught with stability and functionality problems that directly affected the Company's ability to complete sales and collect rental income during the Class Period." Docket Entry # 45 at 1.

The facts are drawn from the Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws and the documents it incorporates by reference such as filings with the Securities and Exchange Commission ("SEC") and other documents that provide the basis for Plaintiffs' claims. *See Izadjoo v. Helix Energy Sols. Grp., Inc.*, No. CV H-15-2213, 2017 WL 590383, at *5 (S.D. Tex. Feb. 14, 2017) ("In securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC, and that are actually filed with the agency.").

RAC is one of the largest rent-to-own operators in North America. Compl., ¶ 2. At RAC's stores, customers can rent-to-own electronics, appliances, furniture, and other durable items. During the Class Period, RAC generated revenue from four operating segments: (1) Core U.S., (2) Acceptance Now, (3) Mexico, and (4) Franchising. *Id.* at ¶ 3. Core U.S. was RAC's largest segment,

---

[2] Davis and Constant are referred to herein as the "Individual Defendants."

operating between 2,400 to 2,800 company-owned stores in the United States, Canada, and Puerto Rico. The Core U.S. segment comprised approximately 72% of the Company's consolidated net revenues during the Class Period. The Company disclosed in its SEC filings, including its Form 10-K for the year ended December 31, 2014, that RAC is "highly dependent on the financial performance of the Core U.S. segment" and that any "significant decrease in the financial performance of the Core U.S. segment may also have a material adverse impact on our ability to implement our growth strategies." *Id.*

Approximately 85% of RAC's Core U.S. rent-to-own agreements were on weekly terms. *Id.* at ¶ 4. Pursuant to such terms, RAC's customers were required to make payments either electronically (over the phone or in person) or by cash or credit in one of RAC's stores. Because RAC's key customer demographic was "unbanked" and without credit, most of its customers paid by cash in the store each week. If a customer could not or did not elect to continue their rent-to-own agreement, the customer would be able to return the merchandise at any time subject to certain conditions. The Company estimates that approximately 75% of rent-to-own items were returned and re-rented, with only 25% reaching full term such that the customer took ownership of the product. *Id.*

The financial status of RAC's customer demographic also required RAC to devote significant resources to collection efforts. RAC regularly monitored customer accounts for missed payments and employed a variety of tactics to timely collect on past due accounts. The Company's primary and most time-intensive collection method involved staff from each store using the in-store computer system to identify past due accounts and to access contact information for each account. *Id.*

Beginning in the fourth quarter of 2014, the Company began rolling out "SIMS," its

proprietary point-of-sale management information system ("POS" or "SIMS"), which had been in development since at least 2009. *Id.* at ¶ 5. This new POS system was purportedly designed to centralize and manage sales, inventory, collections, customer relationship management, and payment tracking on a Company-wide basis, and provided RAC headquarters with real-time access to each store's sales and collection data.[3] Prior to the rollout of SIMS, each store was required to download and transmit to RAC headquarters all store data at least twice daily. *Id.*

At the beginning of the Class Period, on February 2, 2015, RAC announced the new POS system was "fully operational" at its first store "following the system-wide implementation of the back office solution." *Id.* at ¶ 6. Otherwise, RAC provided little other information about the new system, including challenges it was facing with developing and implementing the system and the system's importance to the Company's revenues and strategic growth initiatives. Specifically, Defendants knew, but failed to inform investors, the POS system had a long history of stability and functionality problems which had not been remediated at the time of the rollout and which jeopardized many of the strategic initiatives that RAC was promising, including improvements to RAC's inventory management and account collection functions, and new flexible pricing and e-commerce projects, all which relied on the successful implementation of the system. *Id.*

Throughout 2015, the Company rolled out the POS system to an increasing number of stores, and by December 31, 2015, the system was deployed in 385 stores. *Id.* at ¶ 7. However, despite being in possession of test results including Root Cause Analysis Reports, Incident Reports, and

---

[3] According to Defendants, SIMS was a "proprietary in-house developed system" designed to manage "key business processes in the store such as sales, customer account management, cash management and inventory management" and to "extend and improve capabilities for store sales and operations." Def. Ex. 24, Third-Quarter 2016 Earnings Call (Oct. 27, 2016) at 13; Def. Ex. 15, Form 10-K (filed Feb. 29, 2016) at 68; Def. Ex. 3, Form 10-K (filed Mar. 2, 2015) at 4.

other information that should have caused Defendants to either halt the Company-wide rollout of the system or at least undertake a system-wide revamp before proceeding with a full rollout, Defendants steadfastly refused to do either. *Id*. at ¶ 8. Defendants also failed to inform investors of the ongoing problems, despite knowing internally that these issues would likely result in financial losses. Instead, Defendants repeatedly assured the market that the system was "fully operational and ready to go." *Id*.

"Defendants rushed out a full rollout of the POS system Company–wide in the first half of 2016, going from 385 stores on December 31, 2015 to 887 on March 31, 2016, and then completing the rollout to all 2,478 Core U.S. stores by June 30, 2016." *Id.* at ¶ 9. According to Plaintiffs, the truth about the severity of the problems with the POS implementation came to light through a series of partial disclosures that began on February 1, 2016, when the Company announced its results for the year ended December 31, 2015 after the market closed that day. *Id*. at ¶ 10. The next day, during the Company's earnings call, Defendants acknowledged problems with implementation of the POS system and disclosed that for the first quarter of 2016 (ended March 31, 2016) RAC expected a decrease in year-over-year earnings in the critical Core U.S. segment due to "a pretty short-term impact. . . associated with putting in new point-of-sale system in the stores" and the impact of training RAC workers on the new POS system. *Id.*

According to Plaintiffs, Defendants falsely assured investors the "little bit of impact to revenue" would "go away then in the back half of the year." *Id.* Defendants also falsely assured the market that RAC had "a very good knowledge of what we see in terms of the impact on the stores." Despite these assurances, RAC's stock price dropped approximately 25% on February 2, 2016 on high trading volume. *Id.*

Additional information about problems with the POS system's implementation was revealed on April 27, 2016. *Id.* at ¶ 11. The next day, during the Company's earnings call, Defendants disclosed that the implementation of the POS system had been delayed so the Company could address a "greater-than-expected impact on sales." *Id.* However, according to Defendants, the problems had been fully remediated by then and the POS rollout had been restarted with "approximately one-third of our core stores [] operating this new POS system." *Id.* Defendants also assured investors the Company was "constantly monitoring the results to make sure [the POS system] is landing well in our stores," that the overall impact to Core revenues was not going to be "any more significant" than originally disclosed, and that overall guidance for the year remained on track. In reaction to these revelations, RAC's common stock price fell approximately 12.8% from its close on April 27, 2016 of $15.71 per share to a close of $13.70 per share on April 28, 2016 on high trading volume. However, Plaintiffs allege the price of RAC's stock remained artificially inflated as the Company emphasized its measured approach to the POS rollout and that it had addressed all system issues. *Id.*

The negative effects of the POS implementation on Core revenues were further revealed on July 27, 2016. *Id.* at ¶ 12. Despite revealing decreased sales because of the impacts and acceleration of the POS system rollout, Defendants represented "the distraction of a major system roll-out is now behind us." *Id.* As a result of these disclosures, on July 28, 2016, RAC's common stock price fell approximately 17.6% from a close on July 27, 2016 of $13.26 per share to a close on July 28, 2016 of $10.92 per share on high trading volume. *Id.*

The full truth was finally revealed on October 11, 2016, when Defendants issued a press release announcing preliminary results for the third quarter ended September 30, 2016. *Id.* at ¶ 13.

According to the release, Core U.S. same-store sales were estimated to be down approximately 12% in the quarter due to performance issues with the POS system and peak-time Company-wide outages that "resulted in a larger than expected negative impact on Core sales." *Id.* "In reaction to this disclosure of the full extent of the problems with the POS implementation, RAC's common stock price fell by $3.70 per share, ***or over 28%*** on abnormally high trading volume." *Id.* (emphasis in original).

On October 27, 2016, during the third quarter earnings call, Defendant Davis explained that the Company had begun experiencing "capacity-related system slowness and outages" at the time the POS went fully live in all Core stores in the second quarter of 2016 and that these issues persisted throughout the third quarter with the frequency of the outages not subsiding until the end of the quarter. *Id.* at ¶ 14. On December 2, 2016, the Company announced the termination of Defendant Constant effective immediately. *Id.* at ¶ 15. On January 9, 2017, the Company announced the "resignation" of Defendant Davis, a 24-year Company veteran and RAC Board member, also effective immediately. *Id.*

According to Plaintiffs, the statements of former RAC employees ("confidential witnesses" or "CWs") "with personal knowledge of SIMS' development and implementation confirm that internally known, entrenched, and systemic issues existed at the time RAC initially implemented the POS system in late 2014, and that these problems were not sufficiently remediated during the Company-wide rollout of the POS system when additional scalability and functionality problems surfaced." Docket Entry # 45 at 1. According to the Complaint, the statements of former RAC employees with knowledge of SIMS' development and implementation confirm that "internally known, entrenched, and systemic issues seriously threatened the implementation of the POS system

when it was initially rolled out in early 2015." Compl., ¶ 16. For example, a former Senior Systems Engineering Manager employed by RAC at its headquarters from November 2013 until June 2016 who managed a team of systems engineers responsible for implementing SIMS, and who initially reported to the Director of IT Systems and Operations and then to the Senior Director of Technical Operations (both of whom reported to CTO Christi Liebe) ("CW-1"), "stated Defendants were aware that the operating system SIMS ran on was outdated prior to and during its initial rollout." *Id.* According to CW-1, this severely limited its functionality, prevented enhancements and other necessary fixes, and caused SIMS to clash with current applications that RAC needed to keep the system operational. "Notwithstanding, CW-1 said that the Company moved forward in an effort to avoid a write-down or write-off on the POS system, a capitalized asset which had been in development for approximately five years." *Id.*

The Complaint also relies on "CW-2," who was employed by RAC for nineteen years from 1997 until June 2016. *Id.* at ¶ 17. "From March 2007 to June 2016, CW-2 held the title of Senior Director of Information Security and IT Service Management and reported directly to Chief Information Officer . . . who was Herman Nell from December 2013 to April 2016, and then Angela Yochem starting in May 2016 when Nell retired." *Id.* "CW-2 was responsible for the information security of all RAC business units, including the Core U.S. segment, as well as litigation support, e-Discovery, and he was the custodian of all records at the Core store level." *Id.* CW-2 was also a member of the project team that evaluated risks related to the SIMS rollout. CW-2 attended a "Go No-Go" meeting each time RAC rolled SIMS out to additional stores, and CW-2 corroborated information provided by CW-1 about persistent problems with SIMS, including intermittent outages and other functional issues well before the system was fully implemented in the second quarter of

2016. *Id.*

## II. PROCEDURAL BACKGROUND

On December 23, 2016, the original Class Action Complaint for Violations of the Federal Securities Laws was filed by Alan Hall, individually and on behalf of all others similarly situated. The case was assigned to District Judge Mazzant and referred to Magistrate Judge Johnson for pretrial purposes. On February 2, 2017, Magistrate Judge Johnson granted Defendants' Unopposed Motion for Consolidation of Related Cases, consolidating *James Depalma v. Rent-A-Center, Inc., et al.* (Cause No. 4:16cv981-ALM-KPJ) into the above first-filed case. Docket Entry # 9. All subsequent filings have been made in the above case.

On February 21, 2017, Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") filed a motion for the entry of an Order (1) appointing Oklahoma Firefighters as Lead Plaintiff for a Class of all persons who purchased the securities of Rent-A-Center, Inc., between July 27, 2015, and October 10, 2016, inclusive; and (2) approving Oklahoma Firefighters' selection of Labaton Sucharow LLP ("Labaton Sucharow") as Lead Counsel for the Class and Hicks Davis Wynn, PC as Liaison Counsel for the Class. Docket Entry # 10. The same day, Alan Hall and Larry Adams filed a motion for appointment as Lead Plaintiff and approval of Glancy Prongay & Murray LLP and Bragar Eagel & Squire, P.C. as Co-Lead Counsel for the class and Kendall Law Group, PLLC as Liaison Counsel. Docket Entry # 14. Three other movants filed motions to be appointed lead counsel, but they later requested their motions be withdrawn. Docket Entry #s 13, 15, 16. Magistrate Judge Johnson granted the movants' requests.

Although Alan Hall and Larry Adams did not request the Court withdraw their motion, they notified the Court that it appeared they did not possess the "largest financial interest in the relief

sought by the class" as required by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u(a)(3)(B). *See* Docket Entry # 25. Thus, Magistrate Judge Johnson only considered Oklahoma Firefighter's motion as to whether it met the requirements for designation as lead plaintiff. On March 16, 2017, Magistrate Judge Johnson granted Oklahoma Firefighters' motion and denied Alan Hall and Larry Adams' motion. Docket Entry # 34. Judge Johnson also approved Oklahoma Firefighters' selection of lead counsel.

Court-appointed Lead Plaintiff Oklahoma Firefighters is a defined-benefit pension plan headquartered in Oklahoma City, Oklahoma. Oklahoma Firefighters, together with additional named plaintiff City of Hollywood Employees' Retirement Fund, filed the Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws on May 5, 2017.

## III. DEFENDANTS' MOTION TO DISMISS

On June 5, 2017, Defendants filed their current Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the PSLRA. Docket Entry # 44. The elements of a private securities fraud claim based on violations of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5 are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 683 (5th Cir. 2014).

Defendants assert the Complaint fails to plead either (1) falsity or (2) the requisite strong inference of scienter with particularity as to any of the alleged misrepresentations. Specifically, Defendants assert the Complaint is devoid of any facts demonstrating how or why the Individual

Defendants knew, or were consciously blind to, information showing that their regular (and increasingly negative) reports on the SIMS rollout throughout the Class Period were false at the time they were made.

In response, Plaintiffs point out Defendants contest only two elements of Plaintiffs' 10(b) claim – falsity and scienter – and assert Defendants thus concede "all other elements have been adequately pled: materiality, reliance, economic loss, and loss causation." Docket Entry # 45 at 3. Regarding falsity and scienter, Plaintiffs assert Defendants' arguments fail. According to Plaintiffs, allegations from senior-level CWs confirm that Defendants' statements and omissions were false and misleading when made. Plaintiffs assert Defendants, despite having test results and other information that clearly demonstrated the massive problems RAC was encountering with the SIMS rollout, failed to inform investors both of the existence of the ongoing problems and that the problems would likely materially affect the Company's revenues. "Instead, Defendants repeatedly assured the market that SIMS was fully operational and that any issues RAC faced were minor and had already been resolved," and when problems started to seriously impact RAC collection efforts, "Defendants falsely reassured investors that these were only temporary hiccups that had been fully addressed." *Id.* at 2.

In addition, Plaintiffs contend allegations from the CWs, the Core U.S. segment's importance to the Company and the POS to the future of RAC's business, "as well as Constant and Davis's terminations, taken together with allegations that Defendants were motivated to roll out the POS System rather than write down this $175 million asset, demonstrate a strong inference of scienter." *Id.* at 3.

## IV. LEGAL STANDARDS

### A. Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a case for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). The court must accept as true all well-pleaded facts contained in the plaintiff's complaint and view them in the light most favorable to the plaintiff. *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir. 1996). In deciding a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Gonzalez v. Kay,* 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).

To "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Gonzalez,* 577 F.3d at 603 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "It follows, that 'where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.' " *Id.*

As explained below, a district court evaluating a motion under Rule 12(b)(6) must also consider the strict pleading requirements of Rule 9(b) and the PSLRA in a securities fraud case. *In re Fleming Companies Inc. Sec. & Derivative Litig.*, No. 03-md-1530, 2004 WL 5278716, at *5 (E.D. Tex. June 16, 2004); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–24 (2007).

**B. Section 10(b) of the Securities Exchange Act and Rule 10b-5 pleading requirements**

Section 10(b) of the Securities Exchange Act of 1934 empowers the SEC to promulgate rules to prevent manipulative or deceptive practices in the sale or purchase of securities. 15 U.S.C. § 78j(b); *City of Pontiac Gen. Employees' Ret. Sys. v. Hanger, Inc.*, No. A-14-CA-1026-SS, 2017 WL 384072, at *9 (W.D. Tex. Jan. 26, 2017). Section 10(b) provides it is unlawful to "use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, nor misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must plead "(1) a misstatement or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries." *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004).

Both FED. R. CIV. P. 9(b) and the PSLRA impose a heightened pleading requirement on § 10(b) claims. Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," but that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." FED. R. CIV. P. 9(b). To satisfy Rule 9(b)'s pleading requirements, the plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997); *see also Southland,* 365 F.3d at 362 ("The PSLRA reinforces the particularity requirements of Rule 9(b), requiring the plaintiffs to state not only the time, place, the identity of the speaker, and the content of the alleged misrepresentation, but also to explain why the challenged statement or omission is false or misleading.")

The PSLRA further enhances the "particularity" requirement for pleading securities fraud under Rule 9(b). Enacted in 1995 in response to frustration with Rule 9(b)'s inability "to prevent abusive, frivolous strike suits," the goal of the PSLRA is to "prevent the abuse of federal securities laws by private plaintiffs*." See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406–07 (5th Cir. 2001) (citing H.R. Conf. Rep. No. 104-369, at 41 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 740). The PSLRA provides in relevant part as follows:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

* * *

> Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(1)–(2)(A); *see also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642, 645 (5th Cir. 2005) (observing that only strong inferences of scienter, not based on conclusory allegations or unwarranted deductions, survive a motion to dismiss).

## V. WHETHER THE COMPLAINT PLEADS WITH PARTICULARITY ANY FALSE OR MISLEADING REPRESENTATION

### A. Plaintiffs' allegations

Plaintiffs allege RAC attempted to develop its own POS system, but the results were deeply flawed. According to Plaintiffs, the Individual Defendants knew the POS system implementation was experiencing "serious problems and that the roll-out threatened to affect both store operations and collections." Compl., ¶ 30. Plaintiffs allege the problems were not properly remediated before the system rolled out Company-wide, and the Individual Defendants disseminated materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omission) regarding the troubled implementation of the Company's new POS system, SIMS. *Id*. at ¶¶ 30, 34. This scheme allegedly: (i) deceived the investing public regarding RAC's operations and the true value of RAC's common stock; and (ii) caused Plaintiffs and other members of the Class to purchase RAC common stock at artificially inflated prices, which fell as the truth concerning the material and sustained effect that the implementation of the POS system had on Core revenues ultimately became known. *Id*. at ¶ 34.

Regarding the allegedly false and misleading statements and/or omissions, the Complaint

alleges the following background. In 2008, RAC began developing a proprietary POS system with the goal of centralizing certain functions. *Id.* at ¶ 42. The system was designed to centralize and manage sales, inventory, payments, collections, and customer relationships, all in real-time, from one POS system. *Id.* at ¶¶ 5, 42. Centralizing these functions was critical to RAC's future success because its other strategic initiatives – including integrated inventory management, e-commerce, and variable pricing – required such centralized infrastructure.[4] *Id.* at ¶¶ 42, 72.

CW-2 stated that between 2009 – 2010, RAC employed in-house and temporary engineers, as well as subcontractors, to develop the POS system that it ultimately named "SIMS." *Id.* at ¶¶ 5, 44. According to CW-1, the version of SIMS that was implemented during the Class Period was developed on an "outdated Oracle Linux-based operating system that was already considered to be at 'end of life' before SIMS was rolled out to the first store in Plano, Texas." *Id.* at ¶ 45. "Because of a series of executive changes in the CIO position at RAC between 2010 and 2013 (four CIOs in four years), CW-2 said that ownership of the POS/SIMS project was bounced around from executive to executive until December 2013 when RAC hired a new CIO (Herman Nell) and a new CTO (Christi Liebe)." *Id.* at ¶ 46.

According to CW-2, Nell reported directly to Davis while Liebe reported to Nell until Nell retired from RAC in April of 2016. *Id.* According to CW-2, when Nell retired Liebe reported directly to his successor Angela Yochem. "CW-2 said that Nell was tasked with getting the POS system ready to be commercially deployed (despite all its flaws) with Liebe and Gary Peek (former

---

[4] According to CW-2, prior to the Class Period RAC used an "off the shelf POS system designed for the rent-to-own market" and "sales and collection information" was stored and transmitted to RAC headquarters multiple times daily. Compl., ¶ 43. CW-2 stated the old program could not meet the technological goals of RAC, including a centralized reporting system and e-commerce functionality. *Id.*

Vice President of IT Solutions) assisting with the development of the network servers, asset management, software licensing, database and network infrastructure, and "Dev/Ops" (cloud services)." *Id.*

Despite its efforts and capital investments of approximately $175 million during this period, SIMS, which the CWs have described as a patchwork of multiple older and outdated programs, suffered countless setbacks and was riddled with problems when RAC began pilot testing in one RAC store in December 2014. *Id.* at ¶¶ 47-52, 56. As explained by the CWs, the reason for its failure was that the POS was built on an outdated Oracle operating system that clashed with modern applications and was extremely difficult and costly to upgrade. *Id.* at ¶¶ 45, 64-65.

According to CW-1, a former Senior Systems Engineering Manager employed by RAC at its headquarters from November 2013 until June 2016 who managed a team of systems engineers that was responsible for implementing SIMS and who initially reported to the Director of IT Systems and Operations and then to the Senior Director of Technical Operations, Nell and Liebe were given less than one year to work on the POS project before RAC decided to begin pilot testing in a store near headquarters in December 2014. *Id.* at ¶¶ 47, 50. CW-1 stated "the timing of the rollout decision was predominantly based on concerns that if the Company did not commercialize the POS system soon, significant amounts of the capitalized software development costs associated with the project would need to be written off." *Id.* at ¶ 47.

According to CW-1, at the end of 2014, SIMS was "still nowhere near ready for pilot testing" as "serious capacity and performance issues were being experienced." *Id.* at ¶¶ 48-49. According to CW-1, Liebe and Nell were aware of the serious problems surrounding the development and deployment of the system and "would have communicated any significant problems and delays to

Davis and Constant through, for example, color-coded SIMS incident reports . . . and at SIMS Executive Steering Committee meetings which were attended quarterly by Liebe, Nell, Department Heads, SVPs, and the Individual Defendants, and more frequently as the rollout of the POS system progressed." *Id*. at ¶¶ 50-51.

CW-2 confirmed that Davis and Constant were aware of issues relating to the POS system implementation. *Id*. at ¶ 52. CW-2 said Individual Defendants were on the SIMS Executive Steering Committee, and Davis held weekly meetings with his CIOs, including Nell during the Class Period, where SIMS issues were always discussed. *Id*.

The Complaint details the meetings attended by senior RAC executives, including the Individual Defendants, where the ongoing problems with the development and implementation of SIMS were discussed:

- quarterly meetings of the SIMS Executive Steering Committee which included Davis and Constant during which SIMS' progress and issues were continually discussed (¶¶ 50-52);
- weekly SIMS project team meetings attended periodically by Davis and Constant (¶ 51); and
- weekly meetings Davis held with CIO Nell (then CIO Angela Yochem starting in May 2016) during the Class Period where SIMS was discussed.

*Id.* at ¶¶ 50-52, 74. CW-2 also indicated Davis and Constant were kept aware of issues the technology team was encountering with SIMS, and that as the SIMS rollout accelerated and more issues arose, Davis' involvement increased. *Id*. at ¶ 74. CW-2 further confirmed that Davis was directly involved in SIMS' development from the onset. *Id.*

The Complaint also details the reports provided to senior RAC executives in which the problems with the development and implementation of SIMS also were discussed, including:

- SIMS Incident Reports which employed a green/yellow/red color-coding system to rank the severity of SIMS' problems and were provided to Davis and Constant (¶¶ 51, 71); and

- "Root Cause Analysis Reports" which detailed the pervasive scope and specific issues the Company was having with SIMS and "show that RAC was experiencing outages in the weeks prior and subsequent to the start of the Class Period – the same time Defendants were reporting the successful implementation of SIMS in the first pilot store."

*Id.* at ¶ 68.

The Complaint alleges RAC rushed the pilot testing and rollout of the POS system despite known risks and flaws in order to avoid a massive write-down of the system. Specifically, the Complaint alleges as follows. RAC invested at least $175 million in the development of SIMS prior to the Class Period. *Id.* at ¶ 53. Pursuant to Generally Accepted Accounting Principles ("GAAP"), RAC was required to capitalize certain costs associated with SIMS' development. *Id.* at ¶¶ 53-56. The Company was not required to begin amortizing such costs until the software was placed into use. However, GAAP mandated that RAC write down its capitalized costs for software under development to the lower of (1) its carrying amount or (2) its fair value (if any) once its completion or use no longer appeared probable. *Id.* at ¶¶ 55-57, 169.

If it was no longer probable that the POS system would be completed or placed into service, the capitalized asset would need to be reported at the lower of the carrying amount or fair value, if any, less costs to sell. A rebuttable presumption existed in GAAP that uncompleted software has a fair value of zero. *Id.* at ¶ 57. The Complaint alleges the impact of such an accounting adjustment in late 2014 would have been highly material to the Company's annual financial statements. *Id.* at ¶¶ 58-60, 170-71. Indeed, the result of abandoning the still-not-functioning POS system and writing-off the approximately $175 million invested by the Company (and not pilot testing SIMS for later implementation even on a scaled back basis) would have converted RAC's net earnings for the year and the quarter ending December 31, 2014 of $96.4 million and $25.6 million, respectively, into net

losses of approximately $0.6 million and $71.5 million. *Id.* at ¶171.

"According to CW-1, it was very well known within the Company that the POS system was rolled out in December 2014 despite its flaws because that project was close to reaching its 5-year anniversary after having been started in 2009." *Id.* at ¶ 63. CW-1 explained that, by December 2014, RAC had to roll SIMS out into production in order to continue holding it as an asset on its balance sheet. *Id.* CW-1 further explained that if the Company failed to do so, it would be forced to take a substantial write off on SIMS, as its technology was already outdated by late 2014. CW-1 added that instead of taking the write off, the Company decided to rollout what they had and hoped to make it work as they went along. *Id.*

Turning to the alleged false and misleading statements and/or omissions, Plaintiffs contend RAC falsely touted SIMS as "fully operational" in 2015 while failing to acknowledge the serious issues plaguing the system. The Class Period begins on February 2, 2015. *Id.* at ¶ 80. According to the Complaint, in early 2015, Defendants announced that the "[n]ew POS system is fully operational in its first site. . . ." *Id.* at ¶¶ 80, 81. Thereafter, the Company discussed its growth strategies, many of which relied on the successful implementation of SIMS. *Id.* at ¶ 82. However, the Company failed to mention "the pervasive issues the Company was having with the development and rollout of SIMS." *Id.*

Throughout 2015, Defendants touted the successful testing and implementation of the POS System in a growing number of stores, while failing to disclose the major issues the POS system was encountering:

- "hundreds of issues" were reported in Root Cause Analysis Reports from the first store in Plano, Texas; did not work well in the 200-300 additional stores it was rolled out to in the first half of 2015; and generally failed in the stores it was rolled out to afterwards; (¶ 66)

- "major bugs were still being worked on through the end of [CW-1's] tenure in June 2016;" (¶ 67)

- the POS system was running on an outdated Oracle operating system that made implementing any changes or upgrades both extremely difficult and expensive and substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system; (¶ 85(a))

- the POS system lacked sufficient store-level redundancies, which magnified the problems encountered during the implementation; (¶ 85(b))

- the POS system was not advanced enough in early 2015 even for pilot testing and still required substantial development efforts and modifications to make it compatible for Company-wide use; (¶ 85(c))

- the problems with the POS system, including intermittent outages, were serious enough to at least warrant additional testing before the program was expanded to other pilot stores; (¶ 85(d))

- Defendants knew or were reckless in not knowing that the Oracle-based operating system the new POS system ran on were already considered to be at "end of life" and that the age of the Oracle-based operating system that SIMS was built on was causing it to clash with the current versions of software that it needed to interact with.

*Id*. at ¶ 86. Yet in an April 27, 2015 press release, the Company disclosed that the POS system was "fully operational" in 34 stores, and Davis stated, in part: "Our multi-year plan to improve the profitability and performance of our Core business continues to build momentum on a number of fronts." *Id.* at ¶ 87.

On April 28, 2015, before the market opened, the Company hosted a conference call to discuss its results for the first quarter ended March 31, 2015. During the call, with respect to the Company's implementation of SIMS, Davis stated, in part:

> Following the successful pilot tests of our new POS system last quarter, today I'm proud to say that 34 stores are running the new system exclusively as an expanded pilot. General deployment of our new POS system through the remainder of our Core US RTO stores will start midyear and continue throughout this year, giving us the tools to understand and serve customers like never before.

*Id.* at ¶ 88. Similar statements were made for second quarter fiscal 2015 results and third quarter fiscal 2015 results. *See id.* at ¶¶ 94-99, 101-04. For example, on November 9, 2015, the Company filed its quarterly report on Form 10-Q for the quarter ended September 30, 2015 and stated, in part, as follows:

> We are also in the process of implementing our new store information management system and processes that extend and improve capabilities for store sales and operations. ***This system is operational in 8.5% of our Core U.S. stores at September 30, 2015, with general deployment starting in early 2016 to minimize impact on our fourth quarter holiday season.***

*Id.* at ¶ 104 (emphasis in original).

Both CWs confirmed that at all times from RAC's pilot program through June 2016, when they both left the Company, RAC continued to experience, document, and unsuccessfully mitigate hundreds of problems with SIMS, many relating to integral utilities such as general functionality and "scalability." *Id.* at ¶¶ 64, 67-68, 71, 73.

According to the Complaint, the details of the severity of the POS system implementation problems slowly began to emerge beginning with results for year ended December 31, 2015 (partial corrective disclosure). Compl. at pg. 42. However, Plaintiffs allege Defendants continued to mislead the market on the severity and impact of the POS system issues. *Id.* According to Plaintiffs, the truth about RAC's business was disclosed through a series of corrective disclosures of what Defendants "mischaracterized" as minor or "short-term" issues with the system beginning on February 2, 2016 with the release of the Company's fourth quarter 2014 results. Docket Entry # 45 at 8.

That day, the Company disclosed that its 2016 EPS would be down due to the "short-term impact" associated with putting the new POS system in stores. Compl., ¶¶ 109-11. Constant

informed the market of the lower expected results during a February 2, 2016 RAC earnings call, stating: "What we've seen as we have tested the rollout … is we see a pretty short-term impact, just given the activity associated with putting in new [POS] system in the stores. Very quickly the stores get up to speed and we end up with a better [POS] system that allows them to be more efficient to process transactions quicker and to deal with customers better." *Id.* at ¶ 110.

During the same call, Davis responded to a question concerning the rationale for the expected losses on the POS implementation. *Id.* at ¶ 111. Davis failed to acknowledge the persistent systemic issues with the POS system, blaming losses only on installation and training time. Davis also assured investors that all issues encountered during POS testing had been fixed, stating in part as follows:

> We've tested in 385 stores now, so … we have a very good knowledge of what we see in terms of the impact on the stores. ***We've done numerous upgrades and additions to the system … that's improved any of the areas where we were seeing challenges.***
>
> No, the commentary is more around just the change that occurs when you're asking people that are operating the point-of-sale system every day to change what they're doing. . . . . And so that distraction that we see for a fairly short period of time is what we factored into the commentary around first-quarter revenue.

*Id.* (emphasis in original).

The next partial corrective disclosure occurred on April 27, 2016 when, in connection with the announcement of the Company's first quarter 2016 results, Defendants revealed that SIMS had been rolled out to "fewer locations than expected in the quarter," stating this "allowed for implementation of identified system enhancements." *Id.* at ¶¶ 118. During the earnings call, Davis listed the POS implementation as one factor that caused a 7% decline in revenue. *Id.* at ¶¶ 119-20. Davis (1) reiterated that all necessary changes had been made, (2) said the POS system was "operating" in 33% of Core U.S. stores, and (3) projected Company-wide implementation by

September 2016. *Id.*

Constant then suggested the POS issues stemmed from "potential transition period impact." *Id.* at ¶121. Constant further stated: "we don't anticipate now that the impact is going to be any more significant than we originally did, but clearly the timing is a little bit different than we originally expected." *Id.*

Defendants made a third partial corrective disclosure on July 27, 2016 in connection with the announcement of second quarter 2016 results during which Defendants disclosed that Core U.S. revenue decreased by 10.6%, driven in part by "the impact and acceleration of the [POS] rollout" to all stores. *Id.* at ¶¶ 127-34, 137. During its earnings call the next day, Davis stated he was "extremely disappointed in our top-line performance and the short-term revised outlook" and explained that the rollout of the POS system to all 2,400 Core stores was accelerated because RAC's "other critical initiatives" depended on the full implementation of POS in all stores. *Id.* at ¶ 129. According to Plaintiffs, RAC continued to mislead investors about how the rollout to all stores would further exacerbate problems the Company was already struggling to mitigate. Specifically, Davis further stated as follows:

> Despite our team's efforts to mitigate the negative impact of accelerating the implementation of the new system, the decline in core top-line results was more significant than we expected, making up over half of the second-quarter decline in core same-store sales. ***Although the system performance and usability issues identified in the first quarter were fixed, the distraction of the new system*** impacted our core portfolio and took time away from collections efforts which resulted in a hit to revenues. Given the impact to the portfolio, we expect it to be a few quarters before we fully recover.
>
> That said, the distraction of a major system roll-out is now behind us, and we believe that longer-term benefits of our new system will outweigh the short-term costs. The new POS enables us to move forward with several growth opportunities to address the broader challenges in the core business.

* * *

> The new POS system also enables us to be more prescriptive on pricing, so that we can customize pricing elements by region and by product category to ensure our value proposition continues to be relevant to our customers. Although we are not happy with the negative impact from ***the distraction related to the roll-out of new POS system**, **we are excited about the opportunities it will continue to bring well into the future***.

*Id*. at ¶ 129 (emphasis in original).

Constant also made a number of other false and misleading statements, including calling the "primary driver" of the portfolio deterioration a "transition" problem and assuaging "now [] we're through that distraction." *Id*. at ¶132. Even when asked by an analyst regarding how the POS implementation could case such financial harm and why the Company elected to expedite the POS rollout if it had been projecting issues, including significant deterioration of earnings since at least the beginning of 2016, "neither Davis nor Constant explained the true loss "driver"- crippling POS system outages, coupled with an inexplicable failure to install redundancies, made it onerous if not impossible to collect payments from its high risk customers." Docket Entry # 45 at 10. Instead, Davis stated "there's a number of capabilities that we are unlocking by getting the POS system fully implemented and in place" and one part to the answer is "just getting it behind us and eliminating the distraction" and "get going sooner on these new capabilities." Compl., ¶ 133. Davis then "falsely reassured" the analyst the issues were corrected. *Id*. at ¶ 134.

According to Plaintiffs, the full truth about the troubled POS implementation and its negative effects on the Company's revenues was not revealed until October 11, 2016 when the Company issued a press release announcing results for the third quarter ended September 30, 2016. *Id*. at ¶ 141. Defendants disclosed that Core U.S. sales for the third quarter would be down by approximately 12% due to "***system performance issues and outages*** that resulted in larger than expected negative impact

on Core sales." *Id.* Less than one month before this disclosure, Davis and Constant presented at the Raymond James North American Equities Conference, wherein Davis stated RAC had recently rolled out a new store information management system that was "having a short-term negative impact on sales" but that set RAC up very well in the future to continue to grow the business. *Id.* at ¶ 139.

On October 11, 2016, RAC's stock price per share fell from a close of $12.88 on October 10, 2016 to a close of $9.18 on October 11, 2016 - a decline of approximately 28.7% - on unusually high trading volume. *Id*. at ¶ 142. Two weeks later on October 26, 2016, RAC confirmed that, for the quarter ended September 30, 2016, Core U.S. same store sales had decreased by 12% "driven by the impact of the store information management system implementation and system outages . . . ." *Id.* at ¶ 146.

During a conference call the next day, the Company explained that it had to implement additional software releases and changes to "improve stability" and that "additional hardware capacity has been added to help mitigate the overutilization issues." *Id*. at ¶ 148. Davis also explained how the peak time outages affected the Company's ability to collect revenues from RAC's customers. *Id.* Constant further revealed details concerning the Company's losses and how those losses impacted the Core U.S. segment going forward. *Id.* at ¶ 149. He stated about two-thirds of the "core same-sales decline" was related to the rollout of the new POS system; some was the "absorption factor . . . as a result of co-workers getting used to the new system," but the remainder was related to the outages. *Id.* at ¶ 150.

Constant was terminated by Davis on December 2, 2016, less than sixty days after the Company announced the truth regarding the failed POS system implementation and its negative

impact on the Company's long-term financial status. *Id.* at ¶ 154.

On January 9, 2017, the Board of Directors of RAC announced Davis' "resignation" as CEO and board member effective immediately. Board Chairman Mark E. Speese, the Company's founder and former CEO, was appointed interim CEO of RAC. *Id.* at ¶ 153.

**B. Defendants' assertions**

Defendants assert the Complaint fails to plead with particularity any false or misleading representation. According to Defendants, far from suggesting that the SIMS implementation was problem-free, RAC disclosed that SIMS was rolled out at a slow pace, starting with one store. Defendants further assert at the outset of the rollout, when SIMS was operational only in a small number of stores, the Company warned as follows:

- RAC's operations were dependent on effective management information systems and failure of the systems to perform as designed, loss of data, or any interruption of the management information systems for a significant period of time could disrupt RAC's business;

- If the management information systems were to sustain repeated failures, the Company might not be able to manage store operations, which could have a material adverse effect on its business, financial condition, and results of operations;

- Enhancements or replacement of store information management systems could have a significant impact on the ability to conduct core business operations and increase risk of loss resulting from disruptions of normal operating processes and procedure that may occur during the implementation of new technology; and

- RAC could make no assurances that SIMS would be implemented without material disruption, that it would be beneficial, or that it would not harm results of operations.

*See, e.g.*, Def. Ex. 3, Form 10-K (filed Mar. 2, 2015) at 14.

According to Defendants, analysts following the Company repeated and explained these warnings in reports to investors. Compl., ¶ 84 (quoting April 20, 2015 analyst report stating "[a]ny disruption in the rollout of the company's new POS system could negatively impact sales and

inventory"). On a quarterly basis throughout the Class Period, RAC informed investors about the number of stores operating SIMS and warned investors concerning the risks inherent in implementing the new system. *See, e.g.,* Compl., ¶¶ 80–83, 87–89, 91, 94–95, 98, 101, 104, 110–11, 114–15, 118–22, 125; *see also* Def. Ex. 3, Form 10-K (filed Mar. 2, 2015) at 1 (warning that the Company's actual operating results might materially differ from projected results depending the Company's "ability to successfully implement [its] new store information management system"). According to Defendants, RAC never suggested the pilot tests of SIMS were without setback, and the slow pace of the rollout demonstrated the Company was taking time to address issues along the way.

According to Defendants, over a year after SIMS rolled out to the first store, when RAC reported on its results for the year ended December 31, 2015, the Company reported it had tested SIMS in only 385 of 2,627 stores. Def. Ex. 15, Form 10-K (filed Feb. 29, 2016) at 68. Defendant Davis explained the Company had completed "numerous upgrades and additions to the system throughout the testing process" and had made "improvements" in areas where the Company was "seeing challenges." Compl., ¶ 111. By that time, RAC had been able to review the data related to the implementation of SIMS in the pilot stores.

Even with only 385 stores in the pilot at that time, the Company projected that "activity associated with putting a new point-of-sales system in the stores" caused distraction that would negatively impact revenue. Def. Ex. 14, Fourth-Quarter 2015 Earnings Call (Feb. 2, 2016) at 13. As Davis explained, the Company planned to roll out SIMS to all stores by the end of the first quarter or beginning of the second quarter 2016 and was projecting that Core revenues in the first

quarter would be down from $629.2 million the prior year to $575 - $590 million.[5] Def. Ex. 6, Form 10-Q (filed May 1, 2015) at 11; Def. Ex. 14, Fourth-Quarter 2015 Earnings Call (Feb. 2, 2016) at 7.

Following the first quarter of 2016, the Company explained it paused the implementation of SIMS over the quarter because it had identified system enhancements that it needed to address and because there was a "greater-than-expected impact" on sales. Def. Ex. 17, First-Quarter 2016 Earnings Call (Apr. 28, 2016) at 3. At the time RAC reported on its results from the first quarter, SIMS was operating in one third of stores in the Core segment, and the Company expected to have the system fully implemented by the end of the third quarter. *Id.*

In the second quarter, the Company completed the implementation of SIMS earlier than expected, and SIMS rolled out to all stores in the Core segment by the end of the quarter. In reporting on the second-quarter results, RAC identified "system performance and usability issues" that had been fixed. Def. Ex. 20, Second-Quarter 2016 Earnings Call (Jul. 28, 2016) at 3. Davis explained that the implementation involved distraction that "negatively impacted Core revenue" and resulted in a decline in that segment's top-line results that was "more significant than . . . expected." Def. Ex. 19, Form 8-K (filed July 27, 2016); Def. Ex. 20, Second-Quarter 2016 Earnings Call (July 28, 2016) at 3. Davis stated "we expect it to be a few quarters before we fully recover." Def. Ex. 20, Second-Quarter 2016 Earnings Call (July 28, 2016) at 3.

During the third quarter, after SIMS was operating in all stores, the system experienced

---

[5] The Complaint alleges RAC's stock price dropped "[i]n reaction to these disclosures" about the SIMS pilot in only 385 of 2,627 stores. Compl., ¶ 112; Def. Ex. 15, Form 10-K (filed Feb. 29, 2016) at 68. According to Defendants, Plaintiffs ignore that the Company reported at the same time that it had written down goodwill as a result of impairment in its Core segment by $1.17 billion and reported a diluted loss of $17.20 per share, instead of what would have been earnings of $0.54 per share, as a result. Def. Ex. 13, Form 8-K (filed Feb. 1, 2016).

"unexpected capacity-related system slowness and outages following the full implementation of our new store information management system within our Core U.S. stores." Def. Ex. 24, Third-Quarter 2016 Earnings Call (Oct. 27, 2016) at 3. When reporting on the third-quarter results, Davis explained that these issues and outages "resulted in a larger than expected negative impact on Core sales." Def. Ex. 23, Form 8-K (filed Oct. 11, 2016) at 2. Because the system was down during peak business hours, key business activities were severely limited and customers fell behind on their rental agreements. Def. Ex. 24, Third-Quarter 2016 Earnings Call (Oct. 27, 2016) at 3.The Company reported it had implemented software releases to improve stability and that other steps were taken to mitigate overutilization issues. *Id.* at 4. As a result, the Company's collection metrics improved significantly during the weeks following the system outages. *Id.* at 3-4. The Company did not experience any capacity-related issues during the fourth quarter of 2016. Def. Ex. 25, Form 10-K (filed Mar. 1, 2017) at 13.

According to Defendants, the majority of the challenged statements in the Complaint consist of RAC's reports concerning the number of stores that had transitioned to operating SIMS, but the Complaint does not plead any facts demonstrating RAC's reports about the number of stores operating SIMS during the rollout were inaccurate. Defendants contend the allegations appear to confuse the difference between the Company's reporting of historical information and reporting of information as of the date the Company was making statements to investors.

Defendants further assert the Complaint's only other basis for claiming falsity with respect to RAC's regular updates on the number of stores operating SIMS is a "litany of opinions from two unidentified low-level employees." Docket Entry # 44 at 20. According to Defendants, the Complaint ignores that RAC never represented SIMS was problem-free and "instead coupled its

reports of the slow rollout with warnings concerning the potential for unexpected results with the new system." *Id*. Defendants argue RAC's reporting of factual information about the number of stores in which SIMS was operating did not create any duty to disclose details or opinions about the issues it was addressing with SIMS during the course of its rollout. Even so, Defendants state RAC began reporting with more detail about SIMS – beyond merely stating the number of stores in which SIMS was operating – once the pilot had expanded around 385 of more than 2,400 stores.

According to Defendants, "[a]t that time, the Company did not pretend the rollout was without a hitch but instead explained, based on what it had learned so far in the pilot, that it expected a company-wide negative impact due to the distraction involved in implementing SIMS." *Id.* Defendants point out that in each quarter of the Class Period the Company "updated its outlook concerning the expected impact of implementing SIMS" and assert these "reports of negative information and opinions concerning a negative outlook did not create any duty to disclose the opinions of lower-level employees concerning SIMS." *Id*. at 20-21.

**C. Applicable law**

**1. Section 10(b) and Rule 10b-5**

Section 10(b) and Rule 10b–5 require that the defendant make a material misstatement or omission. A plaintiff pleading a false or misleading statement or omission as the basis for a § 10(b) and Rule 10b–5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u–4(b)(1) & 78u–4(b)(3)(A):

> (1) specify each statement alleged to have been misleading, *i.e.,* contended to be fraudulent;
> (2) identify the speaker;
> (3) state when and where the statement was made;
> (4) plead with particularity the contents of the false representations;
> (5) plead with particularity what the person making the misrepresentation obtained

> thereby; and
> (6) explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent.

*ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 350 (5th Cir. 2002). This is the "who, what, when, where, and how" required under Rule 9(b) in Fifth Circuit securities fraud jurisprudence and under the PSLRA. *Id.* Additionally, under 15 U.S.C. § 78u–4(b)(1), for allegations made on information and belief, the plaintiff must "state with particularity all facts on which that belief is formed, *i.e.,* set forth a factual basis for such belief." *Id.*

If allegations regarding the statements or omissions are made on information and belief, the complaint must state with particularity *sufficient* facts to support that belief. *Id.* at 353. The plaintiffs are not required to plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. *Id.* If the allegations in the complaint come from confidential sources, there is no requirement that the sources be named. *Id.* at 352.

In determining whether the plaintiff has plead with particularity sufficient facts to support the allegations of false or misleading statements made on information and belief, sources need not be named in the complaint so long as the other facts provide an adequate basis for believing the defendants' statements were false or misleading; if the other facts do not provide such an adequate basis, the complaint does not need to name the confidential sources so long as they are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief. *Id.* at 353. Accordingly, a complaint can meet the pleading requirement by providing a sufficient general description of the personal sources of the plaintiffs' beliefs. *Id* .

**2. PSLRA safe harbor**

With regard to misstatements, the PSLRA establishes a safe harbor shielding a forward-looking statement from liability where such a statement is made by a natural person unless defendants prove that it was made with "actual knowledge . . . that the statement was false and misleading." A statement is forward-looking if it is

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
>
> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer. . . .

15 U.S.C. § 78u–5(i)(1)(A).

The safe harbor protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. 15 U.S.C. § 78u–5(c)(1)(A)(i) and (ii). Where the forward-looking statement is not accompanied by cautionary language, plaintiffs must demonstrate that the defendant made the statement with "actual knowledge" that it was "false or misleading." 15 U.S.C. § 78u–5(c)(1)(B). The safe harbor provision

does not apply where the defendants knew at the time that they were issuing statements that the statements contained false and misleading information and thus lacked any reasonable basis for making them.

Vague optimistic statements are not actionable because a reasonable investor would not rely on them in deciding to buy or sell securities. *In re Fleming*, 2004 WL 5278716, at *9. "Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' 'projections of future performance not worded as guarantees,' and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re Sec. Litig. BMC Software, Inc.,* 183 F.Supp.2d 860, 888 (S.D.Tex.2001) (quoting *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1446 (5th Cir. 1993)).

**D. Discussion**

**1. Safe harbor/ "puffery"**

Defendants contend the alleged misrepresentations are not actionable because they are protected by PSLRA's safe harbor or are inactionable "puffery." ***First***, Defendants argue ¶¶ 103, 109, 110, 111, 121, 127, 129-134 contain protected forward-looking statements. According to Defendants, each of these statements in RAC's quarterly filings, press releases, and conference calls were accompanied by meaningful cautionary language. Defendants assert statements projecting financial results and predicting the impact from the implementation of SIMS are not actionable, both because they were accompanied by meaningful cautionary language and because the Complaint fails to plead any facts that either of the Individual Defendants had actual knowledge that the forward-looking statements were false at the time.

As noted above, a forward-looking statement is a statement containing financial projections, a statement "of the plans and objectives of management for future operations," or a statement "of future economic performance." *In re BP p.l.c. Sec., Litig.*, 843 F. Supp. 2d 713, 747 (S.D. Tex. 2012); 15 U.S.C. § 78u-5(i)(1). The Fifth Circuit has described the test for applying the safe harbor provision of the PSLRA as "two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind." *Southland*, 365 F.3d at 371. Under the first prong, the safe harbor protects a forward-looking statement if it is either (1) identified as forward-looking and accompanied by "meaningful cautionary statements" or (2) immaterial. *Id.* Under the second prong, the safe harbor protects a forward-looking statement if the plaintiff fails to prove the statement was made with "actual knowledge" that it was false or misleading. *Id.*; *see also* 15 U.S.C. § 78u-5(c)(1)(A)(i)-(ii), (B).

The Court first notes Plaintiffs have alleged Defendants had actual knowledge of the falsity of the statements when the statements were made. *See* Compl., ¶¶ 43-52, 62-74. Specifically, Plaintiffs have alleged facts based directly on the personal knowledge of two CWs, both of whom were senior managers, employed in the IT department at RAC where they worked on the technology at the center of the alleged fraud before and during the Class Period. The CWs stated Defendants had actual knowledge of the alleged problems with SIMS, including repeated failures during its implementation, which rendered their statements knowingly false when the statements were made. The CWs assert the outages the Company first disclosed on October 11, 2016 had been ongoing, but previously undisclosed, since pilot testing began in December 2014. *Id.* at ¶¶ 17, 68, 71, 73. Moreover, the CWs stated they wrote and/or received reports which the Individual Defendants also received, and that the Individual Defendants were informed about SIMS issues through various

meetings, including the SIMS Executive Committee meetings and Davis' weekly meetings with his Chief Information Officer, Herman Nell (and later, Angela Yochem). *Id.* at ¶¶ 43-52, 62-74.

Because Plaintiffs adequately allege Defendants "actually knew that their statements were misleading at the time they were made, [the second prong of] the safe harbor provision is inapplicable to all alleged misrepresentations." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244 (5th Cir. 2009) (citing 15 U.S.C. § 78u–5(c)(1)(A)–(B)). Even when the plaintiffs show actual knowledge, the safe harbor may still apply if the statement is either immaterial or is identified as forward-looking and is accompanied by meaningful cautionary language. *Southland*, 365 F.3d at 371. Therefore, the Court considers the first prong of the safe harbor.

Regarding the first prong, Defendants do not assert, nor does the Court find, the statements are immaterial. Additionally, Plaintiffs assert the statements at issue are not forward-looking but false statements of existing fact. Plaintiffs rely on *Carlton v. Cannon*, 184 F. Supp. 3d 428, 468 (S.D. Tex. 2016), *amended on denial of reconsideration*, No. CV H-15-012, 2016 WL 3959164 (S.D. Tex. July 22, 2016),[6] wherein the court stated "[s]tatements describing past or present conditions are not forward-looking statements that trigger the PSLRA's safe harbor." The court in *Carlton* analyzed statements about how a plant operated and determined that statements regarding how "technology was operating and whether the problems *were* merely start-up glitches or more fundamental, structural issues implicating… core proprietary technology" were not forward-looking, but "referred to then-present factual conditions." *Id.* (emphasis in original).

---

[6] The court amended its previous analysis to clarify the legal standard for control-person liability under § 20(a) and the application of that standard to the plaintiffs' allegations against the defendant company's CFO. Although the analysis changed, the outcome did not. *Carlton v. Cannon*, No. CV H-15-012, 2016 WL 3959164, at *1 (S.D. Tex. July 22, 2016).

Here, Defendants focus on ¶¶ 103, 109, 110, 111, 121, 127, 129-134 of the Complaint, representative samples of which are listed as follows: (1) "[The portfolio's] not in bad shape. But it's not quite as good as it was at the start of the quarter." (¶ 103); (2) "We expect the year-over-year declines in core revenues to the weakest in the first quarter, coming in at approximately $575 million to $590 million, ***as we absorb the short-term impact*** as seen in tests of the rollout of our new point-of-sale system to our core store network. This will result in a projected first quarter year-over-year earnings-per-share decrease of over 20% (¶ 109) (emphasis in original); (3) "Yes, that's correct, we expect the EPS to be down more than 20%. It's basically related to revenues in the core business that we think will come in between $575 million and $590 million. ***What we've seen as we have tested the rollout of our new point-of-sale system is we see a pretty short-term impact, just given the activity associated with putting in new point-of-sale system in the stores*.** . . ." (¶ 110) (emphasis in original); (4) "We've tested in 385 locations now, so pretty substantial test and so we have a very good knowledge of what we see in terms of the impact on the stores. ***We've done numerous upgrades and additions to the system through the testing process that's improved many of the areas where we were seeing challenges*.** . . ." (¶ 111) (emphasis in original); (5) "[A]s we look at rolling out the POS system, we obviously want to a manage the impact we have on the stores and reduce the potential transition period impact over all to results. . . . Now that being said, we don't anticipate now that the impact is going to be any more significant than we originally did, but clearly the timing is a little bit different than we originally expected." (¶ 121); (6) "The point of sale implementation negatively impacted Core revenue in the second quarter and reduced our portfolio making it necessary to revise our outlook for the year. ***However, the benefits of the system will play an important role in helping reinvigorate Core revenue in the future by enabling eCommerce and***

***unlocking new pricing capabilities.”*** (¶ 127) (emphasis in original). *See also* ¶¶129-134.

While there are parts of these paragraphs that may contain future statements (“We expect. . . .”), other parts of these paragraphs, and most significantly the parts emphasized in the Complaint, are past or present statements (“What we’ve seen. . .;” “We’ve tested. . .;” “We’ve done. . .”). Even if certain of the statements at issue are “mixed present/future statement[s],” such statements are “not entitled to the safe harbor with respect to the part of the statement that refers to the present.” *Spitzberg v. Houston American Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014); 15 U.S.C. § 78u-5(c)(1)(A)(i)-(ii).

Finally, Plaintiffs correctly assert none of the statements identified by Defendants as forward-looking were accompanied by meaningful cautionary language. A “meaningful” cautionary statement “calls for ‘substantive’ company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors.” *Southland*, 365 F.3d at 372. A “generic and formulaic” cautionary statement that is repeated “only with slight variations” and “used in conjunction with each alleged misrepresentation” is not meaningful. *Lormand*, 565 F.3d at 245. Thus, RAC’s generic risk disclosures do not shield Defendants’ false statements.

According to Plaintiffs, Defendants negated any cautionary statements “through their concomitant false and misleading reassurances that any SIMs distractions had been resolved and was limited to personnel concerns.” Docket Entry # 47 at 4. For example, when the Company filed its annual Form 10-K on February 29, 2016, the Company qualified the potential in a risk disclosure concerning the POS implementation, stating the new POS system “may cause distraction of key personnel.” Compl., ¶114. According to Plaintiffs, Davis and Constant both used the term

"distraction" when discussing the Company's Q2 2016 results on July 28, 2016. *Id.* at ¶¶ 129-134. Davis used the term "distraction" no fewer than seven times during the Q2 2016 earnings call, twice claiming "the distraction … is [] behind us." *Id.* at ¶¶129, 133-34. Constant used the term once during that call, but he did so by referring to "Robert [Davis'] point" about "now that we're through that distraction … the resulting profitability of it will be much better." *Id.* at ¶132.

Drawing all inferences in favor of Plaintiffs, the Court finds any "cautionary language" relied upon by Defendants "do not provide sufficiently meaningful caution about clearly present danger that was materializing." *Lormand*, 565 F.3d at 247 (citing *Rubinstein v. Collins,* 20 F.3d 160, 167–68 (5th Cir.1994) (noting that alleged misrepresentations and cautionary language must be analyzed in context and the presence of cautionary language is not *per se* dispositive). Viewing all of the statements in context, the Court concludes Defendants' safe harbor argument is without merit.

***Second,*** Defendants argue many statements alleged to be false or misleading in the Complaint constitute non-actionable "puffery." *See* Compl., ¶¶ 80, 81, 87, 88, 89, 94, 96, 108, 127, 129.[7] The Fifth Circuit has repeatedly held that statements that constitute "optimistic

---

[7] *See, e.g.*, Compl., ¶ 80 ("[O]ur resolve is strengthened in the pursuit of that balance and the urgency remains high in delivering on the initiatives and results that we have promised."); ¶ 81 ("Our key initiatives have moved from the planning stage to the implementation stage and are set to provide meaningful results in 2015."); ¶ 87 ("Our multi-year plan to improve the profitability and performance of our Core business continues to build momentum on a number of fronts."); ¶ 88 (stating that fully deploying SIMS would "giv[e] us the tools to understand and serve customers like never before"); ¶ 89 ("[W]e are on the cusp of——the next couple of quarters—some of our strategic initiatives coming online and having a meaningful impact to the Business."); ¶ 94 ("We continue to see progress toward transforming our Core business."); ¶ 96 ("Again, we are very pleased with our second-quarter results and optimistic about our future, again, particularly given that two of our largest strategic initiatives are just now getting started in earnest."); ¶ 108 ("We're now two years into our multi-year transformation strategy, with the plan to deliver improved profitability in our core rent-to-own business."); ¶ 127 ("[T]he benefits of the system will play an important role in helping reinvigorate Core revenue in the future by enabling eCommerce and unlocking new pricing capabilities."); ¶ 129 ("Although we are not happy with the negative impact from the distraction related to the rollout of new POS system, we are excited about the opportunities it will continue to

generalizations" or "expressions of confidence in its management or business" are not actionable. *See, e.g.*, *Nathenson*, 267 F. 3d at 419 (statements that a drug was "fast acting" and an "improved formulation" were "optimistic generalizations" and thus non-actionable puffery). "Allegations that amount to little more than corporate 'cheerleading' are puffery, projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *Carlton*, 184 F. Supp. 3d at 455 (quoting *In re BP*, 843 F.Supp.2d at 748).

The statements identified by Defendants are not inactionable statements of puffery - "of the vague and optimistic type" that are not specific enough to perpetrate a fraud on the market. According to Plaintiffs, they detailed specific milestones RAC had purportedly reached in the development and implementation of SIMS while withholding "facts that would undermine the veracity of its statements at the time those statements were made." *Marcus v. J.C. Penney Co.*, No. 13-cv-736-MHS-KNM, 2015 WL 5766870, at *5 (E.D. Tex. Sept. 29, 2015). "Even if these statements were looked upon as mere 'puffery' … that does not negate the duty to disclose other information necessary to make those statements not misleading." *Id.* (citing *Rubinstein*, 20 F.3d at 170). For these reasons, the Court finds Defendants' "puffery" arguments without merit.

**2. Falsity**

The Court now considers whether the Complaint alleges Defendants made materially false and misleading statements and/or omissions. A misleading statement or omission has been adequately pleaded when a plaintiff alleges the defendant "made an untrue statement of material

---

bring well into the future.").

fact" or "omitted to state a material fact necessary in order the make the statements made, in light of the circumstances in which they were made, not misleading." 15 U.S.C.A. §78u-4(b)(1). Plaintiffs assert the Complaint clearly identifies each of the false and misleading statements and omissions, including the speaker and the date when and location where the statement was made; explains why each statement was false and misleading when made; identifies Defendants' purported risk disclosures; explains why each disclosure was insufficient; and contains substantial information from high-level CWs who were employed by RAC before and during the Class Period, based on their own personal knowledge of the facts alleged. Thus, according to Plaintiffs, they have adequately pleaded falsity under the PSLRA.

According to Defendants, the Complaint suggests without support or particularization that Defendants were aware of ongoing material problems. Defendants assert "[a]t bottom, the Complaint contends that the Defendants committed securities fraud because they did not disclose opinions about SIMS espoused by low-level, unidentified employees who left the Company." Docket Entry # 46 at 3. Defendants assert they are not required to present an overly gloomy picture. but even so they reported negative information, did not tout the successful testing or implementation of SIMS, or convey SIMS was fully operational when it was not.

A corporation has "no duty to cast its business in a pejorative, rather than a positive, light." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003). "[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 433 (5th Cir.2002). Instead, the plaintiffs must plead with particularity the reasons why the defendants created "an impression of a state of affairs that differ[ed] in a material way from

[the] one that actually existed." *See Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp.*, Inc., 537 F.3d 527, 541 (5th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir.2002)). Plaintiffs assert they have done just that and again rely on the *Carlton* case.

In its falsity discussion, the *Carlton* court found the plaintiffs had "plausibly alleged, with particularity, that the statements about the Columbus plant's operations materially misled investors to believe that KiOR was a viable business when it was not." 184 F. Supp. 3d at 472. According to the court, confidential witnesses, all former KiOR employees, "detailed issues at the Columbus plant throughout this period that were more severe than [CEO] Cannon and [CFO] Karnes represented." *Id*. And even though Cannon disclosed some of these issues in January 2014, the court noted "he also assured investors on the earnings call that the company would make improvements to the plant that would have it back up and running," but the plant was shut down two months later. *Id*. Although Cannon and Karnes argued they had no obligation to characterize the operational issues at the Columbus plant as "severe design flaws" rather than as "start up issues," the court stated as follows:

> But by downplaying the extent and duration of the technological problems as normal start-up issues, while simultaneously assuring investors that the core technology was sound for commercial-scale production, these defendants represented that the . . . plant was a viable operation that had minor and temporary setbacks, overcame them, and was now ready for the long haul.

*Id.* The court found the third amended complaint plausibly alleged "the misleading nature of these representations with facts that are sufficiently particularized to explain why and on what basis they were misleading." *Id.* at 472-73.

Notwithstanding the limited negative information Defendants may have disclosed, Plaintiffs assert Defendants, having chosen to speak about the POS system, had a duty to disclose the full truth

about the problems plaguing the POS system and the Company-wide rollout of the system. In the Complaint, Plaintiffs allege Defendants' statements in each of the four partial disclosures (fourth quarter and full year 2014 results, first quarter fiscal 2015 results, second quarter fiscal 2015 results, and third quarter fiscal 2015 results) were false and misleading when made because Defendants knew but failed to disclose that:

> (a) the POS system was running on an outdated Oracle operating system that made implementing any changes or upgrades both extremely difficult and expensive and substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system;
>
> (b) the POS system lacked sufficient store-level redundancies, which magnified the problems encountered during the implementation;
>
> (c) the POS system was not advanced enough in early 2015 even for pilot testing and still required substantial development efforts and modifications to make it compatible for Company-wide use; and
>
> (d) the problems with the POS system, including intermittent outages, were serious enough to at least warrant additional testing before the program was expanded to other pilot stores.

Compl., ¶¶ 85, 92, 99, 105.

Further, for each of these partial disclosures, Plaintiffs allege the Company's disclosures about the risks of the implementation of the POS system were materially false and misleading when issued as the Defendants knew or were reckless in not knowing that the Company was not merely "at risk" of the POS not performing as designed or sustaining "repeated failures." *Id.* at ¶¶ 86, 93, 100, 106. According to Plaintiffs, this was already happening during in-house testing and in the pilot stores where the system was implemented. Plaintiffs further allege Defendants knew or were reckless in not knowing that the Oracle-based operating system the new POS system ran on was already

considered to be at "end of life" and that the age of the Oracle-based operating system that SIMS was built on was causing it to clash with the current versions of software that it needed to interact with. *Id.* According to Plaintiffs, Defendants created "an impression of a state of affairs that differ[ed] in a material way from [the] one that actually existed." *See Shaw*, 537 F.3d at 541.

Defendants rely on *Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.,* No. 14 CV 3876-LTS, 2016 WL 1261135 (S.D.N.Y. Mar. 30, 2016), wherein the defendants made public disclosures about RM's live check program that were generally positive but that downplayed increasing delinquency rates with the new program. "The thrust of all of Plaintiffs' allegations [was] that RM's positive statements regarding the live check program expansion, its loan loss reserve provisions, and its underwriting practices were materially misleading, or omitted information necessary to make the statements not misleading, because RM and the Individual Defendants knew, at the time of each such statement, that: (1) staffing problems had created, or were likely to lead to, increased delinquencies; (2) that RM's underwriting practices were unsound and would lead to increased delinquencies as the live check program grew; and (3) that there were material undisclosed financial reporting and control problems." *Id.* at *5.

According to the court, the alleged misstatements as to RM's underwriting were statements in the nature of belief or opinion, and the plaintiffs did not allege facts demonstrating RM or the Officer Defendants did not believe the statements were true at the time they were made. *Id.* at *10. The court explained that "[a]lthough Plaintiffs have alleged that lower-level branch staff were skeptical of RM's live check underwriting and were experiencing difficulties in servicing live check loans, Plaintiffs have alleged no facts demonstrating that RM's management believed that the Company's underwriting practices were unsound or inappropriate for a program of that type. . . ."

*Id.* The court concluded the plaintiffs' allegations did not identify misstatements or omissions of material facts, but rested solely on "non-actionable opinion statements by the Officer Defendants and RM. . . ." *Id.* at *11.

In *Waterford*, unlike in this case, the plaintiffs did not allege the defendants were aware of ongoing material problems that were already causing problems at the time the statements or omissions were made. There, the plaintiffs alleged no facts demonstrating RM's management believed the Company's underwriting practices were unsound or inappropriate for a program of that type. Instead, they alleged the defendants made poor business choices, including understaffing branches which "were likely to lead to" such problems. *Id.* at *5.

Here, Plaintiffs have alleged facts indicating Defendants knew of the problems with the POS development and implementation. What is more, the Court is not convinced the CWs relied upon in the Complaint were "low-level" employees whose corroborating allegations should be discounted like in the *Waterford* case, as maintained by Defendants in their reply brief. Confidential witness accounts are a permissible basis on which to allege falsity. As noted above, the witnesses must be "identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements."[8] *ABC Arbitrage*,

[8] In *ABC Arbitrage,* the Fifth Circuit found that "allegations concerning a conversation between 'a high ranking [Company] official' who was 'a top executive of [the Company]'" and one of the company's executive vice presidents were "pleaded with sufficient particularity to meet the standard for pleadings based on information and belief" in that "[t]his executive, and his conversation with the [company's executive vice president], is described with sufficient particularity to support the probability that a person in such a position would possess the information pleaded and that, to the extent it is necessary, construing the allegations in the light most favorable to Plaintiffs, this executive was himself Plaintiff's source for this information." *In re Fleming*, 2004 WL 5278716, at *9 (quoting *ABC Arbitrage*, 291 F.3d at 357). The Fifth Circuit concluded that the plaintiffs'

291 F.3d at 351-53. In lieu of names, plaintiffs must provide details such as "job descriptions, individual responsibilities, and specific employment dates for the witnesses." *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 839 (S.D. Tex. 2016) (citation omitted).

In their Complaint, Plaintiffs provide each CW's job title and description, her reporting structure, dates of employment, office location, and basis of knowledge. Compl., ¶¶ 16-17. Defendants assert the CWs were no longer RAC employees during the third quarter of 2016, when SIMS experienced capacity-related outages, and therefore they have no personal knowledge of what led to the outages and are in no position to opine that the prior statements about SIMS were proven false by the subsequent outages. Even taken as true, Defendants assert none of the CW allegations are inconsistent with the Company's factual reports or the negative updates concerning SIMS in the latter half of the Class Period. According to Defendants, the opinions of two unidentified former employees who were no longer at RAC at the time of the third-quarter outages do nothing to demonstrate that, at the time of the prior statements, anyone predicted significant outages or problems with SIMS beyond those the Individual Defendants had already disclosed.

In *Carlton*, Cannon and Karnes challenged the confidential witnesses' qualifications to offer opinions. 184 F.Supp.3d at 473. For example, they argued the confidential witnesses were "several levels removed from any operational authority" and could not distinguish between a design flaw and a start-up issue at the Columbus plant. *Id.* However, the court noted both confidential witnesses had

---

allegations relying on the Group Services Report, the *Stuttgarter Zeitung* article, the MMRs, and the "Kom–Aktuell" newsletter, "as well as the allegations based on a July 1998 conversation between a top Alcatel executive and Dunoge, survive dismissal under section 78u–4(b)(1) of the PSLRA." *ABC Arbitrage*, 291 F.3d at 358-59. However, as to those allegations that survived dismissal under the PSLRA's pleading requirements, the court found the plaintiffs failed to allege *materially* false or misleading statements or omissions sufficient to state a securities fraud claims under § 10(b) and Rule 10b-5 upon which relief could be granted. *Id.* at 362 (emphasis added).

worked at the Columbus plant from June 2012 to February 2013, and the complaint relied on their "firsthand observations from that work." *Id.* The court further noted both confidential witnesses had engineering and oil-refinery experience, and this experience was not insufficient or unreliable. *Id.* at 473-74.

The defendants also argued the allegations of the confidential witnesses' statements and reports were not sufficiently particular. *Id.* at 474. The defendants also criticized "the failure to directly quote the confidential witnesses and instead vaguely and conclusorily summarizing the information allegedly obtained from them." *Id.* The *Carlton* court pointed out that a complaint relying in part on confidential witnesses must identify the witnesses' job descriptions, individual responsibilities, specific employment dates, experience, and how they knew the information alleged. *Id.* According to the court, the third amended complaint provided this information. *Id.*

Similarly here, the Complaint identifies the CWs' job descriptions, individual responsibilities, specific employment dates, experience, and how they knew the information alleged. The Court finds the two CWs have been described with sufficient particularity to establish their reliability and personal knowledge. According to Plaintiffs, both CWs were high level managers who worked in RAC's IT department for years, both before and during the Class Period, where they gained personal knowledge of the central issue in this case – the Company's failed attempt at developing and implementing the POS technology platform. According to Plaintiffs, both before and during the Class Period, "the Company and the Individual Defendants relied on the CWs' experience and knowledge to help address the burgeoning problems with SIMs," and by reason of such first-hand knowledge and experience, "the testimony of these CWs reliably details the nature and extent of the issues with SIMs." Docket Entry # 47 at 1.The Court further notes the CWs

independently corroborate one another's statements. *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 259 (5th Cir. 2005) (CWs' statements sufficiently reliable to establish falsity where corroborated by other CWs). Considering Plaintiffs' allegations as a whole, including those provided by the Cws, the Court finds the Waterford case relied upon by Defendants is distinguishable.

Finally, the Court considers several other assertions made by Defendants, including that the Company reported it took one year to rollout the POS system to just 385 stores of the Company's 2,627 stores; the Company used the phrase "fully operational" in only three instances (when SIMs rolled out to 1, 10 and 34 stores); and the Company reported negative information in its disclosures, including that numerous upgrades had been required, the Company had been "seeing challenges," and implementation was going to negatively impact revenue. According to Defendants, the Complaint is entirely devoid of facts indicating that (1) the Individual Defendants' factual reports concerning the number of stores in which SIMS was operating were false or (2) the Individual Defendants did not believe the projections they gave concerning expected negative impacts from the SIMS implementation at the time of these reports or statements.

Regarding the ***first issue***, Defendants argue the number of stores they reported to the market as "operating SIMS" each quarter was correct and thus cannot serve as the basis for liability. However, Plaintiffs are not challenging the number of stores where SIMS was installed, but that Defendants' repeated characterization of SIMS as "operational" in those stores was meant to and did convey to the market that SIMS was fully functional in those stores (which it was not). Plaintiffs have identified numerous instances over the Class Period where Defendants indicated SIMS was "functional in a growing number of locations." Docket Entry # 47 at 3. *See, e.g.,* Compl., ¶ 80 ("New POS system is fully operational in its first site"); ¶ 81 ("I am excited to say the new POS

system is now fully operational in its first site");¶ 87 ("New POS system … is fully operational in 34 stores"); ¶ 95 ("150 core US [are] running the new system exclusively); ¶ 104 ("[POS] is operational in 8.5% of our Core U.S. stores"); ¶ 115 ("We have approximately 385 of our 2,627 Core U.S. rent-to-own stores on the new system as of December 31, 2015 and we expect to complete the roll out to the remaining stores in 2016."); ¶ 119 ("Today approximately one-third of our core stores are operating this new POS system."); ¶ 129 ("After out initial delay, in Q2 we completed the roll-out of our new POS system. . . ."). According to Plaintiffs, the sparse "negative information" Defendants claims to have disclosed was inconsequential and "was offset by accompanying positive statements and baseless reassurances." Docket Entry # 47 at 3.

The Court agrees with Plaintiffs that whether the term "operational"/ "fully operational" was intended to and did convey to the market that SIMS was fully functional is best answered based on the evidence produced during a later stage of this litigation. *See Spitzberg,* 758 F.3d at 689 (stating whether Defendants–Appellees will ultimately prevail on their argument that "no investor would understand or did understand the term 'reserves' to mean 'reserves' as defined by the PRMS" can "only be answered based on the evidence produced during a later stage of this litigation"); *see also Lormand*, 565 F.3d at 249 ("defendants continually skewed the mix of information by omitting the known severe risks associated with these business actions even as they recognized signs that those risks had already materialized").

Regarding the ***second issue***, the CWs stated Defendants had actual knowledge of the alleged problems with SIMS, including repeated failures during its implementation, which rendered their statements knowingly false when the statements were made. The CWs confirm the outages the Company first disclosed on October 11, 2016 had been ongoing, but previously undisclosed, since

pilot testing began in December 2014. Compl., ¶¶ 17, 68, 71, 73. Moreover, the CWs confirmed that they wrote and/or received reports which the Individual Defendants also received, and that the Individual Defendants were informed about SIMS issues through various meetings, including the SIMS Executive Committee meetings and Davis' weekly meetings with his CIO, Herman Nell (and later, Angela Yochem). *Id.* at ¶¶ 43-52, 62-74.

In sum, the Court finds a reasonable person may draw the plausible inferences from the allegations that Defendants made material misrepresentations or omissions as described above.

**3. Failure to disclose information required under Item 303 of SEC Regulations S-K**

Plaintiffs further allege Defendants violated Item 303 of Regulation S–K, 17 C.F.R. § 229.303, by failing to disclose trends or uncertainties that would have a material impact on RAC's sales, revenues, and income. "Item 303 of Regulation S–K requires the disclosure of known trends, demands, commitments, events, and uncertainties that are reasonably likely to have a materially adverse effect on a company's liquidity, net sales, capital resources, revenues, or income from continuing operations." *In re Blockbuster Inc. Sec. Litig.*, No. 03-cv-0398-M, 2004 WL 884308, at *11 (N.D. Tex. Apr. 26, 2004).

According to Plaintiffs, Item 303 of Regulation S–K obligated Defendants to disclose, among other things, that: (i) the POS system was running on an outdated Oracle-based operating system which made implementing any changes or upgrades extremely difficult and expensive and substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system; (ii) the POS system was not advanced enough in early 2015 even for pilot testing and still required substantial development efforts and modifications to make it compatible for Company-wide use; (iii) the POS system lacked sufficient redundancies which

would magnify any problems encountered during the implementation; (iv) by the first quarter of 2016, the problems with the POS system were serious enough to negatively impact the Company's collection efforts on a Company-wide basis, and, thus, negatively impact RAC's financial results; (v) RAC's projected growth strategy was unsustainable if the Company was unable to adequately collect overdue amounts in its rent-to-own portfolio; and (vi) the importance of the POS system to many of RAC's other strategic initiatives. Compl., ¶¶ 75-79. The Complaint also alleges the SOX certifications Davis and Constant signed during the Class Period were false. *Id.* at ¶ 79.

The Fifth Circuit has not held that Item 303 creates a duty to disclose under the Exchange Act, and other circuits are divided on the question. *Compare Stratte–McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (Item 303 creates an actionable duty to disclose), *with In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) (Item 303 does not create a duty to disclose under the Securities Act). Considering Defendants have not moved to dismiss on this issue, and further considering the Court's findings as to the issues on which Defendants moved to dismiss, the Court need no reach the question at this time of whether Item 303 creates a duty to disclose under the Securities Act.

The Court now considers whether the Complaint fails to establish a strong inference of scienter.

## VI. WHETHER THE COMPLAINT ESTABLISHES A STRONG INFERENCE OF SCIENTER

### A. Defendants' assertions

Defendants assert the Complaint does not demonstrate any inference of scienter with respect

to any statement by either of the Individual Defendants. Defendants assert the Complaint's CW allegations do not create any inference of scienter. According to Defendants, the Complaint contains none of the typical motive allegations, such as allegations that a corporate executive was motivated to issue false statements to capitalize on insider trades of the company's stock. Defendants argue the only supposed "motive" is that RAC prematurely placed SIMS into service to avoid a write-down in the Company's financial statements of the development costs associated with SIMS, and these allegations fail to raise any inference of scienter. Defendants next assert Plaintiffs' assertions regarding the importance of the Core U.S. segment do not add to the scienter analysis. Finally, Defendants contend Davis and Constant's resignations do not support an inference of scienter.

**B. Applicable law**

The PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To establish scienter, a plaintiff must show the defendant intended to deceive, defraud, or manipulate, or that the defendant acted with severe recklessness. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009). Stated differently, in the Fifth Circuit, "plaintiffs must plead facts giving rise to a 'strong inference' that defendants acted intentionally or severely recklessly to survive a motion to dismiss." *In re EDS and "ERISA" Litig.*, 298 F.Supp.2d 544, 555 (E.D. Tex. 2004).

Severe recklessness is defined as follows:

> Severe recklessness, which, properly defined and adequately distinguished from mere negligence, resembles a slightly lesser species of intentional misconduct. . . limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 555-56 (quoting *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)). A plaintiff can raise a strong inference of scienter by alleging either conscious disregard of the truth or "that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005).

The United States Supreme Court has outlined a framework for analyzing motions to dismiss § 10(b) complaints for failing to establish a strong inference of scienter. "First, as in any other motion to dismiss, the court accepts all factual allegations in the complaint as true." *City of Pontiac Gen. Employees' Ret. Sys. v. Hanger, Inc.*, No. A-14-CA-1026-SS, 2017 WL 384072, at *10 (W.D. Tex. Jan. 26, 2017)(citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007)). Second, the court considers the entire complaint, other sources typically examined in a 12(b)(6) motion, sources incorporated by reference into the complaint, and matters of which a court may take judicial notice. *Id.* Third, in determining whether the pleaded facts give rise to a strong inference of scienter, as required by the PSLRA, a court should consider all of the facts alleged, taken collectively, and should also take into account plausible opposing inferences. *Id.*

"The inference of scienter need not be irrefutable, nor even the most compelling of all competing inferences, but must be strong in light of other inferences." *City of Pontiac*, 2017 WL 384072 (citing *Tellabs*, 551 U.S. at 324). To create an inference of scienter, "the allegations in the complaint must be 'cogent and compelling,' not simply 'reasonable,' or 'permissible.' " *Local 731*, 810 F.3d at 957 (quoting *Tellabs*, 551 U.S. at 323). Plaintiffs may establish a strong inference of scienter by circumstantial evidence. *In re EDS and "ERISA" Litig.*, 298 F.Supp.2d at 556.

The Fifth Circuit Court of Appeals has also rejected the group pleading approach to scienter,

which would allow a plaintiff to prove state of mind through the collective knowledge of all the corporation's officers and employees. *Id.* Instead, a court looks only to the state of mind of the corporate officials who made or issued the alleged misleading statement to determine if a complaint sufficiently pleads scienter. *Id.*; *see also Trendsetter Inv'rs, LLC v. Hyperdynamics Corp.*, Civ. A. No. H-06-0746, 2007 WL 172627, at *13 (S.D. Tex. Jan. 18, 2007) ("The plaintiff must allege facts sufficient to raise a strong inference of scienter with respect to each individual defendant; so-called group pleadings are insufficient.").

Allegations of "motive and opportunity standing alone" are not enough to establish scienter, but such circumstantial evidence may "meaningfully enhance the strength of the inference of scienter." *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008). Without more, "an officer's position with a company does not suffice to create an inference of scienter." *Izadjoo*, 237 F.Supp.3d at 509. An officer's position with a company can support the scienter inference only when viewed with other "special circumstances." *Id.* (quoting *Local 371 I.B. of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951, 959 (5th Cir. 2016)). These special circumstances include (1) a small company in which corporate executives are likely to be familiar with day-to-day operations, (2) transactions "critical to the company's continued vitality," (3) omitted information readily apparent to the speaker, and (4) internally inconsistent statements. *Id.*

Corporate statements that allegedly misrepresent facts or omit facts necessary to avoid misrepresentation can be connected to a particular officer if the plaintiff alleges the officer signed the document in which the statement appears or adequately alleges the officer's involvement in creating the document. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).

Signed SOX certifications support scienter only "if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007)(internal quotation marks omitted). A defendant's signature on a SOX certification, without more, does not support a strong scienter inference. *Izadjoo*, 237 F. Supp. 3d at 509 (citations omitted).

**C. Discussion**

Although the Court's "job is not to scrutinize each allegation in isolation but to assess all of the allegations holistically," *Tellabs, Inc.*, 551 U.S. at 326, the Court has categorized the scienter allegations for convenience. The Court then assesses the allegations holistically. *See City of Pontiac*, 2017 WL 384072, at *10.

**1. CW allegations**

Defendants first assert the Court should discount the confidential witness allegations. According to Defendants, "[a]llegations regarding scienter that are derived from confidential sources *detract* from their weight in the scienter analysis, and courts *must discount* allegations from confidential sources." (Docket Entry # 44 at 26)(emphasis in original) (quoting *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 378 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Trust U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012)). However, the Fifth Circuit Court of Appeals in *Spitzberg* recently reversed and remanded the dismissal of a securities fraud complaint and held that scienter was adequately alleged based, in large part, on statements from confidential witnesses.

In *Spitzberg*, the plaintiffs, investors in a Houston-based energy company, alleged the

company's statement that it had "estimated recoverable reserves of 1 to 4 billion barrels" of oil was misleading. 758 F.3d at 680. The plaintiffs argued the statement "communicated to investors that certain geological testing had been completed based on the definition of 'reserves' used by the oil industry and by SEC regulations." *Id.* The defendants argued they had not "explicitly represent[ed] that any drilling had yet occurred," that their other references to drilling were ambiguous, and that "no investor would understand or did understand the term 'reserves' to mean 'reserves' as defined by the [oil industry]." *Id.* at 681.

The plaintiffs alleged other fraudulent statements were made after test drilling began. *Id.* Specifically, in a number of regulatory filings and press releases, the defendants repeatedly stated that a test well had produced "strong inflow[s]" and "significant shows" of both "gas and oil." *Id.* But according to the statements (cited extensively in the complaint) of confidential witnesses that were allegedly involved in the drilling operations, the test well produced no "inflow[s]" or "shows" of oil or "flowable hydrocarbons" during test drilling. *Id*. at 682.

The Fifth Circuit assumed the truth of the confidential witness statements. *Id.* at 684. The court recognized that although additional evidence at later stages of the proceedings may confirm or undermine the factual proposition set forth by a particular confidential witness, the court noted that the plaintiffs' contention, at the motion to dismiss stage, was "at least as compelling as any opposing inference one could draw." *Id.* at 684-85. Therefore, according to the Fifth Circuit, the plaintiffs' complaint could not be dismissed based on the failure to plead severe recklessness. *Id.* at 685.

Even cases relied upon by Defendants (most older than *Spitzberg*) state confidential source statements are a permissible basis on which to make an inference of scienter. Confidential witness

allegations may be credited if, as they are here, such sources are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded." *Shaw*, 537 F.3d at 535 (ellipses omitted).

Here, the confidential witnesses are described with sufficient particularity to support the probability that a person in their position would possess the information pleaded. The CWs detail how Davis and Constant were made aware of information that demonstrated, contrary to their statements to the public, SIMS was initially not ready for pilot testing and then still not ready for general rollout due to persistent and pervasive problems which threatened to affect the Company's ability to record and track sales and payments. Compl., ¶¶ 16-17, 43, 47, 50-52, 65-68, 71-74.

Defendants next assert the Complaint contains no facts to "support the probability that a person in the position occupied by [either of the confidential witnesses] would possess the information" ascribed to him. *Shaw Grp.*, 537 F.3d at 535, 539 (alteration in original). The Court disagrees. According to Plaintiffs, both CWs were high level managers who worked in RAC's IT department for years, where they gained personal knowledge of the Company's attempt at developing and implementing SIMS. Defendants next contend Plaintiffs fail to allege particularized facts concerning the state of mind of either Davis or Constant regarding any alleged misrepresentation.[9]

[9] On the one hand, Defendants assert the Complaint does not demonstrate how either CW had any first-hand information concerning either of the Individual Defendants' state of mind or knowledge of any specific event, conversation, or document. On the other hand, Plaintiffs assert such knowledge in not necessary, noting what Defendants "actually believed . . . is irrelevant to whether Defendants . . . were severely reckless." *Spitzberg*, 758 F.3d at 686. As pointed out by Plaintiffs, in *Spitzberg* the Fifth Circuit relied in large part on allegations attributed to a single confidential witness that did not involve first-hand knowledge of the individual defendants' state of mind as sufficient to plead "circumstances constituting at least severe recklessness." *Id.* at 684-85. The court did not rely in its opinion on any allegations that the confidential witness interacted with the individual defendants; he only allegedly worked for another company that was the defendants' business partner. *Id*. at 681-85.

Defendants contend the Complaint vaguely references "Individual Defendants" or "the Company," as follows: (1) that company officials "would have communicated any significant problems and delays to Davis and Constant" via "color-coded SIMS incident reports . . . and at SIMS Executive Steering Committee meetings," Compl. ¶ 51; (2) that "Davis held weekly meetings with his CIOs" during the Class Period in which "SIMS issues were always discussed," (*id.* ¶ 52); and (3) that "Davis and Constant were kept aware of any issues the technology team was encountering with implementing SIMS." *Id.* at ¶ 74. According to Defendants, these vague and conclusory allegations add nothing to the scienter analysis, as they are drawn from two lower-level former employees, who—according to the Complaint—did not participate in any meeting with either Davis or Constant.

It is true an officer's mere presence at meetings, without specific allegations regarding discussions at the meetings, will not support an inference of scienter. *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d 600, 632 & n.31 (S.D. Tex. 2013). However, this is not a case where Plaintiffs try to impute knowledge of problems with the POS system to Davis and Constant simply because of their mere presence at meetings. "Plaintiffs have pointed to specific meetings, reports, and practices whereby [Defendants] were made actually aware of the [POS'] status." *See In re EDS and "ERISA" Litig.*, 298 F. Supp. 2d 544, 557 (E.D. Tex. 2004). Both CWs confirm *how* information about the POS' problems was communicated to Davis and Constant; *when* meetings occurred (¶¶ 32, 50-52, 74, 158), *who* was involved in communicating information (¶¶ 46, 50-52, 65, 71, 74), *what* reports were titled and *by whom* (¶¶ 16-17, 46-47, 68, 71, 74), facts regarding Davis and Constant's *motive* in acting severely recklessly (¶¶ 16, 53-63, 73-74, 159-73), and the contemporaneous problems the POS experienced during the Class Period, rendering Defendants' statements or omissions false and misleading. (¶¶ 45, 48-50, 64-73).

According to the CWs, Davis was involved in the POS project from the onset, and he held weekly meetings with RAC CIO Nell until April 2016 where SIMS was always discussed. Compl., ¶¶ 52, 74. Davis and Constant also were members of and participated in the "SIMS Executive Steering Committee," which was a "C-Level meeting" wherein the SIMS' progress and issues were discussed. *Id.* at ¶ 74. The Executive Steering Committee met quarterly at first, and then more frequently as the rollout progressed. *Id*. at ¶ 51. These Executive Steering Committee meetings were attended by Davis, Constant, CTO Liebe, CIO Nell, Department Heads, and SVPs. *Id.* Davis and Constant also periodically attended weekly SIMS project team meetings during which changes, challenges, and problems related to SIMS were discussed. *Id*. at ¶¶ 50-52, 74. As the SIMS rollout accelerated (and therefore into the Class Period), and more issues arose, Davis' involvement with the POS increased. *Id*. at ¶ 74. Both Davis and Constant were kept aware of any issues the technology team was encountering with implementing SIMS. *Id.*

What is more, both Davis and Constant admitted during the Class Period that management was deeply involved with the SIMS rollout: "the approach that we took to learn in the early stages had a lot more care and feeding [sic], if you will, and hand-holding and oversight from multi-levels of management" (¶ 134 – Davis) and "as we roll out stores every week, we are constantly monitoring the results to make sure it is landing well in our stores" (¶ 121 – Constant).

With respect to the various reports the CWs describe, those are pled in sufficient detail, even under the case law relied on by Defendants. "[F]or allegations concerning internal corporate reports alone to support a strong inference of scienter (1) the complaint must have corroborating details regarding the contents of allegedly contrary reports, their authors and recipients, and (2) the corporate reports be connected to the speaking executive in a persuasive way." *Neiman* v. *Bulmahn*,

854 F.3d 741, 748 (5th Cir. 2017) (citations omitted). Both criteria are met here. Corroborating details, authors, recipients, and their connections to Davis and Constant are all adequately pled.

In addition to providing specific facts regarding how, when, and where information regarding the POS system was communicated to Defendants Davis and Constant, the former employees also provide the what – the scope of issues the POS system experienced prior to and during the Class Period:

- By the end of 2014, just prior to the start of the Class Period, the POS system experienced serious capacity and performance issues including but not limited to (1) network bandwidth issues; (2) scalability problems; (3) capacity problems including network capacity, database capacity, and old-technology capacity problems; (4) functionality problems with payment methods; and (5) hundreds of other varying issues. (¶ 48). Certain issues continued through at least June 2016. (¶ 73)

- RAC's systems ran on an older Oracle-based operating system that newer software was increasingly unable to interact with. (¶ 65)

- The POS System did not meet the Company's needs when it was first rolled out in Plano, Texas, resulting in hundreds of issue detailed in Root Cause Analysis Reports. Moreover, the overall functionality of the POS system never improved much, and did not work well in the 200-300 additional stores it was rolled out to in the first half of 2015 (during the Class Period). POS system continued to generally fail as it was rolled out to additional stores. (¶ 66)

- The Company did not fix problems with the POS system before implementation in additional stores and major bugs were still being worked on as of June 2016. Necessary redundancies in the POS system were not in place by June 2016, which also magnified the risk of outages the Company was experiencing. (¶ 73).

Taken together, these facts—which the Court must accept as true—plead a strong inference that Davis and Constant were at least severely reckless during the Class period, "especially when they are juxtaposed with what they told the public:"

- On February 3, 2015, Davis stated "the new POS system is now fully operational in its first site." (¶ 81). Defendants did not disclose the system was unable to interact with the older system, or that it was experiencing "serious capacity and performance issues"—instead, the Company's 10-K merely stated future issues hypothetically might impact the Company's

performance (when present issues were already hampering performance at the pilot store). (¶ 83).

- On April 27, 2015, the Company stated POS was "fully operational" in 34 stores. No warnings were provided to the market about what was internally known. (¶ 87).

- On February 2, 2016, Constant revealed that RAC saw a "short-term impact" due to a "distraction" in stores where the POS system was being rolled-out, and Davis stated that "numerous upgrades and additions to the [POS] system …improved any of the areas where we were seeing challenges." (¶¶ 110-11). There was no disclosure of the host of ongoing capacity and functionality issues. (¶ 116).

- On July 28, 2016, Davis stated "we decided to accelerate the roll-out, which was completed in its entirety in Q2" and that "the system performance and usability issues identified in the first quarter were fixed," and "that distraction is behind us." (¶ 129). Again, there was no disclosure of the ongoing issues and outages being experienced.

Docket Entry # 45 at 24-25.[10]

**2. Motive**

Defendants spend a large part of their argument on motive, or the lack thereof. According to Defendants, Plaintiffs' only attempt to allege a "motive" is to assert that RAC prematurely placed SIMS into service to avoid a write-down in the Company's financial statements of the development costs associated with SIMS, and these allegations fail to raise any inference of scienter for the following reasons. ***First***, according to Defendants, this suggestion of a "write-down" motive is drawn entirely from the purported statements of a single confidential witness—who is not alleged to have been in a position to know anything about RAC's accounting policies or financial statements—and whose allegations "must [be] discounted." *See Shaw Grp.*, 537 F.3d at 535, 539. ***Second***, Defendants assert a motivation to take action that will maximize a company's financial results *i.e.*, placing SIMS into service to avoid writing off development costs, is not motive to

[10] As urged by Plaintiffs, the allegations belie Defendants' argument that the Complaint engaged in "group pleading" only. These statements, and other alleged facts, are specifically attributed to each Individual Defendant.

commit securities fraud. According to Defendants, Plaintiffs' contention is nothing more than an allegation that the Individual Defendants were motivated to increase profits, which is insufficient to support a claim of scienter as a matter of law. ***Third***, Defendants assert the supposed "write-down" motivation is illogical and inconsistent with the other alleged facts—the scienter inference Plaintiffs propose is not compelling, much less *at least as compelling* as far more logical inferences that can be drawn from the alleged facts.[11] *See Tellabs*, 551 U.S. at 324 ("A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

In *Spitzberg*, the Fifth Circuit noted the parties had mistakenly focused on the presence or absence of a pecuniary motive for the defendants to commit securities fraud, as the "absence of a motive allegation, though relevant, is not dispositive" under the PSLRA. 758 F.3d at 685 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1324 (2011)). Although motive allegations

---

[11] The Complaint states "the POS system was rolled out in December 2014 despite its flaws because that project was close to reaching its [five]-year anniversary after having been started in 2009." Compl., ¶ 63. But according to Defendants, the Complaint does not explain the significance of the five-year anniversary for write-down purposes, nor does it explain why five years would have been any more significant than three, four, or six years. Defendants assert the notion that the Individual Defendants were motivated to misrepresent information about the SIMS rollout even while knowing SIMS was supposedly bound to fail due to "material flaws"—simply because the software-development project had reached its fifth anniversary—is illogical.

Defendants further argue Plaintiffs' proposed "motive" inference becomes more illogical when one considers the bigger picture, as the Complaint notes, for year-end 2015, the Company recorded and disclosed that it was taking a $1.17 billion dollar write-down to the goodwill asset on its balance sheet. Compl., ¶ 107. Defendants challenge Plaintiffs' over-inflated estimates, but even taking them as true, Defendants assert the value of a potential SIMS write-down was dwarfed by the company's $1.17 billion 2015 goodwill write-down. According to Defendants, Plaintiffs' allegations require the illogical assumption that, while the Individual Defendants disclosed over a billion dollars' worth of write-downs to investors, they also were willing to commit securities fraud to prevent a much smaller write-down of the cost of the SIMS program.

might "meaningfully enhance the strength of the inference of scienter," the Fifth Circuit found a strong inference of severe recklessness did not depend on such an enhancement in the *Spitzberg* case. *Spitzberg*, 758 F.3d at 685.

According to Plaintiffs, the CWs provide facts that raise compelling evidence of the Individual Defendants' motive. The Complaint alleges Defendants were aware that the operating system SIMS ran on was outdated prior to and during its initial rollout, with severely limited functionality, but the Individual Defendants still directed the rollout late in 2014 in order to avoid having to write-down that asset. Compl., ¶¶ 16, 47, 63. According to the Complaint, that was the predominant reason the POS system was first rolled out in late 2014, despite all of its known flaws. *Id.* at ¶¶ 43, 63. Such a write-off - approximately $175 million - would have been substantial and material to the Company's 2014 financial results, and it would have turned its earnings upside down, from positive to negative earnings for the fourth quarter of 2014. *Id.* at ¶¶ 53-61, 169-73.

Although Defendants challenge CW-1's lack of knowledge of RAC's accounting policies and financial statements, Plaintiffs assert they are not relying upon CW-1 for facts regarding accounting irregularities or accounting policies. Rather, CW-1 provides contemporaneous facts regarding the Defendants' motivation to push out the POS system too early, when (contrary to their public statements) the POS system was not working and dragging down the Company's financial performance. These allegations enhance the strength of the inference of scienter.

**3. Core operations**

Defendants next assert Plaintiffs' assertions regarding the importance of the Core U.S. segment do not add to the scienter analysis. Plaintiffs do not rely on core operations as an independent basis to adequately alleged scienter but argue the "core operations" exception

*contributes* to a strong inference of scienter.

The Fifth Circuit recognizes core operations as indicative of scienter in cases which exhibit some combination of the following four considerations that might tip the scales in favor of an inference of scienter: (1) a small company where it is more likely corporate executives are familiar with day-to-day operations; (2) transactions "critical to the company's continued vitality;" (3) omitted information readily apparent to the speaker; and (4) statements by the corporate officer that are internally inconsistent. *Nathenson*, 267 F.3d at 425.

According to Plaintiffs, both the Core U.S. segment and SIMS were critically important to RAC. Plaintiffs allege Defendants repeatedly acknowledged how important both the POS system and the Core U.S. segment were to the Company. Compl., ¶¶ 39, 81, 89, 94, 127, 161. The Core U.S. segment, which was negatively impacted by the POS system rollout during the Class Period, represented more than two-thirds of RAC's revenue throughout the Class Period. *Id*. at ¶¶ 159-63. Plaintiffs allege that "[g]iven the size of the Core Segment and its critical importance to [the Company's] overall business, the problems detailed herein could not have occurred without the Individual Defendants' knowledge and approval." *Id*. at ¶ 163.

The "core operations" doctrine is an extremely narrow exception to the rule that "scienter may not rest on the inference that defendants must have been aware of" the alleged misconduct "based on their positions within the company." *Abrams*, 292 F.3d at 432 (affirming trial court's dismissal of plaintiffs' securities fraud class action for failure to adequately plead scienter). Under the narrow exception, if a business unit or product is effectively the only product of a small-scale company, and certain other "special circumstances" apply, knowledge of that business unit or product might be sufficient to support an inference that executives must have known certain facts.

*See Nathenson*, 267 F.3d at 422, 424–25 (plaintiffs "barely" pleaded scienter where a single-product company with less than 40 employees devoted "substantially all" of its resources to its patented product and had "ample opportunity to become familiar with" a patent it falsely represented as covering the product).

The Court is not convinced these "special circumstances" are present here. First, as noted by Defendants, the Company has approximately 21,600 employees and is much larger than the companies to which the exception has been applied. *See Carlton*, 184 F.Supp.3d at 479 ("These circumstances are not present here. KiOR has 183 employees, many more than the companies falling under the *Nathenson* exception."). Second, Defendants assert for the "core operations" exception to apply, Plaintiffs would have to plead particularized facts showing circumstances akin to those in *Nathenson*, in which the defendant company sold only a single patented product and planned to devote "[s]ubstantially all of [its] efforts and expenditures over the next few years" to that product. *Nathenson*, 267 F.3d at 422; *see also Carlton*, 184 F.Supp.3d at 479, 484 ("The plaintiffs have not pleaded a basis to infer that Karnes' culpable knowledge of the plant's day-to-day operations and the production issues can be presumed under the limited circumstances outlined in *Nathenson*." However, the court allowed the "core-business exception" to apply to the CEO Cannon "by virtue of his position and in light of the surrounding circumstances.")

Here, the Company's size is substantially larger than the less than 40 employees in *Nathenson* and the 183 employees in *Carlton*. And despite Plaintiffs' allegations as to the importance of the POS system and the U.S. Core segment, the Court is not convinced RAC is a "one-trick pony" without an "extensive operating [history]" whose success was "dependent" on the facts underlying the basis of the statements alleged to be false or misleading. *See Carlton*, 184 F.Supp.3d at 484

(quoting *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 342-43 (5th Cir. 2008)). Plaintiffs recognize that "[d]uring [the] Class Period, [the Company] generated revenue from four operating segments: Core U.S., Acceptance Now, Mexico, and Franchising." Compl., ¶ 3. While "[t]he Core U.S. segment comprised approximately 72% of the Company's consolidated net revenues during the Class Period," *id.*, nearly one third of the Company's consolidated net revenues came from other sources. For these reasons, this is not the "rare" case with such "special circumstances" where a strong inference of scienter may be drawn from Davis and Constant's positions in the Company. *See Diodes*, 810 F.3d at 959.

**4. Terminations/resignations of Davis and Constant**

Finally, Plaintiffs contend the Court should infer "compelling evidence of scienter" from the sudden terminations of Davis and Constant shortly after the truth was fully revealed. Compl., ¶¶ 153-55, 164-68. As urged by Defendants, "[t]he resignation of officials is, in and of itself, unavailing as proof of the commission of fraud" absent "specific evidence" indicating that the resigning officials knew of the alleged misconduct. *Schott v. Nobilis Health Corp.*, 211 F. Supp. 3d 936, 956 (S.D.Tex. September 29, 2016) (noting "executive resignations did not have "any scienter implications" (citing *Southland*, 365 F.3d at 383 & *Abrams*, 292 F.3d at 434)). "Multiple Fifth Circuit decisions suggest resignations have little implication on the scienter analysis." *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 724–25 (W.D. Tex. 2010).

Even accepting as true Plaintiffs' allegation that Davis and Constant's departures were not voluntary but were terminations, Defendants assert the "more logical assumption is that" the allegedly forced resignations were due to "corporate mismanagement" rather than "the result of fraudulent acts." *In re Pilgrim's Pride Corp. Securities Litig.*, No. 2:08cv419-TJW, 2010 WL

3257369, at *13 (E.D.Tex. Aug. 17, 2010). However, Plaintiffs assert the sudden "terminations" of Davis and Constant, coupled with an acknowledgment by the Company after the Class Period that RAC's "operational challenges" were "exacerbated under the previous management regime" and that the departure of Davis and Constant was "a change aimed at improving shareholder value," contribute to the allegations of scienter. *Id.* at ¶ 168. The Court agrees.

Viewed in the context of all the factual allegations pleaded in the Complaint, the alleged terminations are circumstantial evidence that both Constant and Davis were let go because of the failed implementation of the POS system. *Id.* at ¶ 166. *See Kaltman* v. *Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 653 (W.D. Tex. 2006) (termination of CEO "for cause" because the company needed to "transition to a management led by an executive who was not involved in the subjects of the possible restatement of previous financial statements and the Audit Committee investigation" supported strong inference of scienter). Here, the Court finds this is another factor supporting a strong inference of scienter.

**5. Scienter allegations, viewed holistically**

Viewed holistically, Plaintiffs' allegations give rise to a strong inference of scienter and satisfy Plaintiffs' burden under the PSLRA. Even if Defendants' interpretation of the events does support a strong inference as to a lack of scienter, "15 U.S.C. § 78u–4(b)(2) is nonetheless satisfied in the present case because the competing inference of severe recklessness is at least as cogent and compelling." *Spitzberg*, 758 F.3d at 686. As recognized by the Fifth Circuit in *Lormand,* where there are competing inferences that establish or negate the scienter requirement, "a tie favors the plaintiff" on a motion to dismiss under 15 U.S.C. § 78u–4(b)(2). 565 F.3d at 254. Taking them as true and viewing them in the light most favorable to Plaintiffs, Plaintiffs' allegations present a strong

inference of scienter against Defendants "at least as compelling as any opposing inference of nonfraudulent intent." *See Tellabs*, 551 U.S. at 314.

## VII. SECTION 20(a) CLAIMS

Section 20(a) claims for control person liability are derivative of primary claims under § 10(b), and when there is no viable § 10(b) claim, there can be no § 20(a) claim. *See, e.g.*, *Shaw Grp.*, 537 F.3d at 545 (reversing trial court's denial of defendants' motion to dismiss plaintiffs' § 20(a) claims where plaintiffs failed to adequately plead § 10(b) violations). Defendants contest Plaintiffs' § 20(a) claims only on the basis that the underlying § 10(b) claim should be dismissed. Because those arguments fail, Defendants' assertions regarding Plaintiffs' claims under § 20(a) of the Exchange Act are also without merit.

## VIII. RECOMMENDATION

Based on the foregoing, it is

**RECOMMENDED** that Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Docket Entry #44) be **DENIED**.

## OBJECTIONS

Within fourteen (14) days after receipt of this Amended Report and Recommendation, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest

injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 19th day of October, 2017.**

Caroline M. Craven

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE