# United States District Court

## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| ALAN HALL and JAMES DEPALMA, individually and on behalf of all others similarly situated, | § § § | |
| Plaintiffs | § § | |
| v. | § § | CIVIL ACTION NO. 4:16cv978 |
| | § | JUDGE MAZZANT/JUDGE CRAVEN |
| RENT-A-CENTER, INC., ROBERT D. DAVIS, and GUY J. CONSTANT | § § | |
| Defendants | § | |

## MEMORANDUM ADOPTING AMENDED REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

Came on for consideration the amended report of the United States Magistrate Judge in this action, this matter having been referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636. On October 19, 2017, the Magistrate Judge issued an Amended Report and Recommendation ("R&R"),[1] recommending Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Dkt. #44) be denied. Defendants filed objections to the R&R, Plaintiffs filed a response to the objections, and Defendants filed a reply. The Court conducts a *de novo* review of the Magistrate Judge's findings and conclusions.

## BACKGROUND

This is a federal securities class action brought pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) against Rent-A-Center, Inc. ("RAC" or the "Company"); its former Chief

---

[1] The original Report and Recommendation was amended to add on page 68 the inadvertently omitted phrase "Defendants' assertions regarding" in the last sentence of the Court's discussion of Plaintiffs' § 20(a) claims.

Executive Officer ("CEO") Robert D. Davis ("Davis"); and its former Executive Vice President of Finance, Chief Financial Officer ("CFO"), and Treasurer Guy J. Constant ("Constant") (collectively "Defendants")[2] on behalf of all persons and entities that purchased or otherwise acquired RAC publicly traded common stock during the period from February 2, 2015 through October 11, 2016, inclusive (the "Class Period") and who were damaged thereby. The action involves Defendants' alleged collective failure to inform the market that the "pivotal initiative the Company undertook during the Class Period and had been promising Wall Street - the rollout of its proprietary point-of-sale ('POS') management information system, which had been in development for more than five years and cost the Company at least $175 million - was an abject failure fraught with stability and functionality problems that directly affected the Company's ability to complete sales and collect rental income during the Class Period." Dkt. #45 at 1.

The Court provides the following facts, as outlined in the Amended Report and Recommendation. RAC is one of the largest rent-to-own operators in North America. Compl., ¶ 2. At RAC's stores, customers can rent-to-own electronics, appliances, furniture, and other durable items. During the Class Period, RAC generated revenue from four operating segments: (1) Core U.S., (2) Acceptance Now, (3) Mexico, and (4) Franchising. *Id*. at ¶ 3. Core U.S. was RAC's largest segment, operating between 2,400 to 2,800 company-owned stores in the United States, Canada, and Puerto Rico. The Core U.S. segment comprised approximately 72% of the Company's consolidated net revenues during the Class Period. The Company disclosed in its SEC filings, including its Form 10-K for the year ended December 31, 2014, that RAC is "highly dependent on the financial

---

[2] Davis and Constant are referred to herein as the "Individual Defendants."

performance of the Core U.S. segment" and that any "significant decrease in the financial performance of the Core U.S. segment may also have a material adverse impact on our ability to implement our growth strategies." *Id*.

Approximately 85% of RAC's Core U.S. rent-to-own agreements were on weekly terms. *Id*. at ¶ 4. Pursuant to such terms, RAC's customers were required to make payments either electronically (over the phone or in person) or by cash or credit in one of RAC's stores. Because RAC's key customer demographic was "unbanked" and without credit, most of its customers paid by cash in the store each week. If a customer could not or did not elect to continue their rent-to-own agreement, the customer would be able to return the merchandise at any time subject to certain conditions. The Company estimates that approximately 75% of rent-to-own items were returned and re-rented, with only 25% reaching full term such that the customer took ownership of the product. *Id*.

The financial status of RAC's customer demographic also required RAC to devote significant resources to collection efforts. RAC regularly monitored customer accounts for missed payments and employed a variety of tactics to timely collect on past due accounts. The Company's primary and most time-intensive collection method involved staff from each store using the in-store computer system to identify past due accounts and to access contact information for each account. *Id*.

Beginning in the fourth quarter of 2014, the Company began rolling out "SIMS," its proprietary point-of-sale management information system ("POS" or "SIMS"), which had been in development since at least 2009. *Id*. at ¶ 5. This new POS system was purportedly designed to centralize and manage sales, inventory, collections, customer relationship management, and payment tracking on a Company-wide basis, and provided RAC headquarters with real-time access to each

store's sales and collection data.[3]  Prior to the rollout of the new POS system, each store was required to download and transmit to RAC headquarters all store data at least twice daily.  *Id.*

At the beginning of the Class Period, on February 2, 2015, RAC announced the new POS system was "fully operational" at its first store "following the system-wide implementation of the back office solution." *Id.* at ¶ 6.  Otherwise, RAC provided little other information about the new system, including challenges it was facing with developing and implementing the system and the system's importance to the Company's revenues and strategic growth initiatives.  Specifically, Defendants knew, but failed to inform investors, the POS system had a long history of stability and functionality problems which had not been remediated at the time of the rollout and which jeopardized many of the strategic initiatives that RAC was promising, including improvements to RAC's inventory management and account collection functions, and new flexible pricing and e-commerce projects, all which relied on the successful implementation of the system.  *Id.*

Throughout 2015, the Company rolled out the POS system to an increasing number of stores, and by December 31, 2015, the system was deployed in 385 stores.  *Id.* at ¶ 7.  However, despite being in possession of test results including Root Cause Analysis Reports, Incident Reports, and other information that should have caused Defendants to either halt the Company-wide rollout of the system or at least undertake a system-wide revamp before proceeding with a full rollout, Defendants steadfastly refused to do either. *Id*. at ¶ 8. Defendants also failed to inform investors of the ongoing

---

[3] According to Defendants, SIMS was a "proprietary in-house developed system" designed to manage "key business processes in the store such as sales, customer account management, cash management and inventory management" and to "extend and improve capabilities for store sales and operations."  Def. Ex. 24, Third-Quarter 2016 Earnings Call (Oct. 27, 2016) at 13; Def. Ex. 15, Form 10-K (filed Feb. 29, 2016) at 68; Def. Ex. 3, Form 10-K (filed Mar. 2, 2015) at 4.

problems, despite knowing internally that these issues would likely result in financial losses. Instead, Defendants repeatedly assured the market that the system was "fully operational and ready to go." *Id.*

"Defendants rushed out a full rollout of the POS system Company–wide in the first half of 2016, going from 385 stores on December 31, 2015 to 887 on March 31, 2016, and then completing the rollout to all 2,478 Core U.S. stores by June 30, 2016." *Id.* at ¶ 9. According to Plaintiffs, the truth about the severity of the problems with the POS implementation came to light through a series of partial disclosures that began on February 1, 2016, when the Company announced its results for the year ended December 31, 2015 after the market closed that day. *Id*. at ¶ 10. The next day, during the Company's earnings call, Defendants acknowledged problems with implementation of the POS system and disclosed that for the first quarter of 2016 (ended March 31, 2016) RAC expected a decrease in year-over-year earnings in the critical Core U.S. segment due to "a pretty short-term impact. . . associated with putting in new point-of-sale system in the stores" and the impact of training RAC workers on the new POS system. *Id.*

According to Plaintiffs, Defendants falsely assured investors the "little bit of impact to revenue" would "go away then in the back half of the year." *Id.* Defendants also falsely assured the market that RAC had "a very good knowledge of what we see in terms of the impact on the stores." Despite these assurances, RAC's stock price dropped approximately 25% on February 2, 2016 on high trading volume. *Id*.

Additional information about problems with the POS system's implementation was revealed on April 27, 2016. *Id*. at ¶ 11. The next day, during the Company's earnings call, Defendants disclosed that the implementation of the POS system had been delayed so the Company could

address a "greater-than-expected impact on sales." *Id*. However, according to Defendants, the problems had been fully remediated by then and the POS rollout had been restarted with "approximately one-third of our core stores [] operating this new POS system." *Id*. Defendants also assured investors the Company was "constantly monitoring the results to make sure [the POS system] is landing well in our stores," that the overall impact to Core revenues was not going to be "any more significant" than originally disclosed, and that overall guidance for the year remained on track. In reaction to these revelations, RAC's common stock price fell approximately 12.8% from its close on April 27, 2016 of $15.71 per share to a close of $13.70 per share on April 28, 2016 on high trading volume. However, Plaintiffs allege the price of RAC's stock remained artificially inflated as the Company emphasized its measured approach to the POS rollout and that it had addressed all system issues. *Id*.

The negative effects of the POS implementation on Core revenues were further revealed on July 27, 2016. *Id*. at ¶ 12. Despite revealing decreased sales because of the impacts and acceleration of the POS system rollout, Defendants represented "the distraction of a major system roll-out is now behind us." *Id*. As a result of these disclosures, on July 28, 2016, RAC's common stock price fell approximately 17.6% from a close on July 27, 2016 of $13.26 per share to a close on July 28, 2016 of $10.92 per share on high trading volume. *Id*. The full truth was finally revealed on October 11, 2016, when Defendants issued a press release announcing preliminary results for the third quarter ended September 30, 2016. *Id*. at ¶ 13.

According to the release, Core U.S. same-store sales were estimated to be down approximately 12% in the quarter due to performance issues with the POS system and peak-time Company-wide outages that "resulted in a larger than expected negative impact on Core sales." *Id*.

"In reaction to this disclosure of the full extent of the problems with the POS implementation, RAC's common stock price fell by $3.70 per share, ***or over 28%*** on abnormally high trading volume." *Id.* (emphasis in original).

On October 27, 2016, during the third quarter earnings call, Defendant Davis explained that the Company had begun experiencing "capacity-related system slowness and outages" at the time the POS went fully live in all Core stores in the second quarter of 2016 and that these issues persisted throughout the third quarter with the frequency of the outages not subsiding until the end of the quarter. *Id*. at ¶ 14. On December 2, 2016, the Company announced the termination of Defendant Constant effective immediately. *Id.* at ¶ 15. On January 9, 2017, the Company announced the "resignation" of Defendant Davis, a 24-year Company veteran and RAC Board member, also effective immediately. *Id.*

According to Plaintiffs, the statements of former RAC employees ("confidential witnesses" or "CWs") "with personal knowledge of SIMS' development and implementation confirm that internally known, entrenched, and systemic issues existed at the time RAC initially implemented the POS system in late 2014, and that these problems were not sufficiently remediated during the Company-wide rollout of the POS system when additional scalability and functionality problems surfaced." Dkt. #45 at 1. According to the Complaint, the statements of former RAC employees with knowledge of SIMS' development and implementation confirm that "internally known, entrenched, and systemic issues seriously threatened the implementation of the POS system when it was initially rolled out in early 2015." Compl., ¶ 16.

For example, a former Senior Systems Engineering Manager employed by RAC at its headquarters from November 2013 until June 2016 who managed a team of systems engineers

responsible for implementing SIMS, and who initially reported to the Director of IT Systems and Operations and then to the Senior Director of Technical Operations (both of whom reported to CTO Christi Liebe) ("CW-1"), "stated Defendants were aware that the operating system SIMS ran on was outdated prior to and during its initial rollout." *Id*. According to CW-1, this severely limited its functionality, prevented enhancements and other necessary fixes, and caused SIMS to clash with current applications that RAC needed to keep the system operational. "Notwithstanding, CW-1 said that the Company moved forward in an effort to avoid a write-down or write-off on the POS system, a capitalized asset which had been in development for approximately five years." *Id*.

The Complaint also relies on "CW-2," who was employed by RAC for nineteen years from 1997 until June 2016. *Id*. at ¶ 17. "From March 2007 to June 2016, CW-2 held the title of Senior Director of Information Security and IT Service Management and reported directly to Chief Information Officer . . . who was Herman Nell from December 2013 to April 2016, and then Angela Yochem starting in May 2016 when Nell retired." *Id*. "CW-2 was responsible for the information security of all RAC business units, including the Core U.S. segment, as well as litigation support, e-Discovery, and he was the custodian of all records at the Core store level." *Id*. CW-2 was also a member of the project team that evaluated risks related to the SIMS rollout. CW-2 attended a "Go No-Go" meeting each time RAC rolled SIMS out to additional stores, and CW-2 corroborated information provided by CW-1 about persistent problems with SIMS, including intermittent outages and other functional issues well before the system was fully implemented in the second quarter of 2016. *Id.*

## AMENDED REPORT AND RECOMMENDATION

On June 5, 2017, Defendants filed their current Motion to Dismiss Plaintiffs' Consolidated

Amended Class Action Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the PSLRA. Dkt. #44. Defendants assert the Complaint fails to plead either (1) falsity or (2) the requisite strong inference of scienter with particularity as to any of the alleged misrepresentations.

On October 19, 2017, the Magistrate Judge issued a sixty-nine page Amended Report and Recommendation ("R&R"), recommending Defendants' motion to dismiss be denied. In considering whether the complaint pleads with particularity any false or misleading representation, the Magistrate Judge first set forth approximately sixteen pages of allegations before determining Defendants' statements are not entitled to protection under the PSLRA's Safe Harbor provision (R&R at 39) and the "statements identified by Defendants are not inactionable statements of puffery." R&R at 40. Relying in part on the confidential witness allegations, the Magistrate Judge concluded a reasonable person may draw the plausible inferences from the allegations that Defendants made material misrepresentations or omissions. R&R at 50.

Regarding Defendants' arguments with regard to scienter, the Magistrate Judge first noted allegations of "motive and opportunity standing alone" are not enough to establish scienter but that such circumstantial evidence may "meaningfully enhance the strength of the inference of scienter." R&R at 54 (citation omitted). The Magistrate Judge considered the following categories of scienter allegations (confidential witness allegations, motive, core operations, and terminations/resignations of Davis and Constant) and then viewed the scienter allegations holistically. According to the Magistrate Judge, viewed holistically, "Plaintiffs' allegations give rise to a strong inference of scienter and satisfy Plaintiffs' burden under the PSLRA." R&R at 67. The Magistrate Judge stated even if "Defendants' interpretation of the event does support a strong inference as to a lack of scienter, "15 U.S.C. § 78u-4(b)(2) is nonetheless satisfied in the present case because the competing

inference of severe recklessness is at least as cogent and compelling." *Id.* (quoting *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014).

Finally, the Magistrate Judge noted that Defendants contest Plaintiffs' § 20(a) claims only on the basis that the underlying § 10(b) claim should be dismissed. Finding those arguments fail, the Magistrate Judge concluded Defendants' assertions regarding Plaintiffs' claims under § 20(a) of the Exchange Act are also without merit. R&R at 68.

## OBJECTIONS

Defendants filed objections to the Report and Recommendation. Defendants first assert the Magistrate Judge erred in stating and applying the law regarding allegations by confidential witnesses. According to Defendants, the R&R credits allegations by two departed employees who never had communications with the individual defendants. Defendants contend the R&R does not examine whether the "supposedly non-disclosed information would render misleading what a reasonable person would infer from the Company's statements" and does not rely on "any particularized facts possessed by either of the Individual Defendants demonstrating why either of them knew (or recklessly disregarded) that their statements were false or misleading." Dkt. #57 at 2. Defendants assert the allegations attributed to confidential witnesses must be discounted for scienter purposes.

Defendants next assert the R&R improperly credits allegations of motive in finding the scienter allegations sufficient. Finally, Defendants assert the R&R improperly finds two executive resignations add to the inference of scienter.

## *DE NOVO* REVIEW

### *Whether Plaintiffs have adequately pleaded falsity*

The Magistrate Judge concluded that Plaintiffs adequately pleaded Defendants made false and misleading statements and omissions during the Class Period. R&R at 50. In reaching this determination, the Magistrate Judge considered all of Plaintiffs' allegations and found, at this stage, "a reasonable person may draw the plausible inferences from the allegations that Defendants made material representations or omissions. . . . " R&R at 50.

Defendants have challenged the R&R on the element of falsity primarily with respect to the allegations regarding the two confidential witness described in the complaint (the "CWs"). Dkt. # 57 at 6-14. According to Defendants, the Magistrate Judge's failure to discount the CW allegations is contrary to *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527 (5th Cir. 2008). The *Shaw* case dealt with the issue of scienter, and the Court considers Defendants' arguments regarding the CW allegations in its discussion of scienter below.

A misleading statement or omission has been adequately pleaded when a plaintiff alleges the defendant "made an untrue statement of material fact" or "omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading." 15 U.S.C.A. §78u-4(b)(1). The Magistrate Judge noted a corporation has "no duty to cast its business in a pejorative, rather than a positive, light." R&R at 41 (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003)). "[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 433 (5th Cir.2002). According to the Magistrate Judge, the plaintiffs must plead with

particularity the reasons why the defendants created "an impression of a state of affairs that differ[ed] in a material way from [the] one that actually existed." (R&R at 41-42)(quoting *Shaw*, 537 F.3d at 541); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248-249 (5th Cir. 2009) ("Once the defendants engaged in public discussions concerning the benefits . . . they had a duty to disclose a mix of information that is not misleading.") (internal quotes omitted).

Defendants argue the Magistrate Judge's conclusion that Plaintiffs adequately pleaded falsity (and scienter) "hinges upon the view that Rent-A-Center painted too rosy of a picture of the POS system and was instead required to disclose the opinions of two unidentified former employees who left the company long before the end of the class period." Dkt. #57 at 6. According to Plaintiffs, this mischaracterizes their allegations and attempts to downplay the strength of the facts as pleaded. The complaint does not allege Defendants were unduly optimistic about the success of the implementation of the POS system. Instead, as urged by Plaintiffs, the complaint alleges Defendants repeatedly misrepresented and omitted the severe problems the Company was encountering in the development and implementation of its POS system.

Defendants attempt to distinguish *Carlton v. Cannon*, 184 F. Supp. 3d 428, 468 (S.D. Tex. 2016), *amended on denial of reconsideration*, No. CV H-15-012, 2016 WL 3959164 (S.D. Tex. July 22, 2016),[4] a case relied upon by the Magistrate Judge. In *Carlton*, the defendants stated their core technology was "fundamentally sound, that [a production] plant operated successfully on a

---

[4] The *Carlton* court amended its previous analysis to clarify the legal standard for control-person liability under § 20(a) and the application of that standard to the plaintiffs' allegations against the defendant company's CFO. Although the analysis changed, the outcome did not. *Carlton v. Cannon*, No. CV H-15-012, 2016 WL 3959164, at *1 (S.D. Tex. July 22, 2016).

commercial scale, and that any problems were normal, start-up glitches rather than fundamental, structural defects." 184 F.Supp.3d at 472. The *Carlton* court held the complaint plausibly alleged those representations "painted a misleading picture of conditions at the . . . plant." *Id*. In its falsity discussion, the *Carlton* court found the plaintiffs had "plausibly alleged, with particularity, that the statements about the Columbus plant's operations materially misled investors to believe that KiOR was a viable business when it was not." *Id*.

In *Carlton*, confidential witnesses provided enough particularity in their allegations to "explain why and on what basis [the defendants' statements] were misleading." *Id.* at 472–73. According to the court, confidential witnesses, all former KiOR employees, "detailed issues at the Columbus plant throughout this period that were more severe than [CEO] Cannon and [CFO] Karnes represented." *Id*. at 472. In particular, the witnesses detailed issues that "[s]tart-up costs and net-operating losses consistently increased" and "yields were lower, and costs higher, than represented." *Id.*

As noted by the Magistrate Judge in discussing *Carlton*, even though Cannon disclosed some of these issues in January 2014, the *Carlton* court noted "he also assured investors on the earnings call that the company would make improvements to the plant that would have it back up and running," but the plant was shut down two months later. *Id.* Although Cannon and Karnes argued they had no obligation to characterize the operational issues at the Columbus plant as "severe design flaws" rather than as "start up issues," the *Carlton* court stated as follows:

> But by downplaying the extent and duration of the technological problems as normal start-up issues, while simultaneously assuring investors that the core technology was sound for commercial-scale production, these defendants represented that the . . . plant was a viable operation that had minor and temporary setbacks, overcame them, and was now ready for the long haul.

*Id.*

According to Defendants, the CW statements in *Carlton* were pleaded with much more particularity than those involved here. Defendants point out that one of the CWs in *Carlton* was "the senior scientist to develop the technology that the company tried to commercialize." But, according to Plaintiffs, those facts align with this case where both of the CWs were involved in the problem-plagued implementation of SIMS.[5] *See* Compl., ¶¶ 50-52, 68, 73-74. As in *Carlton*, the alleged false statements here concern how the POS system was operating during testing and implementation. Additionally, as in *Carlton*, Defendants here allegedly "downplay[ed] the extent and duration of the technological problems. . . ." *Id*. at 472.

According to the Magistrate Judge, "[n]otwithstanding the limited negative information Defendants may have disclosed, Plaintiffs assert Defendants, having chosen to speak about the POS system, had a duty to disclose the full truth about the problems plaguing the POS system and the Company-wide rollout of the system." R&R at 42-43. The Magistrate Judge pointed out Plaintiffs allege Defendants' statements in each of the four partial disclosures (fourth quarter and full year 2014 results, first quarter fiscal 2015 results, second quarter fiscal 2015 results, and third quarter fiscal 2015 results) were false and misleading when made because Defendants knew but failed to disclose that:

> (a) the POS system was running on an outdated Oracle operating system that made implementing any changes or upgrades both extremely difficult and expensive and substantially increased the likelihood of problems, including system outages and incompatibilities, during the general rollout of the system;

---

[5] *See* FN 5, infra at p. 17.

(b) the POS system lacked sufficient store-level redundancies, which magnified the problems encountered during the implementation;

(c) the POS system was not advanced enough in early 2015 even for pilot testing and still required substantial development efforts and modifications to make it compatible for Company-wide use; and

(d) the problems with the POS system, including intermittent outages, were serious enough to at least warrant additional testing before the program was expanded to other pilot stores.

R&R at 43 (citing Compl., ¶¶ 85, 92, 99, 105).

According to the Magistrate Judge, for each of these partial disclosures, Plaintiffs allege the Company's disclosures about the risks of the implementation of the POS system were materially false and misleading when issued, as Defendants knew or were reckless in not knowing that the Company was not merely "at risk" of the POS system not performing as designed or sustaining "repeated failures." *Id.* (citing Compl., ¶¶ 86, 93, 100, 106). According to Plaintiffs, this was already happening during in-house testing and in the pilot stores where the system was implemented. Plaintiffs further allege Defendants knew or were reckless in not knowing that the Oracle-based operating system the new POS system ran on was already considered to be at "end of life," and that the age of the Oracle-based operating system that SIMS was built on was causing it to clash with the current versions of software that it needed to interact with. *Id.* According to Plaintiffs, Defendants created "an impression of a state of affairs that differ[ed] in a material way from [the] one that actually existed." *See Shaw*, 537 F.3d at 541.

Defendants also object to the Magistrate Judge's falsity finding regarding Defendants' statements that the POS system was "fully operational" in the initial pilot stores. R&R at 48-49. The Magistrate Judge agreed with Plaintiffs that whether the term "operational"/ "fully operational"

was intended to and did convey to the market that SIMS was fully functional is best answered based on the evidence produced during a later stage of this litigation. R&R at 49 (citing *Spitzberg,* 758 F.3d at 689 (stating whether Defendants–Appellees will ultimately prevail on their argument that "no investor would understand or did understand the term 'reserves' to mean 'reserves' as defined by the PRMS" can "only be answered based on the evidence produced during a later stage of this litigation"). In their objections, Defendants assert the complaint's allegations regarding issues and problems with the POS system or the Oracle operating system do not render false any statement about the number of stores where the system was operating. Dkt. #57 at 10. According to Defendants, nothing about the statements indicated the POS system was operating without problem or setback.

As the R&R recognizes, Plaintiffs are not challenging the number of stores where SIMS was installed, but rather Defendants' repeated false statements that SIMS was "operational"— which was meant to and did convey to the market that SIMS was fully functional in those stores when it was not– being:

- ¶ 80 ("New POS system is *fully operational* in its first site");

- ¶ 81 ("new POS system is *now fully operational* in its first site");

- ¶ 87 (New POS system … "*is fully operational in 34 stores*");

- ¶ 95 ("150 core US *[are] running the new system* exclusively);

- ¶ 104 ("*[POS] is operational* in 8.5% of our Core U.S. stores");

- ¶ 115 ("We have approximately 385 of our 2,627 Core U.S. rent-to-own stores on the new system as of December 31, 2015 ….");

- ¶ 119 ("Today approximately one-third of our core stores *are operating this new POS system*."); and

• ¶ 129 ("After our initial delay, in Q2 *we completed the roll-out* of our new POS system. . . .").

R&R at 48-49 (quoting Consolidated Class Action Complaint). According to Plaintiffs, the "sparse negative information Defendants claim to have disclosed was inconsequential and was offset by accompanying positive statements and baseless reassurances." Dkt. #59 at 8.

Viewing the allegations as a whole, the Court agrees with the Magistrate Judge that a reasonable person may draw the plausible inferences from the allegations that Defendants made material misrepresentations or omissions. R&R at 50. The complaint identifies each of the false and misleading statements and omissions, including the speaker, and the date when and location where, the statement was made; plausibly alleges the misleading nature of the representations with facts that are sufficiently particularized to explain why and on what basis they are misleading; and contains information from high-level CWs who were employed by RAC before and during the Class Period, based on their own personal knowledge of the facts alleged.

The Magistrate Judge recognized "[c]onfidential witness accounts are a permissible basis on which to allege falsity," so long as the complaint "provide[s] details such as job descriptions, individual responsibilities, and specific employment dates for the witnesses." R&R at 45-46 (citation omitted). Defendants have not challenged the Magistrate Judge's finding that the two CWs "have been described with sufficient particularity to establish their reliability and personal knowledge."[6]

---

[6] CW-1 is a former Senior Systems Engineering Manager employed by RAC at its headquarters from November 2013 until June 2016 who managed a team of systems engineers who were responsible for implementing SIMS, and who initially reported to the Director of IT Systems and Operations and then to the Senior Director of Technical Operations (both of whom reported to CTO Christi Liebe). Compl., ¶ 16.

CW-2 was employed by RAC for nineteen years from 1997 until June 2016. From March 2007 to June 2016, he held the title of Senior Director of Information Security and IT Service

R&R at 47. The Court addresses below Defendants' specific objection as to the weight given to the CW allegations. Even giving less weight to the CW allegations, the Court agrees with the Magistrate Judge's finding that a reasonable person may draw the plausible inference from the allegations in the complaint that Defendants made material misrepresentations or omissions.

***Whether Plaintiffs have adequately pleaded a strong inference of scienter***

Liability under Rule 10(b)(5) requires not only that the party make a statement which contains an untrue statement of material fact or omits a material fact necessary in order to make the statement not misleading, but also that the party has done so with "not merely simple or even inexcusable negligence" but rather with "scienter." Scienter requires an "intent to deceive, manipulate, or defraud" or "severe recklessness" in which the "danger of misleading buyers or sellers ... is either known to the defendant or is so obvious that the defendant must have been aware of it." *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961–62 (5th Cir.1981) (en banc). For purposes of determining whether a statement made by a corporation was made by it with the requisite Rule 10(b) scienter, it is appropriate to look to the state of mind of the individual corporate official or officials who made or issued the statement (or approved it or its making or issuance, or who furnished information or language for inclusion therein, or the like) rather than generally to the collective

---

Management and reported directly to the Chief Information Officer ("CIO"), who was Herman Nell from December 2013 to April 2016, and then Angela Yochem starting in May 2016 when Nell retired. CW-2 was responsible for the information security of all RAC business units, including the Core U.S. segment, as well as litigation support, e-Discovery, and he was the custodian of all records at the Core store level. CW-2 was also a member of the project team that evaluated risks related to the SIMS rollout, and attended a "Go No-Go" meeting each time RAC rolled SIMS out to additional stores. *Id.*, ¶ 17. CW-2 corroborated information provided by CW-1 about persistent problems with SIMS, including intermittent outages and other functional issues well before the system was fully implemented in the second quarter of 2016. *Id.*

knowledge of all the corporation's officers and employees acquired in the course of their employment. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).

As noted above, confidential source statements are a permissible basis on which to make an inference of scienter. *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,* 497 F.3d 546, 552 (5th Cir. 2007). The witnesses must be "identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements." *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 353 (5th Cir. 2002). In lieu of names, the plaintiffs must provide details, such as "(1) the person's job description, (2) individual responsibilities, (3) specific employment dates, and (4) where and when the confidential source came to know the information supporting an inference of scienter." *Dawes v. Imperial Sugar Co.,* 975 F. Supp. 2d 666, 692 (S.D. Tex. 2013).

For CW1 and CW2, Plaintiffs provided the categories of the necessary information. The Magistrate Judge considered the CW allegations as one permissible basis on which to make an inference of scienter. According to the Magistrate Judge, the Fifth Circuit Court of Appeals in *Spitzberg v. Houston American Energy Corp.*, 758 F.3d 676 (5th Cir. 2014) recently reversed and remanded the dismissal of a securities fraud complaint and held that scienter was adequately alleged based, in large part, on statements from confidential witnesses. In *Spitzberg*, the plaintiffs, investors in a Houston-based energy company, alleged the company's statement that it had "estimated recoverable reserves of 1 to 4 billion barrels" of oil was misleading. *Id*. at 680.

The plaintiffs in *Spitzberg* argued the statement "communicated to investors that certain

geological testing had been completed based on the definition of 'reserves' used by the oil industry and by SEC regulations." *Id.* The defendants argued they had not "explicitly represent[ed] that any drilling had yet occurred," that their other references to drilling were ambiguous, and that "no investor would understand or did understand the term 'reserves' to mean 'reserves' as defined by the [oil industry]." *Id.* at 681. The plaintiffs alleged other fraudulent statements were made after test drilling began. *Id.* Specifically, in a number of regulatory filings and press releases, the defendants repeatedly stated that a test well had produced "strong inflow[s]" and "significant shows" of both "gas and oil." *Id.* But according to the statements (cited extensively in the complaint) of confidential witnesses that were allegedly involved in the drilling operations, the test well produced no "in flow[s]" or "shows" of oil or "flowable hydrocarbons" during test drilling. *Id*. at 682.

The Fifth Circuit assumed that the industry-specific term "reserves" would communicate to investors that certain production or geological testing had already been conducted, as alleged by the plaintiffs. *Id.* at 684. The Fifth Circuit further assumed the truth of one confidential witness statement that "neither oil nor flowable hydrocarbons were found in the. . . well." *Id.* The court recognized that although additional evidence at later stages of the proceedings might confirm or undermine the factual proposition set forth by that particular confidential witness, the court noted that the plaintiffs' contention, at the motion to dismiss stage, was "at least as compelling as any opposing inference one could draw." *Id.* at 684-85. Therefore, according to the Fifth Circuit, the plaintiffs' complaint could not be dismissed based on the failure to plead severe recklessness.[7] *Id*.

---

[7] According to the Fifth Circuit, even if the district court's interpretation of the events did support a strong inference as to a lack of scienter, 15 U.S.C. § 78u–4(b)(2) was "nonetheless satisfied in the present case because the competing inference of severe recklessness [was] at least as cogent and compelling." *Spitzberg*, 758 F.3d at 686. "[W]here there are competing inferences that establish

at 685.

The Magistrate Judge similarly relied on the CW allegations in the complaint, finding this is not a case where Plaintiffs try to impute knowledge of problems with the POS system to Davis and Constant simply because of their mere presence at meetings. R&R at 58. According to the Magistrate Judge, "Plaintiffs have pointed to specific meetings, reports, and practices whereby [Defendants] were made actually aware of the [POS'] status." *Id.* (quoting *In re EDS and "ERISA" Litig.*, 298 F. Supp. 2d 544, 557 (E.D. Tex. 2004)). The Magistrate Judge stated both CWs confirm *how* information about the POS' problems was communicated to Davis and Constant; *when* meetings occurred (¶¶ 32, 50-52, 74, 158), *who* was involved in communicating information (¶¶ 46, 50-52, 65, 71, 74), *what* reports were titled and *by whom* (¶¶ 16-17, 46-47, 68, 71, 74), facts regarding Davis and Constant's *motive* in acting severely recklessly (¶¶ 16, 53-63, 73-74, 159-73), and the contemporaneous problems the POS experienced during the Class Period, rendering Defendants' statements or omissions false and misleading. (¶¶ 45, 48-50, 64-73). R&R at 58.

In their objections, Defendants argue allegations from the confidential sources must be discounted as required by *Shaw*, 537 F.3d at 535 ("That these allegations derive from confidential sources further detracts from their weight in the scienter analysis. Following *Tellabs*, courts must discount allegations from confidential sources. . . . At the very least, such sources must be described" with sufficient particularity). According to Defendants, the Fifth Circuit's decision in *Spitzberg* left untouched the requirement that confidential witness statements, even when they are described with

---

or negate the scienter requirement, 'a tie favors the plaintiff' on a motion to dismiss under 15 U.S.C. § 78u–4(b)(2)." *Id.* (quoting *Lormand*, 565 F.3d at 254).

sufficient particularity, must be discounted. Dkt. #57 at 3. Although the Fifth Circuit in *Spitzberg* did not explicitly discount the confidential witness allegations, Defendants assert the court focused on one confidential witness whose testimony the defendants conceded during oral argument was relevant. 758 F.3d at 682.

The Court is not convinced the Magistrate Judge failed to properly discount and gave too much weight to the CW allegations. However, in its *de novo* review, the Court will give the allegations from CW1 and CW2 less weight. Even still, the Court concludes the allegations, viewed together with the remaining allegations in the complaint, preclude granting a motion to dismiss for lack of a strong inference of scienter. *See Kohut v. KBR, Inc.*, No. CV H-14-1287, 2015 WL 11995250, at *12, *26 (S.D. Tex. Sept. 3, 2015).

Although not discussed in the R&R, the Court finds *Kohut* instructive. In *Kohut*, the plaintiffs alleged "the defendants artificially inflated KBR's stock price by misrepresenting the profits and losses from seven contracts to construct oil and gas facilities in Canada." 2015 WL 11995250, at *1. The plaintiffs' allegations were largely derived from confidential witnesses, who indicated the individual defendants were "integrally involved in the cost estimation process for the Canadian projects at issue." *Id.* at *2. The defendants moved to dismiss based on the absence of individual allegations supporting a strong inference of scienter. *Id.* at *6. The court found allegations based on the individual defendants' involvement in cost estimation precluded granting the motion to dismiss. *Id.* at *26.

According to the court, the amended complaint did not rest on "must have known" allegations like those in *Shaw* which were found to be insufficient to support a strong inference of scienter. Instead, the amended complaint contained allegations from confidential witnesses that there

22

were monthly meeting where the defendants received detailed cost estimates for the projects. *Id.* at *25. Specifically, CW1, a former General Manager of KBR Industrial Services in Canada, described "senior management's role in estimating costs at the outset of projects." *Id*. at *26. According to the amended complaint, CW1 was responsible for preparing "white paper briefs" with detailed evaluations of potential projects. "Though CW1 was not involved in creating a white-paper brief for the seven Canadian contracts, he asserts that the papers would have been prepared and distributed to senior management." *Id*. The amended complaint alleged the "white papers contained detailed cost estimates, gave the bases for them, and provided risk evaluations, all giving the Individual Defendants information about the contract problems." *Id*. The amended complaint alleged Baldwin, Carter, Ferraioli, and Utt would have "reviewed and analyzed the cost estimates for the Canadian projects." *Id*. The amended complaint alleged KBR lacked design drawings for the seven Canadian contracts necessary to produce reliable cost estimates under percentage-of-completion accounting, and the individual defendants inaccurately described their profitability. *Id.*

The amended complaint also alleged details from CW2 about the monthly Executive Leadership Team ("ELT") meetings in Houston. According to CW2, in advance of the meetings, the ELT members allegedly "received detailed monthly reports concerning the Company's important projects, including the Canadian projects at issue here." *Id*. CW2 prepared the KBR Monthly Business Unit Reviews for ELT members and stated these monthly meetings gave the defendants "critical information about the status of the Canadian projects." *Id*. These allegations from confidential witnesses precluded granting the motion to dismiss, especially when viewed in the aggregate with certain other scienter allegations. *Id.* at *26-*27.

Similarly here, the complaint specifically identifies the names of documents and meetings,

the contents of such documents and meetings, the frequency and attendees of the meetings or the frequency and distribution of reports. The CWs link the reports and meetings to the Individual Defendants. R&R at 17-19. According to the CWs, Davis was involved in the POS project from the onset, and he held weekly meetings with RAC CIO Nell until April 2016 where SIMS was always discussed. Compl., ¶¶ 52, 74. Davis and Constant also were members of and participated in the "SIMS Executive Steering Committee," which was a "C-Level meeting" wherein the SIMS' progress and issues were discussed. *Id.* at ¶ 74. The Executive Steering Committee met quarterly at first, and then more frequently as the rollout progressed. *Id.* at ¶ 51. These Executive Steering Committee meetings were attended by Davis, Constant, CTO Liebe, CIO Nell, Department Heads, and SVPs. *Id.* Davis and Constant also periodically attended weekly SIMS project team meetings during which changes, challenges, and problems related to SIMS were discussed. *Id.* at ¶¶ 50-52, 74. As the SIMS rollout accelerated (and therefore into the Class Period), and more issues arose, Davis' involvement with the POS increased. *Id.* at ¶ 74. Both Davis and Constant were kept aware of any issues the technology team was encountering with implementing SIMS. *Id.* These allegations from confidential witnesses, even given less weight, make a strong inference of scienter, especially when viewed in the aggregate with certain other scienter allegations.

According to Plaintiffs, both Davis and Constant admitted during the Class Period that management was deeply involved with the SIMS rollout: "the approach that we took to learn in the early stages had a lot more care and feeding [sic], if you will, and hand-holding and oversight from multi-levels of management" (¶ 134 – Davis) and "as we roll out stores every week, we are constantly monitoring the results to make sure it is landing well in our stores" (¶ 121 – Constant).

As noted by the Magistrate Judge, in addition to providing specific facts regarding how,

when, and where information regarding the POS system was communicated to Defendants Davis and Constant, the former employees also provide the what – the scope of issues the POS system experienced prior to and during the Class Period:

- By the end of 2014, just prior to the start of the Class Period, the POS system experienced serious capacity and performance issues including but not limited to (1) network bandwidth issues; (2) scalability problems; (3) capacity problems including network capacity, database capacity, and old-technology capacity problems; (4) functionality problems with payment methods; and (5) hundreds of other varying issues. (¶ 48). Certain issues continued through at least June 2016. (¶ 73)

- RAC's systems ran on an older Oracle-based operating system that newer software was increasingly unable to interact with. (¶ 65)

- The POS System did not meet the Company's needs when it was first rolled out in Plano, Texas, resulting in hundreds of issue detailed in Root Cause Analysis Reports. Moreover, the overall functionality of the POS system never improved much, and did not work well in the 200-300 additional stores it was rolled out to in the first half of 2015 (during the Class Period). POS system continued to generally fail as it was rolled out to additional stores. (¶ 66)

- The Company did not fix problems with the POS system before implementation in additional stores and major bugs were still being worked on as of June 2016. Necessary redundancies in the POS system were not in place by June 2016, which also magnified the risk of outages the Company was experiencing. (¶ 73)

Taken together, these allegations plead a strong inference that Davis and Constant were at least severely reckless during the Class period.[8]

---

[8] In addition to the CW allegations and admissions by the Individual Defendants of their involvement in the POS rollout, Plaintiffs allege additional factors or motives in support of a strong inference of scienter (*i.e.* that Defendants were motivated to engage in the fraud in order to avoid a $175 million write-down which would have erased the Company's entire annual profit for 2014 and resulted in a loss ( ¶¶ 53-61, 169-173); that the terminations of Davis and Constant, within three months of the end of the Class Period, contribute to the inference of scienter). The Court agrees with the Magistrate Judge these allegations enhance the strength of the inference of scienter and overrules Defendants' objections regarding these findings.

## CONCLUSION

The Court has carefully reviewed the relevant briefing, the Amended Report and Recommendation, the objections, the response to the objections, and the reply, and is of the opinion the findings and conclusions of the Magistrate Judge are correct. The Court adopts the Magistrate Judge's report as the findings and conclusions of the Court. It is therefore

**ORDERED** that Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (Dkt. #44) is **DENIED**.

**SIGNED this 14th day of December, 2017.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE