# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| _____ ) | |
| ALAN HALL AND JAMES DEPALMA,   ) | |
| ) | |
| PLAINTIFFS,   ) | |
| ) | CIVIL NO. 4:16-CV-00978-ALM-CMC |
| v.   ) | |
| ) | |
| RENT-A-CENTER, INC., ROBERT D.   ) | |
| DAVIS, AND GUY J. CONSTANT,   ) | |
| ) | |
| DEFENDANTS.   ) | |
| _____ ) | |

**<u>EXPERT REPORT OF CHAD COFFMAN, CFA</u>**

**March 13, 2018**

# Table of Contents

**Page**

I.      INTRODUCTION ............................................................................3

II.     QUALIFICATIONS ..........................................................................3

III.    SUMMARY OF OPINIONS ............................................................4

IV.     OVERVIEW OF THE COMPANY AND ALLEGATIONS...................5

V.      DISCUSSION OF RELIANCE ELEMENT ....................................7

VI.     CAMMER FACTORS .....................................................................10

VII.    APPLICATION OF EFFICIENCY FACTORS TO RENT-A-CENTER COMMON
STOCK.............................................................................................11

    A.    OVERVIEW.................................................................... 11

    B.    CAMMER FACTOR 1: AVERAGE WEEKLY TRADING VOLUME............... 13

    C.    CAMMER FACTOR 2: ANALYST COVERAGE ................. 15

    D.    CAMMER FACTOR 3: MARKET MAKERS ...................... 17

    E.    CAMMER FACTOR 4: SEC FORM S-3 ELIGIBILITY ................ 19

    F.    CAMMER FACTOR 5: PRICE REACTION TO NEW INFORMATION............. 20

    G.    ADDITIONAL FACTOR 1: MARKET CAPITALIZATION ................ 29

    H.    ADDITIONAL FACTOR 2: THE BID-ASK SPREAD ................ 30

    I.    ADDITIONAL FACTOR 3: FLOAT AND INSTITUTIONAL OWNERSHIP ........ 32

    J.    ADDITIONAL FACTOR 4: AUTOCORRELATION ................ 32

    K.    ADDITIONAL FACTOR 5: OPTIONS ................ 33

VIII.   DAMAGES......................................................................................34

IX.     CONCLUSION ................................................................................35

## I.   INTRODUCTION

1.    I, Chad Coffman, am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation. I have been asked by counsel for the Lead Plaintiff in this matter to examine and opine on whether the market for Rent-A-Center, Inc. ("Rent-A-Center" or "RAC" or the "Company") common stock ("Rent-A-Center Common Stock") was efficient during the period from February 2, 2015 through October 10, 2016, inclusive ("Class Period").[1] In addition, I have been asked to opine on whether calculating damages in this matter is subject to a common methodology under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)").

2.    The materials I have considered in forming my opinions are summarized in **Appendix A**. Global Economics Group is being compensated at an hourly rate of $750 per hour for my work on this matter, and at rates between $175 and $450 for members of my staff who performed work in connection with this report under my direction and supervision. My compensation is in no way contingent on the outcome of this case. My qualifications are described below.

## II.   QUALIFICATIONS

3.    I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's of Public Policy from the University of Chicago. I am also a CFA charter-holder. The

---

[1] Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws filed May 5, 2017, in *ALAN HALL AND JAMES DEPALMA, et al., vs. RENT-A-CENTER, INC., et al.,* Case No. 4:16-CV-00978, ("Complaint") p. 1. Note, the Class Period in the Complaint states February 2, 2015 through October 11, 2016 but with the exception of the cause and effect section explained later, this report considers the Class Period to end on October 10, 2016 due to the fact that the final corrective disclosure was made before market hours on October 11, 2016.

CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

4.    I, along with several others, founded Global Economics Group on March 25, 2008.[2] Prior to starting Global Economics Group, I was employed by Chicago Partners LLC for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator (Retired Judge Daniel Weinstein) to provide economic analysis and opinions in dozens of securities class actions as well as other matters. As a result of my involvement in these cases, much of my career has been spent analyzing and making inferences about how quickly and reliably, and to what degree, new information impacts securities prices.

5.    My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

## III.   SUMMARY OF OPINIONS

6.    After analyzing Rent-A-Center's Common Stock during the Class Period and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the market for Rent-A-Center's Common Stock was efficient throughout the Class Period.

---

[2] Prior to March 16, 2011, Global Economics Group was known as Winnemac Consulting, LLC.

7.    I have also formed the opinion that damages can be calculated on a class-wide basis. These opinions are based upon my analysis described below.

8.    The remainder of this report is organized as follows: **Section IV** of this report provides an overview of Rent-A-Center's business operations and the allegations in this case. **Section V** discusses the reliance requirement for the claims under Section 10(b) of the Exchange Act and the "fraud on the market" theory. **Section VI** introduces the *Cammer* factors and other factors that financial economists and courts apply when evaluating market efficiency under the "fraud on the market" theory. **Section VII** provides the results of my empirical evaluation of each *Cammer* factor and other factors for Rent-A-Center Common Stock during the Class Period. **Section VIII** addresses how damages in this matter are subject to a common approach and methodology that can be applied class-wide. Finally, **Section IX** offers my conclusions.

9.    I reserve the right to amend this report, including to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

## IV.    OVERVIEW OF THE COMPANY AND ALLEGATIONS

10.    Rent-A-Center was incorporated in the state of Delaware with its headquarters in Texas. Rent-A-Center described its business during the Class Period as follows:

> We are one of the largest rent-to-own operators in North America, focused on improving the quality of life for our customers by providing them the opportunity to obtain ownership of high-quality durable products, such as consumer electronics, appliances, computers (including tablets), smartphones, and furniture (including accessories), under flexible rental purchase agreements with no long-term obligation.[3]

---

[3] Rent-A-Center 10-K for the FY 2015, p. 3.

5

11.     As of 2015, Rent-A-Center sold products with regard to four operating segments (i.e., Core U.S., Acceptance Now, Mexico, and Franchising).[4] The Core U.S. segment is responsible for operating Company-owned stores in the United States, Canada, and Puerto Rico, and the Mexico segment operates Company-owned stores in Mexico. On-site rent-to-own options at third-party retailers are managed by the Acceptance Now segment. The Franchising segment consists of stores that use Rent-A-Center, ColorTyme or RimTyme trade names, service marks, trademarks and logos, and operate under distinctive operating procedures and standards. The firm reports both consolidated financials and financials by segment. As of fiscal year end 2015, Rent-A-Center reported the following financial figures: revenues of $3.3 billion, a gross profit of $2.1 billion, and total assets of $2.0 billion.[5] As of February 2016, Rent-A-Center employed over 24,000 employees[6] and its shares traded on the Nasdaq Global Select Market under the ticker "RCII."[7]

12.     Plaintiffs' Complaint alleges that Rent-A-Center and the Individual Defendants[8] issued false and misleading statements and omitted material information during the Class Period, ultimately causing damages to purchasers of Rent-A-Center Common Stock who unknowingly bought Rent-A-Center Common Stock at artificially inflated prices and were damaged when the stock price reflected the concealed information.[9]

13.     Beginning in the fourth quarter of 2014, Rent-A-Center started rolling out a new proprietary point-of-sale (POS) management system referred to as SIMS, which is an acronym

---

[4] Rent-A-Center 10-K for the FY 2015, p. 5.

[5] Rent-A-Center 10-K for the FY 2015, pp. 19-20.

[6] Rent-A-Center 10-K for the FY 2015, p. 9.

[7] Rent-A-Center 10-K for the FY 2015, p. 17.

[8] Complaint ¶¶ 28.

[9] Complaint ¶¶ 180-182.

for Store Information Management Systems. SIMS was designed to centralize and manage sales, inventory, collections, customer relationship management, and payment tracking on a Company-wide basis and in real-time, prior to which each store was required to download and transmit store data to RAC headquarters at least twice daily. The Complaint alleges that by the start of the Class Period (i.e., February 2, 2015) as Rent-A-Center began rolling out SIMS, it failed to disclose challenges with the system's development and implementation, which posed a threat to store operations and account collections. These challenges included: (i) network bandwidth issues; (ii) scalability problems; (iii) capacity problems including network capacity, database capacity, and old-technology capacity problems; and (iv) functionality problems such as problems with credit card readers and POS terminals associated with the new system.[10] The Complaint alleges that these challenges continued throughout the Class Period, directly impacting the Company's operations, and resulting in financial loss. The Complaint alleges that through a set of partial disclosures the market finally learned of the problems facing Rent-A-Center's POS system and as a direct result the price of its shares fell, thus significantly harming investors who bought at inflated prices.[11]

## V.   DISCUSSION OF RELIANCE ELEMENT

14.   Class members' reliance on the alleged misstatements and material omissions is a required element for Lead Plaintiff's Section 10(b) claims. Lead Plaintiff asserts the "fraud on the market" theory of reliance in this matter.[12] The "fraud on the market" theory is based on the fact that in an efficient market (one in which widely-available public information is quickly

---

[10] Complaint ¶¶ 48.

[11] Complaint ¶¶ 1-18.

[12] Complaint ¶¶ 187.

incorporated into the market price of a security), all purchasers implicitly rely on any material misrepresentations or omissions since the value of those misrepresentations or omissions is incorporated into each class member's purchase price. The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic Inc. v. Levinson*:

> … [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[13]

15.    The Supreme Court recently reaffirmed this theory in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[14]

16.    As indicated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed and efficient market, market prices reflect what is publicly known about a company. If a company provides the market with misleading information regarding its financial strength or business practices, the market price will be inflated (or deflated) compared to what the price would have been if the truth were known (but-for the misleading information). Thus, in an efficient market, where the plaintiff asserts there were material misrepresentations or omissions, all purchasers implicitly relied on those misrepresentations and/or lack of disclosure by paying the inflated (or deflated) price. Determining whether the market for a security was "open and developed" or

---

[13] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) ("*Basic*").

[14] *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398, 2418 (2014) ("*Halliburton II*").

"efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory is an empirical exercise.[15] The esteemed economist Dr. Eugene Fama, in his seminal research, first outlined definitions of an "efficient market."[16] He described different levels of efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[17]

17.     The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency. "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price. This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[18] The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not

---

[15] To recognize the presumption of reliance, the *Basic* Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, 485 U.S. at 248 n.28. The *Basic* Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic*, 485 U.S. at 246 n.24. *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency, but rather, market efficiency is a matter of degree.

[16] Eugene F. Fama, Efficient Capital Markets: A Review of Theory and Empirical Work, 25 J. Fin. 383 (1970).

[17] "Weak-form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

[18] *Basic,* 485 U.S. at 241.

necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.

18.    In the next section, I explain the factors that are regularly considered by financial economists and courts in determining whether the market for a particular security is efficient.

## VI.  *CAMMER* FACTORS

19.    In *Cammer v. Bloom*, the Court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[19]

20.    The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency. As articulated below, the adopted definition of efficiency is consistent with Fama's definition of "semi-strong" efficiency. For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" markets as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.
>
> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).
>
> An *efficient market* is one which rapidly reflects new information in price.
>
> These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[20]

---

[19] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*").

[20] *Cammer,* 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988) ("Bromberg & Lowenfels")) (emphasis added).

21. While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory. I also consider a number of other factors that courts have utilized beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics is determinative as to whether a particular market is efficient.

22. In the subsequent sections, I evaluate the market for Rent-A-Center Common Stock during the Class Period under each of the *Cammer* factors, as well as the following additional factors that courts have also considered in assessing market efficiency: 1) market capitalization, 2) bid-ask spread, 3) the fraction of shares held by institutional investors, 4) autocorrelation (meaning whether there is a pattern in a security's returns so that future returns can be predicted based upon past returns), and 5) options trading.

## VII. APPLICATION OF EFFICIENCY FACTORS TO RENT-A-CENTER COMMON STOCK

### A. OVERVIEW

23. After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports the conclusion that the market for Rent-A-Center Common Stock was efficient throughout the Class Period. In addition to the discussion below, **Exhibit 1** summarizes how, for each of the factors examined, the empirical evidence supports a finding that Rent-A-Center Common Stock traded in an efficient market. As further background to my analyses, **Exhibit 2** displays Rent-A-Center Common Stock closing price and trading volume for each day throughout the Class Period.

24.    In summary, and as discussed more fully below, Rent-A-Center Common Stock traded in an efficient market during the Class Period. First, the average weekly trading volume of Rent-A-Center Common Stock during the Class Period far exceeded benchmarks that courts have established. During the Class Period, the average weekly trading volume for Rent-A-Center Common Stock was 4.7 million shares, which represents 8.81% of shares outstanding, higher than the average security traded on the New York Stock Exchange ("NYSE") and/or the NASDAQ Exchange. Second, there were a large number of securities analysts following and reporting on Rent-A-Center. Third, Rent-A-Center Common Stock was actively traded on the NASDAQ, fulfilling the *Cammer* factor regarding market makers. Fourth, Rent-A-Center filed multiple SEC Form S-3's and S-3 ASR's before the Class Period, met the important eligibility criteria for filing a Form S-3, and was apparently eligible to file a Form S-3 throughout the Class Period since the Company had previously provided substantial public information to the market in its previous SEC filings. Fifth, Rent-A-Center Common Stock had a large market capitalization relative to all other firms that traded on the NYSE and NASDAQ. Sixth, Rent-A-Center Common Stock had a low bid-ask spread relative to other exchange-traded common stocks. Seventh, institutions, which are considered generally to be well-informed investors, held the vast majority of the public float of Rent-A-Center Common Stock during the quarters of interest. Eighth, the autocorrelation coefficient for the Class Period was not statistically significant at the 95% confidence level. Ninth, there was considerable trading in Rent-A-Center options throughout the Class Period. Finally, there was a strong cause-and-effect relationship between new Company-specific information and the market price of Rent-A-Center Common Stock during the Class Period. My analyses of all of these factors support the conclusion that

Rent-A-Center Common Stock traded in an open, developed, and efficient market throughout the Class Period.

## B. *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

25.    The first *Cammer* factor is the average weekly trading volume of a security. According to one authority cited by the *Cammer* court,

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[21]

26.    Volume as a fraction of shares outstanding is an important indicator of market efficiency. First, volume is objectively quantifiable and comparable across securities. Second, high volume is generally indicative of continuity, liquidity, and market depth – which are highly indicative of market efficiency.[22] Third, substantial volume would indicate there is likely a market for the collection and distribution of information about the security. As Thomas and Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[23]

---

[21] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[22] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). William Sharpe, Gordon J. Alexander & Jeffrey W. Bailey, *Investments*, Prentice Hall, 44-45 (5th ed. 1995).

Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." *Cammer*, 1276 n.17 (citing Bromberg & Lowenfels).

Market depth refers to "the number of shares that [can] be traded at the quoted bid and ask prices." A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price. *See* Amihud, Y., et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005), 317.

[23] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 105, 108 (2000). Randall S. Thomas is a Director of the Law and Business Program at Vanderbilt University. Dr. James Cotter is an Associate Professor of Finance at Wake Forest University.

27.     Rent-A-Center Common Stock easily surpasses the threshold level of average weekly trading volume necessary for an efficient market. The average weekly trading volume for Rent-A-Center Common Stock during the Class Period was 8.81% of shares outstanding, compared to a combined 2.18% for the NYSE and NASDAQ. Based on this figure, the weekly trading volume for Rent-A-Center Common Stock far exceeds the 1% or 2% threshold cited by *Cammer.* **Exhibit 3** plots Rent-A-Center Common Stock's trading volume as a fraction of shares outstanding for each week during the Class Period.[24] Indeed, the average weekly trading volume during the Class Period was 4.7 million shares. The volume of trading for Rent-A-Center Common Stock supports the conclusion that the market for this security was efficient throughout the Class Period.

28.     Another way to measure trading volume is annualized turnover velocity, which is essentially the first *Cammer* factor expressed in dollar terms.[25] To be more specific, instead of looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of shares traded (i.e., shares traded multiplied by price per share) divided by the dollar value of all shares outstanding (i.e., shares outstanding multiplied by price per share). This is the same ratio because the numerator and denominator are multiplied by price per share. The advantage of this measure is that once quoted in annualized terms, Rent-A-Center Common Stock's turnover velocity can be compared directly with other publicly traded stocks based on exchange-reported statistics. For example, over the Class Period, the annualized turnover velocity ratio for Rent-A-Center Common Stock was 448% compared with the NYSE and NASDAQ combined average of

---

[24] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days, which may not follow the calendar week.

[25] Turnover velocity is simply the average trading volume as a percentage of shares outstanding (the first *Cammer* Factor) expressed in dollar terms:

**Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

113% for the Class Period.[26] Thus, Rent-A-Center Common Stock had an average annualized

turnover that was substantially higher than the average stock trading on the NYSE and

NASDAQ, further supporting that it traded in an efficient market.

29.    In short, the relatively high trading volume in Rent-A-Center Common Stock

throughout the Class Period supports the conclusion that the market for Rent-A-Center Common

Stock was efficient.

### C. *CAMMER* FACTOR 2: ANALYST COVERAGE

30.    The *Cammer* court stated the following related to analyst coverage:

> … [I]t would be persuasive to allege a significant number of securities
> analysts followed and reported on a company's stock during the class period.
> The existence of such analysts would imply, for example, the [auditor]
> reports were closely reviewed by investment professionals, who would in
> turn make buy/sell recommendations to client investors.[27]

31.    Analyst coverage can be important evidence of efficiency. Significant analyst

coverage implies that there is sufficient interest in a company and its securities, that there is an

active market for information regarding the company and its securities, and that the information

is widely distributed.

32.    During the Class Period, there was extensive analyst coverage of Rent-A-Center.

**Exhibit 4** shows that there were at least 171 reports issued during the Class Period and 17

separate firms that had equity analysts issue reports on Rent-A-Center, including major firms

such as KeyBanc, Cantor Fitzgerald & Co., Stephens Inc., and BB&T.[28] These reports served the

---

[26] Turnover velocity for the NYSE and NASDAQ is calculated from data provided by the World Federation of Exchanges. *See* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

[27] *Cammer*, 711 F. Supp. at 1286.

[28] I obtained Rent-A-Center analyst reports from Investext and Lead Plaintiff's counsel. The number of analyst reports I identify is likely understated since many are not available through third party data providers such as Investext. For example, it is clear that analysts from JP Morgan Chase & Co, Deutsche Bank AG, and BofA Merrill Lynch participated on earnings conference calls during the Class Period, but I did not have access to research reports

purpose of disseminating publicly available information along with commentary, news, updates, analyses, and recommendations of the analysts to investors. The extensive coverage of Rent-A-Center by securities analysts supports the conclusion that Rent-A-Center Common Stock traded in an efficient market throughout the Class Period.

33.     Since 1989, when the *Cammer* decision was rendered, there has been a significant increase in alternative methods by which publicly available information about publicly-traded securities is disseminated to investors. For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[29] and other media, the ability of individual and institutional investors to obtain information about publicly-traded securities and the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

34.     Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account. Thus, in addition to the substantial analyst coverage of Rent-A-Center, there were many other sources of public information dissemination. For example, there was frequent public press regarding Rent-A-Center. A search for articles classified as related to Rent-A-Center by Factiva over the Class Period resulted in 426 unique articles.[30] In addition, there

---

of those firms through Investext in connection with preparing this report. (*See*, "FQ4 2014 Earnings Call Transcripts," *S&P Capital IQ*, February 3, 2015, 10:45 AM ET; "FQ4 2015 Earnings Call Transcripts," *S&P Capital IQ*, February 2, 2016, 8:30 AM ET.)

[29] RSS is an acronym for Really Simple Syndication or Rich Site Summary. RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content. The RSS feeds are generally simple headlines and brief descriptions; if the user is interested, the user can click to see additional information. Content viewed in the RSS reader or news aggregator is known as an RSS feed. RSS is becoming increasing popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships (*see* http://www.rss-specifications.com/, and http://www.rss-specifications.com/what-is-rss.htm).

[30] Factiva is a business information and research tool owned by Dow Jones & Company. Factiva aggregates content from both licensed and free sources, and provides organizations with search, alerting, dissemination, and other

were numerous SEC filings available online at the SEC EDGAR search database at no cost, as well as various other sources of public information available throughout the Class Period that I do not attempt to quantify. The degree of news coverage and publicly available information further supports the conclusion that there was substantial supply of, and demand for, information regarding Rent-A-Center in the public arena throughout the Class Period.

35.    In summary, the number of analyst reports and the substantial public dissemination of news and other information regarding Rent-A-Center provides evidence of a robust and active market for public information about Rent-A-Center and evidence that its common stock traded in an efficient market during the Class Period.

### D. *CAMMER* FACTOR 3: MARKET MAKERS

36.    A market maker is a firm that is ready to buy or sell a particular stock on a regular and continuous basis.[31] The third *Cammer* factor states:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[32]

37.    The premise that the number of market makers can serve as an efficiency criterion relates to the notion that market makers are:

---

information management capabilities. The 426 unique articles were identified as a result of a search for "All Sources" with the company field "Rent-A-Center, Inc." or keyword field "Rent-A-Center, Inc." for the period "February 2, 2015 – October 11, 2016." The last earnings release included in the Class Period was before market hours on October 11, 2016. Thus, I have included October 11, 2016 in my search for news articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder. I also removed articles containing the phrase "New 52-Week Highs and Lows", as those yielded large numbers of automatically generated announcements, of which Rent-A-Center was often included, but did not provide information or discussion on the Company or its operations to the public. I acknowledge that this may not reflect all news as the Factiva database is limited to certain sources and content type.

[31] *See* http://www.sec.gov/answers/mktmaker.htm.

[32] *Cammer*, 711 F. Supp. at 1293.

> … [P]resumably knowledgeable about the issuing company and the stocks'
> supply and demand conditions (i.e., the "order flow"). Therefore, it is
> believed the larger the number of market makers in a given security, the more
> information is available about it and the quicker its dissemination in the
> price.[33]

38.     Rent-A-Center Common Stock traded on the NASDAQ, a major exchange  with

continuous public price and volume reporting, as opposed to an over-the-counter market without

volume reporting, which is the context in which *Cammer* indicated this was a relevant criterion.[34]

On such over-the-counter markets, there may be reason for concern regarding liquidity and

information dissemination. However, these concerns are generally not applicable to stocks

trading on large, modern exchanges such as the NYSE and NASDAQ, which are presumed to be

efficient, report volume and trade details, and tend to have rules that virtually guarantee a liquid

market.[35]

39.     The NYSE and NASDAQ are two of the largest and most liquid security exchanges

in the world with billions of shares traded each day. Unlike over-the-counter markets that rely on

decentralized market makers providing liquidity for trading, the NYSE and NASDAQ rely on a

computerized system to match orders and provide quotes.[36] The minimum requirements to be

---

[33] Barber, B., et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. 285 (1994), 291.

[34] *See Cammer,* 711 F. Supp. at 1292 (citing Bromberg & Lowenfels): "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

[35] For example, there are rules for minimal market capitalization and specialists that are *required* to maintain an orderly market. S*ee* Section 102, http://wallstreet.cch.com/LCM/Sections/; *see also*, William Sharpe, Gordon J. Alexander & Jeffrey W. Bailey, *Investments*, Prentice Hall, 45-53 (5th ed. 1995); Frank J. Fabozzi, Franco Modigliani & Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Chapter 18 – Appendix A (4th ed. 2010).

[36] For NYSE, *see* https://www.nyse.com/market-model/overview#dmms-2; https://www.nyse.com/market-model/dmm-case-studies; and https://www.nyse.com/publicdocs/nyse/listing/fact_sheet_dmm.pdf. For NASDAQ, *see* http://www.nasdaq.com/includes/Anatomy_of_a_Trade_FactSheet.pdf; http://www.nasdaqomx.com/transactions/trading/equities; http://www.nasdaq.com/about/MarketMechanics.stm.

listed on the NYSE or NASDAQ and remain in good standing virtually guarantee a liquid market for that security. Therefore, the number of "market makers" itself is not a particularly relevant metric in this case.

40.    Nevertheless, according to Bloomberg, throughout the Class Period, there were 114 market makers for Rent-A-Center Common Stock.[37] Therefore, Rent-A-Center Common Stock easily meets the letter and spirit of this factor, further supporting the efficiency of the market during the Class Period.

## E.  *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

41.    The fourth *Cammer* factor is SEC Form S-3 eligibility, which states,

> …[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[38]

42.    Through Form S-3, the SEC allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[39] In order to be eligible to issue a Form S-3, among other things, a company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months, and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted

---

[37] Bloomberg RANK function.

[38] *Cammer*, 711 F. Supp. at 1287.

[39] Additional information available at: www.sec.gov/about/forms/forms-3.pdf.

on debts or material leases. Eligibility to file a Form S-3 is confirmatory evidence of efficiency,

not a requirement. Interpreted in this way, the standard makes sense as an indicator of efficiency.

43.    I have found no evidence that Rent-A-Center was not S-3 eligible throughout the

Class Period, and in fact, Rent-A-Center filed several Form S-3's before the Class Period (on

May 7, 1999; April 5, 2001; May 7, 2002; and June 21, 2004). Rent-A-Center also filed Form S-

3ASR's before the Class Period (on August 23, 2006 and September 29, 2009).[40,41] While a

Form S-3 is a registration statement for specified transactions by certain issuers, a Form S-3ASR

is a type of Form S-3, but only "well-known seasoned issuers" are eligible to file S-3 ASRs.[42]

Therefore, Rent-A-Center meets this *Cammer* efficiency factor, which supports the conclusion

that Rent-A-Center Common Stock traded in an efficient market.

## F.  *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

44.    The fifth *Cammer* factor relates to how the price of a security reacts to new,

company-specific information and states:

> … [O]ne of the most convincing ways to demonstrate [market] efficiency
> would be to illustrate, over time, a cause and effect relationship between
> company disclosures and resulting movements in stock price.[43]

45.    Establishing a causal connection between new company-specific events and

movements in the market price is convincing evidence of market efficiency. A technique often

relied upon, both inside and outside of the context of litigation, to establish such a causal

connection is called an "event study." An event study is a well-accepted statistical method

---

[40] https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001000180&type=s-
3&dateb=&owner=exclude&count=40.

[41] It is not unusual for a company to go some period of time between filing Form S-3's even if the company is S-3
eligible.

[42] https://www.sec.gov/about/forms/forms-3.pdf.

[43] *Cammer,* 711 F. Supp. 1291.

utilized to isolate the impact of information on market prices.[44] Indeed, academics used event studies as one tool for evaluating the efficient market hypothesis in the first place. Event studies have been used for over 40 years and have appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how new information affects securities prices.[45]

46.   An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities. New information may include, for example, company press releases, earnings reports, SEC filings, and news reports or analyst reports. An event study is conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause.

47.   To analyze cause and effect, I performed an event study to determine whether Rent-A-Center Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with no Rent-A-Center-related news. Based on the event study I performed, which explicitly controls for market and industry factors, I find that there is a clear cause-and-effect relationship between new public information about Rent-A-Center and the market price of Rent-A-Center Common Stock. I now describe in further detail the event study methodology, the events I test, and the results.

48.   A well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[46] I have performed

---

[44] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE, 13 (1997).

[45] John J. Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT., 111 (1998).

[46] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent variable"). In this case, the

such an analysis in this matter where I evaluated the relationship between Rent-A-Center Common Stock daily returns (percentage change in price) controlling for the S&P 500 Total Return (the "Market Index") and a market-weighted peer index, hereafter referred to as the "Peer Index."[47, 48]

49.     For each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (roughly six months).[49] By using a "rolling" estimation window, it allows for the relationship between Rent-A-Center Common Stock, industry and market factors, as well as firm-specific volatility to update over time according to the data observed over the most recent 120 trading day period. Use of a rolling model to account for changing volatility and evolving relationships among market indices is accepted in peer-reviewed literature.[50]

50.     The model indicates that there is a positive correlation between Rent-A-Center Common Stock and the control variables. In other words, the movement of the Market Index and Peer Index helps explain the price movements of Rent-A-Center Common Stock. For instance, choosing a day in the Class Period purely as an example, September 16, 2015, and looking at the regression results based on the 120 days prior to that day, the estimated coefficient for the S&P

---

daily percentage change in Rent-A-Center Common Stock (the Rent-A-Center daily return) is the dependent variable and the contemporaneous daily returns for a market and peer index are the independent variables. For a general discussion of regression analysis, see Damodar N. Gujarati, *Basic Econometrics*, McGraw Hill, Chapters 1-3 (3rd ed. 1995).

[47] The Peer Index is a value-weighted index comprised of the constituents of the S&P Composite 1500 Specialty Retail (Industry) Index, excluding Rent-A-Center. The Company compares its performance against the S&P Composite 1500 Specialty Retail (Industry) Index in its 10-K filings during the Class Period (FY 2015 and FY 2016). The composition of the Peer Index fluctuates throughout the Class Period. I have analyzed the constituents leaving and joining the index over the Class Period. Overall, 72 firms were constituents of the Peer Index during the Class Period.

[48] The returns of the Peer Index are net of the S&P 500 Total Return Index.

[49] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE, 15 (1997): "For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."

[50] Phillip A. Braun, *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575, 1597 (1995).

500 is 1.06 which means that a 1% rise in the S&P 500 predicts a 1.06% increase in returns for Rent-A-Center Common Stock. The estimated coefficient for the Peer Index is 1.01, meaning that the expected return for Rent-A-Center Common Stock is about a 1.01% increase for every 1% increase in the Peer Index over and above the return of the S&P 500. **Exhibit 5** plots the estimated coefficients for the rolling regression models for each day during the Class Period, and it depicts the observed positive relationship between the general market, the Peer Index, and the price of Rent-A-Center Common Stock.

51.     Another important statistic from the regression is the standard deviation of the errors, which measures the degree of imprecision in the predictions from the model. Put another way, this measure provides a metric for how much "randomness" remains in the price movement of Rent-A-Center Common Stock after controlling for the Market Index and Peer Index. For instance, on the example date, September 16, 2015, the model predicted that absent any value relevant new firm-specific information, the price of Rent-A-Center Common Stock would increase by 1.22% because the S&P 500 was up 0.87% and the Peer Index was up 0.41%.[51] Because of the inherent randomness observed in stock price returns, I do not expect the model to predict returns exactly. In this example, I observe an actual return of 1.24%. Thus, the "abnormal return" for this day is 0.02% (the actual return of 1.24% minus the predicted return of 1.22%). I then rely on the standard deviation of the errors from the regression model to tell if this abnormal return of 0.02% is sufficiently large that I can reject random movement as the explanation.

52.     The test for whether randomness can be rejected is done by calculating what is known as a "t-statistic," which represents the number of standard deviations between the actual

---

[51] The predicted return of 1.22% is found as follows: 1.06 * 0.875% (Coefficient on Market Index *times* Market Index return) + 1.01 * 0.412% (Coefficient on Peer Index Return *times* Peer Index Return) + (-0.127%) (constant term from regression).

observation and the prediction. For the example date of September 16, 2015, an abnormal return of 0.02% represents 0.01 standard deviations or a t-statistic of 0.01 (abnormal return of 0.02% divided by the standard deviation of the errors of 0.0156). Using the standard assumption that, in the absence of new value-relevant company-specific news, abnormal returns will be normally distributed around zero, probability theory implies that based on randomness alone, using a 95% confidence level and large sample size, the abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) only 5% of the time.[52] Stating this point another way, there is a 95% confidence level that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation. Since our example has a t-statistic of 0.01, the abnormal return is not statistically significant at the 95% confidence level, and I cannot reject randomness as the cause of the abnormal price movement with greater than 95% confidence. By contrast, if on a particular day one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and one observes new value-relevant Company-specific information, one would reject randomness as the explanation with 95% confidence and infer that the new information is the cause of the stock price movement.

53.     **Exhibit 6** shows that the standard deviation of the errors varied over the Class Period. By adopting the rolling regression model, my event study explicitly adjusts for the changing firm-specific volatility.

54.     To analyze cause-and-effect, I examined the price response of Rent-A-Center Common Stock to the eight earnings announcements during the Class Period. See **Exhibit 7**.

---

[52] David I. Tabak & Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, Ch. 19, (3rd ed. 2001). The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

55.     There are many academic articles and financial treatises that explain theoretically and demonstrate empirically that the release of company earnings information often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[53] Also, newly released earnings reports by a company are an objective set of news to identify and test. Considering the second earnings release listed in **Exhibit 7** as an example, the Company announced positive first quarter results for the fiscal year 2015, announcing earnings per share that beat Street estimates by $0.02 and reported revenue growth of $16M above consensus.[54] In response, the market price of Rent-A-Center Common Stock increased by 13.57%, compared to the predicted return of -0.35%. Thus, the abnormal return on April 28, 2015 was 13.92%. With a t-statistic of 8.40, this abnormal price movement is statistically significant above the 95% level, and I therefore have scientific evidence that Rent-A-Center Common Stock reacted rapidly to this new information.

56.     Similar to this example, I analyzed the market reaction to Rent-A-Center's other earnings announcements I identified above. In total, of the eight earnings announcements Rent-A-Center issued during the Class Period, all resulted in statistically significant price movements above the 95% confidence level.

57.     **Exhibit 7** presents a summary of the earnings releases during the Class Period, and **Exhibits 8A–8H** depict the intraday price movements for each of these announcement dates.

---

[53] William H. Beaver, Maureen F. McNichols & Zach Z. Wang., "The Information Content of Annual Earnings Announcements: New Insights from Intertemporal and Cross-Sectional Behavior," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 67-92 (1968); Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 119-163(1971); Joseph Aharony & Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, 1-12 (1980).

[54] *See*, "RCII: SSS Growth and Expense Management Overcome Mix Impact on Gross Margin," *BB&T Capital Markets,* April 28, 2015.

25

58.     I then compared these results against the 178 days during the Class Period[55] where I identified no Rent-A-Center-related news from the Factiva database and there were no analyst reports or SEC filings issued. Of these 178 days, there were 13 days with statistically significant price movements. Thus, during the Class Period there was a statistically significant price reaction at the 95% confidence level or greater for 100% of the earnings announcements, but when compared to days with no Rent-A-Center-related news, I observed only 7.30% statistically significant reactions.[56,57] This is powerful scientific evidence of a cause-and-effect relationship between new publicly released information concerning the Company and changes in the price of Rent-A-Center Common Stock.

59.     Furthermore, on the 178 days with no news, the average change in price of Rent-A-Center Common Stock was 1.44% after controlling for market and industry factors, while the average change in Rent-A-Center Common Stock on earnings announcement dates was 17.95%. In other words, the average magnitude of stock price movement on earnings announcement days was about 12.5 times higher than on no news days.[58] Again, this demonstrates that on days when important Company-specific information is released to the market, the stock price moves much more than on days where there is no Company-specific news. This provides further evidence of a cause-and-effect relationship between Company-specific news and changes in the price of Rent-A-Center Common Stock, and thus an efficient market.

60.     The bar charts below summarize this analysis while **Exhibit 9** gives more detail.

---

[55] In order to capture the last corrective disclosure, I expanded my news analysis to account for the earnings release announced before market hours on October 11, 2016. *See also* **Exhibit 7** for the event study results on these days.

[56] This difference between 100.00% and 7.30% is itself statistically significant at the 95% confidence level.

[57] Based on randomness alone, one would expect 5% of the no news days to be statistically significant.

[58] This difference between 17.95% and 1.44% is itself statistically significant at the 95% confidence level.





61.    Finally, when important company-specific news is released to the market (e.g. earnings announcements), the daily trading volume also tends to be much higher[59] than on days where there is no news. For instance, the average daily trading volume of the eight days with earnings announcements was 6.6 million. Compare this to the average daily trading volume of 0.8 million for days where there is no news in the Class Period.[60] The bar chart below summarizes this analysis.

**Average Daily Trading Volume**



62.    The bar charts above establish a strong cause-and-effect relationship between new, Company-specific news and rapid changes in the price of Rent-A-Center Common Stock. The earnings announcement days had a much greater percentage of significant price movements,

---

[59] William H. Beaver, "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 69, 84 (1968).

[60] This difference between 6.6 million and 0.8 million is itself statistically significant at the 95% confidence level.

higher daily trading volume on average, and statistically significantly larger price changes than those found on days with no news. In fact, as shown in **Exhibit 7**, all the earnings announcements during the Class Period are associated with statistically significant price movements at the 95% confidence level.

63.    In conclusion, the event study analysis and intraday charts presented in this section demonstrate a clear cause-and-effect relationship between new material news and changes in the market price of Rent-A-Center Common Stock during the Class Period.

### G.  ADDITIONAL FACTOR 1: MARKET CAPITALIZATION

64.    In *Krogman v. Sterritt*, the court noted that economic theory includes other possible relevant factors for determining whether a stock trades in an efficient market, in addition to the *Cammer* factors.[61] The *Krogman* Court held that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[62] Furthermore, Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[63] Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

65.    Rent-A-Center Common Stock had higher market capitalization than the majority of NYSE and NASDAQ stocks during the Class Period, thus suggesting this factor is supportive

---

[61] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*"). The factors identified by the *Krogman* Court are 1) market capitalization, 2) bid-ask spread, and 3) float.

[62] *Krogman*, 202 F.R.D. at 478.

[63] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 117 (2000).

of efficiency. There were approximately 53 million shares of Rent-A-Center Common Stock outstanding throughout the Class Period.[64]

66.   Based on the market price, the market capitalization for Rent-A-Center Common Stock averaged $1.06 billion during the Class Period. **Exhibit 10** shows Rent-A-Center's market capitalization over the Class Period. **Exhibit 11** shows that during the Class Period, Rent-A-Center Common Stock market capitalization ranged from the 59th to 75th percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Class Period.[65] In other words, over the Class Period, Rent-A-Center Common Stock had a higher market capitalization than at least 59% of the firms on the combined NYSE and NASDAQ.

67.   Given that the market capitalization for Rent-A-Center Common Stock was consistently large relative to other publicly traded companies, this factor is supportive of market efficiency for Rent-A-Center Common Stock.

## H.  ADDITIONAL FACTOR 2: THE BID-ASK SPREAD

68.   The *Krogman* court's last additional efficiency factor considered the bid-ask spread for a security, saying, "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[66] The bid-ask spread is an important indicator of the degree to which a market is developed. The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price.

---

[64] S&P Capital IQ.

[65] Bloomberg.

[66] *Krogman*, 202 F.R.D. at 478.

In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies. Thus, the narrower the bid-ask spread, the greater indication of an efficient market.

69.    I analyzed bid-ask spreads for Rent-A-Center Common Stock during the Class Period. **Exhibit 12** shows that during this period, the time-weighted average percentage bid-ask spread for Rent-A-Center Common Stock in each month was between 0.045% and 0.112%. This is well below the average and median bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in February 2016 (the full month during the Class Period when Rent-A-Center had the largest percentage bid-ask spread).[67,68] **Exhibit 12** demonstrates that Rent-A-Center Common Stock had a monthly average bid-ask spread of 0.112% in February 2016, while a randomly selected group of 100 other common stocks on the NYSE and NASDAQ had an average bid-ask spread of 1.00%.[69] Accordingly, the bid-ask spread for Rent-A-Center Common Stock was low during the Class Period, and this factor further supports market efficiency for Rent-A-Center Common Stock.

---

[67] Quote data for Rent-A-Center and other publicly traded stocks were obtained from the TICK database. *See* https://tickapi.tickdata.com/.

[68] I constructed a random sample because I am not aware of any exchange-wide reporting of average or median bid-ask spreads. Determining the average bid-ask spread for the entire market would be a very costly and data intensive process, therefore I adopted a random sampling methodology. I determined the constituents of the NYSE and NASDAQ for February 2016 and then randomly generated a list of 100 common stock securities. I then calculated the time-weighted average monthly bid-ask spread for February 2016.

[69] The time-weighted average bid-ask spread was calculated by taking the average of the spread during trading hours on the primary exchange of each security, weighted by the amount of time each quote prevails in the market. That is, I take the weighted average quote, with the weight being the number of seconds between that quote and the next quote that occurs. Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang & Hans R. Stoll, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).

## I.   ADDITIONAL FACTOR 3: FLOAT AND INSTITUTIONAL OWNERSHIP

70.   The *Krogman* court also considered public float (i.e., the amount of shares not held by insiders) to be indicative of market efficiency. As shown in **Exhibit 13**, during the Class Period, insiders held, on average, just 2.50% of all outstanding shares of Rent-A-Center Common Stock, meaning that over 97% of shares were held by non-insiders. This large percentage of shares held by non-insiders supports a finding of market efficiency.

71.   In addition, institutional investors are considered to be sophisticated and well-informed with access to most publicly available information for the stocks that they own. These investors include mutual funds, pension funds, investment banks, and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios. As **Exhibit 13** shows, 427 institutions reported owning Rent-A-Center Common Stock during the Class Period, holding the vast majority of public float. This substantial level of institutional ownership of Rent-A-Center Common Stock during the Class Period coupled with the high trading volume further supports a conclusion of market efficiency.

## J.   ADDITIONAL FACTOR 4: AUTOCORRELATION

72.   If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated." Autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency.

73.   A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has

a statistically significant effect on the abnormal return today.[70] If the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation.

74.    **Exhibit 14** displays the autocorrelation coefficient for Rent-A-Center Common Stock using the abnormal returns from the event study model described above. The autocorrelation coefficient for the Class Period is not significant. Furthermore, the sign of the coefficient flips from one quarter to the next. This suggests there is no consistent pattern of autocorrelation in Rent-A-Center Common Stock and this factor supports the conclusion that Rent-A-Center Common Stock traded in an efficient market.[71]

## K.  ADDITIONAL FACTOR 5: OPTIONS

75.    In addition to the factors analyzed above, there was also considerable option trading in Rent-A-Center Common Stock during the Class Period.[72] Academic articles have demonstrated that options written on existing assets can improve efficiency by permitting an expansion of the contingencies that are covered by the market.[73] Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market

---

[70] William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

[71] The fact that one quarter has a significant coefficient is not indicative of meaningful autocorrelation because it is not uncommon for autocorrelation to occur from time to time due to random factors.  Indeed, autocorrelation is only a concern if there is a consistent pattern that suggests a trader could consistently earn riskless profits *See* Doron Avramov, Tarun Chordia & Amit Goyal, *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. 2365, 2367-68 (2006); Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95-101 (1978).

[72] For instance, according to Bloomberg, there were 159,604 Rent-A-Center Common Stock put contracts and 70,823 Rent-A-Center Common Stock call contracts that traded during the Class Period.

[73] Stephen A. Ross, *Options and Efficiency*, 90 Q. J. ECON. 75 (1976).

quality of the underlying stocks.[74] Thus, this factor also supports that Rent-A-Center common stock traded in an efficient market throughout the Class Period.

## VIII. DAMAGES

76.     Although I have not been asked to calculate class-wide damages in this action, which I understand will be subject to further discovery, it is clear that damages in this matter can be calculated using a methodology common to the class. Indeed, the standard and well-settled formula for assessing damages for each class member seeking relief under Section 10(b) is the "out-of-pocket" method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the PSLRA's "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[75]

77.     The methodology and evidence for establishing the artificial inflation per share in the market price on each day during the Class Period is also common to the class and can be measured class-wide. In particular, as is standard procedure in Section 10(b) cases, the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the class. Damages for any individual class member could then be calculated

---

[74] Raman Kumar, Atulya Sarin & Kuldeep Shastri, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, 53 J. FIN. 717 (1998).

[75] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See*, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

formulaically based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Accordingly, although I have not been asked to calculate class-wide damages, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the class as a whole.

## IX.   CONCLUSION

78.   In sum, every factor analyzed supports my opinion that Rent-A-Center Common Stock traded in an efficient market during the Class Period. Furthermore, class-wide damages in this action can be calculated using a common methodology.

79.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on March 13, 2018

Chad Coffman

**Exhibit 1**

## Summary of Efficiency Factors for Rent-A-Center, Inc.

| Factor | Summary of Factor | Rent-A-Center |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | • The average weekly trading volume of 8.81%, as a percentage of shares outstanding, exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 4.7 million shares traded weekly on average during the Class Period). |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | • During the Class Period at least 17 securities analysts issued 171 analyst reports which implies that important information relevant to trading Rent-A-Center Common Stock was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | • Because Rent-A-Center's shares were exchange-traded on the NASDAQ during the Class Period, not over the counter, this factor is satisfied. According to Bloomberg, throughout the Class Period, there were at least 114 market makers for Rent-A-Center Common Stock. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | • Rent-A-Center filed Form S-3's before the Class Period (i.e. May 7, 1999; April 5, 2001; May 7, 2002; and June 21, 2004). Rent-A-Center also filed Form S-3ASR's before the Class Period (on August 23, 2006 and September 29, 2009). I have found no evidence to believe that Rent-A-Center was not S-3 eligible throughout the Class Period, thus satisfying this factor. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for Rent-A-Center Common Stock. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | • As of 12/31/2014 and 12/31/2016, Rent-A-Center's market capitalization was $1.92 billion and $0.60 billion, respectively, which is at least the 59th percentile of all NYSE and NASDAQ stocks. Rent-A-Center Common Stock therefore easily meets this criterion. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | • During the Class Period, the average percentage bid-ask spread for Rent-A-Center Common Stock in each month ranged from 0.045% to 0.112%. Rent-A-Center's average percentage bid-ask spread was well below the mean and median bid-ask spread of a random sample of 100 other common stocks trading on the NASDAQ and NYSE in February 2016 (the full month when Rent-A-Center had the largest bid-ask spread). This supports a finding of efficiency. |
| Public Float & Institutional Holdings | Public float measures the fraction of shares that are readily available to trade. Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | • During the Class Period, only 2.5% of Rent-A-Center Common Stock was held by insiders. 427 institutions held the vast majority of public float throughout the Class Period which further supports the finding that Rent-A-Center Common Stock traded in an efficient market. |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | • The coefficient for the Class Period is not statistically significant at the 95% confidence level and no pattern of persistent autocorrelation throughout the Class Period is evident, therefore supporting the conclusion that Rent-A-Center Common Stock traded in an efficient market. |
| Options | Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks. | • There were 159,604 Rent-A-Center Common Stock put contracts and 70,823 Rent-A-Center Common Stock call contracts that traded during the Class Period. Rent-A-Center Common Stock therefore easily meets this criterion. |

**Exhibit 2**
**Rent-A-Center Common Stock Price & Volume**
**2/2/2015 - 10/31/2016**



Sources: Complaint and S&P Capital IQ.

**Exhibit 3**
**Rent-A-Center Common Stock Average Weekly Trading Volume**
**as a Percentage of Shares Outstanding**
**2/2/2015 - 10/10/2016**



Source: S&P Capital IQ.
Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period on February 2, 2015 through October 10, 2016. The last week consists of two trading days (i.e., 10/7/2016 and 10/10/2016), and therefore, the average of the daily trading volume on these two days is multiplied by five to get a comparable measure for the average weekly trading volume as a percentage of shares outstanding.

# Exhibit 4
# Summary of Securities Analyst Reports Issued for Rent-A-Center

| | Analyst Name | Reports Issued During the Class Period: 2/2/2015 - 10/10/2016 |
|---|---|---|
| [1] | MINKABU | 26 |
| [2] | BB&T CAPITAL MARKETS | 17 |
| [4] | NORTHCOAST RESEARCH | 17 |
| [3] | KEYBANC CAPITAL MARKETS | 16 |
| [5] | SIDOTI & COMPANY, LLC | 13 |
| [6] | WRIGHT INVESTORS SERVICE | 12 |
| [7] | STEPHENS INC. | 11 |
| [8] | CANTOR FITZGERALD AND COMPANY | 9 |
| [9] | VALUENGINE, INC. | 9 |
| [10] | BUYSELLSIGNALS RESEARCH | 8 |
| [11] | SADIF ANALYTICS | 8 |
| [12] | MARKETLINE | 7 |
| [13] | OPPENHEIMER & CO. INC. | 7 |
| [14] | VALIDEA | 7 |
| [15] | GILFORD SECURITIES | 2 |
| [16] | DIRECTORS DEALS LTD. | 1 |
| [17] | TOPEKA CAPITAL MARKETS REPORTS | 1 |
| | **Total** | **171** |

Source: Investext and counsel.
Note: Many analyst reports are not available through third party data providers (e.g. Investext); therefore, this almost certainly understates the total amount of analyst coverage.

**Exhibit 5**
**Coefficients from Rolling Event Study Regression for Rent-A-Center**
**2/2/2015 - 10/10/2016**



Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is a value-weighted index comprised of the constituents of the S&P Composite 1500 Specialty Retail (Industry) Index, excluding Rent-A-Center. The composition of the Peer Index fluctuates throughout the Class Period. I have analyzed the constituents leaving and joining the index over the Class Period. Overall, 72 firms were constituents of the Peer Index during the Class Period. The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements and the alleged corrective disclosure dates have been removed from estimation.

**Exhibit 6**
**Standard Deviation of the Errors for Rolling Event Study**
**Regression for Rent-A-Center Common Stock**
**2/2/2015 - 10/10/2016**



Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is a value-weighted index comprised of the constituents of the S&P Composite 1500 Specialty Retail (Industry) Index, excluding Rent-A-Center. The composition of the Peer Index fluctuates throughout the Class Period. I have analyzed the constituents leaving and joining the index over the Class Period. Overall, 72 firms were constituents of the Peer Index during the Class Period. The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements and the alleged corrective disclosure dates have been removed from estimation.

## Exhibit 7
### Event Study Analysis of Rent-A-Center Earnings Announcements

| # | Date | Time | Market Date | Event | Headline | Closing Price | Raw Return | Abnormal Return | Abnormal Dollar Change | t-Stat | Sig Level |
|---|------|------|-------------|-------|----------|---------------|------------|-----------------|------------------------|--------|-----------|
| | | | | | | | | Rolling Regression Model (120-day window) | | | |
| 1 | 2/2/2015 | 4:45 PM | 2/3/2015 | Q4 2014 Earnings | Rent-A-Center, Inc. Reports Fourth Quarter and Year End 2014 Results *Source -Business Wire* | $30.25 | -13.65% | -16.45% | -$5.76 | -10.18 | *** |
| 2 | 4/27/2015 | 4:25 PM | 4/28/2015 | Q1 2015 Earnings | Rent-A-Center, Inc. Reports First Quarter 2015 Results *Source - Business Wire* | $30.71 | 13.57% | 13.92% | $3.76 | 8.40 | *** |
| 3 | 7/27/2015 | 4:05 PM | 7/28/2015 | Q2 2015 Earnings | Rent-A-Center, Inc. Reports Second Quarter 2015 Results *Source - Business Wire* | $27.49 | 4.37% | 3.64% | $0.96 | 2.37 | ** |
| 4 | 10/26/2015 | 4:04 PM | 10/27/2015 | Q3 2015 Earnings | Rent-A-Center, Inc. Reports Third Quarter 2015 Results *Source - Business Wire* | $18.06 | -29.95% | -28.77% | -$7.42 | -21.21 | *** |
| 5 | 2/1/2016 | 4:49 PM | 2/2/2016 | Q4 2015 Earnings | Rent-A-Center, Inc. Reports Fourth Quarter and Year End 2015 Results *Source - Business Wire* | $9.89 | -25.53% | -23.55% | -$3.13 | -13.57 | *** |
| 6 | 4/27/2016 | 4:15 PM | 4/28/2016 | Q1 2016 Earnings | Rent-A-Center, Inc. Reports First Quarter 2016 Results *Source - Business Wire* | $13.70 | -12.79% | -11.42% | -$1.79 | -4.22 | *** |
| 7 | 7/27/2016 | 4:15 PM | 7/28/2016 | Q2 2016 Earnings | Rent-A-Center, Inc. Reports Second Quarter 2016 Results *Source - Business Wire* | $10.92 | -17.65% | -18.89% | -$2.50 | -6.97 | *** |
| 8 | 10/11/2016 | 6:55 AM | 10/11/2016 | Pre Q3 2016 Earnings | Rent-A-Center, Inc. Announces Selected Preliminary Third Quarter 2016 Financial Information *Source - Business Wire* | $9.18 | -28.73% | -26.95% | -$3.47 | -13.07 | *** |

Sources: S&P Capital IQ and Factiva.
Notes:
(1) The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is a value-weighted index comprised of the constituents of the S&P Composite 1500 Specialty Retail (Industry) Index, excluding Rent-A-Center. The composition of the Peer Index fluctuates throughout the Class Period. I have analyzed the constituents leaving and joining the index over the Class Period. Overall, 72 firms were constituents of the Peer Index during the Class Period.  The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements and the alleged corrective disclosure dates have been removed from estimation.

(2) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater.



**Exhibit 8A**
**Rent-A-Center Common Stock Intraday Price and Volume**
**2/3/2015**

Source: TICK Data.



**Exhibit 8B**
**Rent-A-Center Common Stock Intraday Price and Volume**
**4/28/2015**

4/28/2015 7:30 AM
Rent-A-Center hosts call to discuss earnings for Q1 2015.

| Return | Abn. Return | t-Stat |
|--------|-------------|--------|
| 13.57% | 13.92% | 8.40 |

4/28/2015
9:30 am - $29.28
**NASDAQ Open**

4/28/2015
4:00 pm - $30.71
**NASDAQ Close**

4/27/2015
4:00 pm - $27.04
**NASDAQ Close**

4/27/2015 4:25 PM
Rent-A-Center releases earnings for Q1 2015.

Source: TICK Data.



**Exhibit 8C**
**Rent-A-Center Common Stock Intraday Price and Volume**
**7/28/2015**

| Return | Abn. Return | t-Stat |
|--------|-------------|--------|
| 4.37%  | 3.64%       | 2.37   |

7/27/2015
4:00 pm - $26.34
NASDAQ Close

7/27/2015 4:05 PM
Rent-A-Center releases
earnings for Q2 2015.

7/28/2015 7:30 AM
Rent-A-Cemter hosts
call to discuss earnings
for Q2 2015.

7/28/2015
9:30 am - $26.48
NASDAQ Open

7/28/2015
4:00 pm - $27.49
NASDAQ Close

Source: TICK Data.

**Exhibit 8D**
**Rent-A-Center Common Stock Intraday Price and Volume**
**10/27/2015**



| | Return | Abn. Return | t-Stat |
|---|---|---|---|
| | -29.95% | -28.77% | -21.21 |

10/26/2015
4:00 pm - $25.78
**NASDAQ Close**

10/26/2015 4:04 PM
Rent-A-Center releases earnings for Q3 2015.

10/27/2015 7:30 AM
Rent-A-Center hosts call to discuss earnings for Q3 2015.

10/27/2015
9:30 am - $20.29
**NASDAQ Open**

10/27/2015
4:00 pm - $18.06
**NASDAQ Close**

Source: TICK Data.



**Exhibit 8E**
**Rent-A-Center Common Stock Intraday Price and Volume**
**2/2/2016**

Source: TICK Data.

**Exhibit 8F**
**Rent-A-Center Common Stock Intraday Price and Volume**
**4/28/2016**



Source: TICK Data.

**Exhibit 8G**
**Rent-A-Center Common Stock Intraday Price and Volume**
**7/28/2016**



Source: TICK Data.

**Exhibit 8H**
**Rent-A-Center Common Stock Intraday Price and Volume**
**10/11/2016**



Source: TICK Data.

**Exhibit 9**
**Comparison of Statistical Significance and Abnormal Returns**
**for Rent-A-Center Earnings Announcements**
**vs. Days with No News during the Class Period**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 8 | 178 |
| Significant Days at 95% Confidence Level | 8 | 13 |
| % Significant Days at 95% Confidence Level [2] | 100.00% | 7.30% |
| Average Absolute Abnormal Return [3] | 17.95% | 1.44% |
| Average Volume (Millions) [4] | 6.6 | 0.8 |

Notes:
(1) The last earnings release included in this analysis window was before market hours on October 11, 2016 and thus, I included the date of the market reaction for this earnings announcement, October 11, 2016. For the purposes of this analysis, I selected the 178 days with no news. I identify days with no news when there were zero news articles via the Factiva database, and no analyst reports or SEC filings issued.
(2) 100.00% rate of statistical significance is statistically significantly different than 7.30% at the 95% confidence level.
(3) 17.95% absolute return is statistically significantly different than 1.44% based on a t-test for difference of means at the 95% confidence level.
(4) The difference between 6.6 million and 0.8 million is statistically significant at the 95% confidence level.



**Exhibit 10**
**Rent-A-Center Common Stock Market Capitalization**
**2/2/2015 - 10/31/2016**

Sources: Complaint and S&P Capital IQ.

**Exhibit 11**
**Rent-A-Center Common Stock**
**Market Capitalization Rankings**

| Last trading day of: | Market Capitalization (billions) | Percentile Rank on NYSE & NASDAQ |
|---|---|---|
| Q4 2014 | $1.92 | 75% |
| Q1 2015 | $1.46 | 71% |
| Q2 2015 | $1.50 | 70% |
| Q3 2015 | $1.29 | 70% |
| Q4 2015 | $0.79 | 63% |
| Q1 2016 | $0.84 | 64% |
| Q2 2016 | $0.65 | 61% |
| Q3 2016 | $0.67 | 60% |
| Q4 2016 | $0.60 | 59% |

Source: Bloomberg and S&P Capital IQ.

**Exhibit 12**
**Rent-A-Center Common Stock Average Monthly Bid-Ask Percentage Spread**
**2/2/2015 - 10/10/2016**



Source: Thomson Reuters Eikon and TICK Data.
Note: October 2016 data is limited to the Class Period.

**Exhibit 13**
**Rent-A-Center Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings**

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Public Float[1] |
|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [6] |
| 12/31/2014 | 52,902 | 227 | 1,428 | 6,176 | 57,650 | 2.70% | 56,945 | 98.78% |
| 3/31/2015 | 53,025 | 225 | 1,415 | 4,236 | 55,846 | 2.67% | 55,774 | 99.87% |
| 6/30/2015 | 53,028 | 262 | 1,260 | 8,033 | 59,801 | 2.38% | 62,015 | 103.70% |
| 9/30/2015 | 53,055 | 259 | 1,265 | 8,363 | 60,153 | 2.38% | 61,814 | 102.76% |
| 12/31/2015 | 53,068 | 250 | 1,314 | 7,899 | 59,653 | 2.48% | 61,026 | 102.30% |
| 3/31/2016 | 53,092 | 232 | 1,288 | 7,562 | 59,366 | 2.43% | 60,891 | 102.57% |
| 6/30/2016 | 53,092 | 243 | 1,272 | 8,347 | 60,167 | 2.40% | 62,649 | 104.13% |
| 9/30/2016 | 53,116 | 221 | 1,355 | 7,636 | 59,397 | 2.55% | 60,363 | 101.63% |
| 12/31/2016 | 53,150 | 213 | 1,355 | 10,613 | 62,408 | 2.55% | 63,108 | 101.12% |
| Total Institutions over Class Period: | | 427 | | | Average: | 2.50% | | 101.87% |

Sources: S&P Capital IQ and SEC filings.
Notes:
(1) S&P Capital IQ updates short interest every two weeks while updates to institutional holdings via 13-F filings are only available every quarter; therefore, occasionally the time difference in data updates may cause institutional holdings to appear to exceed shares outstanding and the public float.

**Exhibit 14**
**Rent-A-Center Common Stock**
**Test for Autocorrelation During the Class Period**

| Quarter | Coefficient on Previous Day's Abnormal Return[1] | t-Statistic | Sig Level |
|---|---|---|---|
| Q1 2015 | -0.12 | -0.76 | |
| Q2 2015 | 0.15 | 1.15 | |
| Q3 2015 | -0.11 | -0.88 | |
| Q4 2015 | 0.03 | 0.25 | |
| Q1 2016 | -0.06 | -0.44 | |
| Q2 2016 | -0.40 | -3.58 | *** |
| Q3 2016 | 0.03 | 0.25 | |
| **Class Period** | **-0.04** | **-0.89** | |

Source: S&P Capital IQ.
Notes:
(1) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable. The six trading days in Q4 2016 during the Class Period (i.e., 10/3/2016, 10/4/2016, 10/5/2016, 10/6/2016, 10/7/2016, and 10/10/2016) have been included in "Q3 2016" for purposes of this analysis.
(2) "***" Denotes statistical significance at the 99% confidence level or greater, "**" denotes statistical significance at the 95% confidence level or greater, and "*" denotes statistical significance at the 90% confidence level or greater.

# Appendix A
# Documents Considered

## Court Documents

- Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws filed May 5, 2017, in *ALAN HALL AND JAMES DEPALMA, et al., vs. RENT-A-CENTER, INC., et al.,* Case No. 4:16-CV-00978.

## Court Decisions and Securities Law

- *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).
- Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6. (Aug. 1988).
- *Cammer, et al., v. Bruce M. Bloom, et al.*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton Co., et al., v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

## SEC Filings

- Rent-A-Center SEC Form 10-K filings submitted during the Class Period.
- Rent-A-Center SEC Form 10-Q filings submitted during the Class Period.
- Rent-A-Center SEC Form 8-K Current reports submitted during the Class Period.
- Rent-A-Center SEC Form S-3's filed on May 7, 1999; April 5, 2001; May 7, 2002; and June 21, 2004.
- Rent-A-Center SEC Form S-3ASR's filed on August 23, 2006 and September 29, 2009.

## Security Data

- Historical data for Rent-A-Center common stock, constituents of the S&P Composite 1500 Specialty Retail (Industry) Index during the Class Period, and the S&P 500 Total Return Index were obtained from S&P Capital IQ.
- Trade and quote data for Rent-A-Center common stock during the Class Period and one hundred randomly selected companies trading on the New York Stock Exchange and NASDAQ for February 2016 were obtained from Tick Data, *see* https://tickapi.tickdata.com/.
- Companies trading on the New York Stock Exchange and NASDAQ for February 2016 were identified using Thomson Reuters Eikon.
- Institutional and insider holdings data was obtained from S&P Capital IQ.
- Rent-A-Center common stock options data was obtained from Bloomberg.
- Rent-A-Center common stock market makers data was obtained from Bloomberg, using the RANK function.

- Rent-A-Center common stock market capitalization percentiles were obtained from Bloomberg.
- Turnover velocity data for NYSE and NASDAQ were obtained from the World Federation of Exchanges, *see* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

## Rent-A-Center News

- Rent-A-Center news headlines and select articles downloaded from Factiva for the Class Period. The Factiva search for news over the Class Period resulted in 426 unique articles. News articles were obtained by executing a search via Factiva for "All Sources" with the company field "Rent-A-Center, Inc." or keyword field "Rent-A-Center, Inc." for the period "February 2, 2015 – October 11, 2016." The last earnings release included in the Class Period was before market hours on October 11, 2016. Thus, I have included October 11, 2016 in my search for news articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.
- Rent-A-Center earnings and investor call transcripts during the Class Period.
- Rent-A-Center earnings, pre-announcement, and guidance update press releases during the Class Period.

## Rent-A-Center Analyst Reports

- Rent-A-Center analyst reports supplied by Investext via Thomson Reuters and counsel for the period of February 2, 2015 – October 11, 2016, including but not limited to:
  - "RCII: SSS Growth and Expense Management Overcome Mix Impact on Gross Margin," *BB&T Capital Markets,* April 28, 2015.

## Academic Articles

- Aharony, J., and Swary, I., "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980.
- Amihud, Y., et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005).
- Avramov, D., et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. (2006).
- Barber, B., et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. 285 (1994).
- Beaver, W., "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968.
- Binder, J., *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. (1998).

- Braun, P., et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575 (1995).
- Fabozzi, F., Modigliani, F., Jones, F., *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010.
- Fama, E., *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383 (1970).
- Greene, W., *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008.
- Gujarati, D., *Basic Econometrics*, Third Edition, McGraw Hill, 1995.
- Huang, R., and Stoll, H., *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).
- Jensen, M., *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95 (1978).
- Kumar, R., et al., *The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis*, 53 J. FIN. 717 (1998).
- MacKinlay, A., *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE (1997).
- May, R., "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 1971.
- Ross, S., *Options and Efficiency*, 90 Q. J. ECON. 75 (1976).
- Sharpe, W., Alexander, G., and Bailey, J., *Investments*, Prentice Hall, Fifth Edition, 1995.
- Tabak, D., and Dunbar, F., "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.
- Thomas, R., and Cotter, J., *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 105 (2000).

**<u>Other</u>**

- http://www.sec.gov/answers/mktmaker.htm
- http://wallstreet.cch.com/LCM/Sections/
- https://www.nyse.com/market-model/overview#dmms-2
- https://www.nyse.com/market-model/dmm-case-studies
- https://www.nyse.com/publicdocs/nyse/listing/fact_sheet_dmm.pdf
- http://www.nasdaq.com/includes/Anatomy_of_a_Trade_FactSheet.pdf
- http://www.nasdaqomx.com/transactions/trading/equities
- http://www.nasdaq.com/about/MarketMechanics.stm
- http://www.rss-specifications.com/
- http://www.rss-specifications.com/what-is-rss.htm
- SEC Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf

APPENDIX B

CHAD W. COFFMAN, MPP, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:          (312) 470-6500
Mobile:         (815) 382-0092
Email:          ccoffman@globaleconomicsgroup.com

## EMPLOYMENT:

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

**CFA**      Chartered Financial Analyst, 2003

**M.P.P.**   University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

Chad Coffman
Page 2 of 11

    **B.A.**    Knox College, 1995
              Economics, Magna Cum Laude
              Graduated with College Honors for Paper entitled "Increasing Efficiency in Water
              Supply Pricing:  Using Galesburg, Illinois as a Case Study"
              Dean's List Every Term
              Phi Beta Kappa

**PROFESSIONAL EXPERIENCE:**

<u>Securities, Valuation, and Market Manipulation Cases:</u>

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

  o In Re: <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation</u>.  Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
  o In Re: <u>Schering-Plough Corporation/ Enhance Securities Litigation</u>. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
  o In Re: <u>REFCO Inc. Securities Litigation</u>. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
  o In Re: <u>Computer Sciences Corporation Securities Litigation</u>. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
  o Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies.  One led to restatement of previously issued financial statements and both involved SEC investigations.

**Testimony:**

- Testifying expert in the matter of <u>Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836</u>.  Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory.  Filed expert report April 30, 2010.  Filed expert rebuttal report August 4, 2010.  Filed declaration re: Plan of Allocation September 25, 2009**.**

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed expert rebuttal report December 17, 2008. Deposition January 27, 2009. Filed expert rebuttal report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009.  Filed declaration re: Plan of Allocation September 9, 2009**.**

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>.  Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed expert rebuttal report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed expert rebuttal report July 8, 2010.  Deposition September 1, 2010. Filed supplemental expert rebuttal report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD), United States District Court for the Southern District of New York</u>.  Filed expert rebuttal report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed expert rebuttal report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed expert rebuttal report September 26, 2011. Filed expert report March 16, 2012. Filed expert rebuttal report April 9, 2012. Filed expert rebuttal report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed expert rebuttal report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court, Southern District of Florida</u>. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed expert rebuttal report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed expert rebuttal report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee, Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed expert rebuttal report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed expert rebuttal report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed expert rebuttal report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013. Filed expert rebuttal report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Filed expert rebuttal report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016. Filed expert rebuttal report March 27, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert rebuttal report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert rebuttal report May 13, 2016. Deposition June 10, 2016. Hearing testimony re: Plan of Allocation July 31, 2017.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed expert rebuttal report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015.  Filed expert rebuttal report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report

September 1, 2015. Filed expert rebuttal report November 16, 2015. Filed expert report November 8, 2016. Filed expert report February 8, 2017. Deposition December 12, 2017.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed expert rebuttal report December 7, 2015. Filed expert report November 18, 2016. Filed expert rebuttal report January 17, 2017. Filed declaration March 6, 2017. Deposition March 7, 2017.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed expert rebuttal report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed expert rebuttal report February 2, 2016. Filed rebuttal reply expert report March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert reply report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC, United States District Court for the Southern District of New York.</u> Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert rebuttal report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division.</u> Filed expert report October 14, 2016. Deposition October 20, 2016.

- Testifying expert in <u>Dr. Joseph F. Kasper, et al., Plaintiff, v. AAC Holdings, Inc., et al., Defendants, No. 3:15-cv-00923, United States District Court for the Middle District of Tennessee, Nashville Division.</u> Filed expert report October 18, 2016. Deposition November 29, 2016. Filed expert rebuttal report February 10, 2017. Filed expert report December 4, 2017.

- Testifying expert in <u>KBC Asset Management NV, et al., Plaintiff, v. 3D Systems Corporation, Abraham N. Reichental, Damon J. Gregoire, and Ted Hull, Defendants, No. 15-cv-02393-MGL, United States District Court for the District of South Carolina, Rock Hill Division.</u> Filed expert report October 31, 2016. Deposition January 5, 2017. Filed expert report April 21, 2017.

- Testifying expert in <u>Arkansas Teacher Retirement System, et al., Plaintiff, v. Virtus Investment Partners, Inc., Defendants, No. 15-cv-1249-WHP, United States District Court for the Southern District of New York.</u> Filed expert report November 7, 2016. Filed expert rebuttal report February 17, 2017. Deposition February 28, 2017. Filed expert report June 16, 2017. Filed expert rebuttal report July 26, 2017. Deposition August 9, 2017. Filed declaration re: prior reports December 4, 2017.

- Testifying expert in <u>Laborers Pension Trust Fund – Detroit, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. Conn's, Inc., et al., Defendants, No. 4:14-cv-00548 (KPE), United States District Court for the Southern District of Texas, Houston Division.</u> Filed expert report November 10, 2016. Deposition December 9, 2016. Filed expert rebuttal report March 27, 2017.

- Testifying expert in <u>Glen Hartsock, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., and Rajesh C. Shrotriya, Defendants, No. 16-cv-02279-RFB-GWF and Olutayo Ayeni, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., Rajesh C. Shrotriya, Kurt A. Gustafson, Joseph Turgeon, and Lee Allen, Defendants, No. 16-cv-02649-KJD-VCF, United States District Court for the District of Nevada.</u> Filed declaration re: damages December 8, 2016.

- Testifying expert in <u>In Re: ARIAD Pharmaceuticals, Inc. Securities Litigation, No. 1:13-cv-12544 (WGY), United States District Court District of Massachusetts.</u> Filed expert report March 6, 2017.

- Testifying expert in <u>Washtenaw County Employees' Retirement System, individually and on behalf of all others similarly situated, Plaintiff, v. Walgreen Co., Gregory D. Wasson, and Wade Miquelon, Defendants, No. 15-cv-3187, United States District Court for the Northern District of Illinois.</u> Filed expert report April 21, 2017. Deposition June 15, 2017. Filed expert rebuttal report September 15, 2017.

- Testifying expert in <u>Lou Baker, individually and on behalf of all others similarly situated, Plaintiff, v. SeaWorld Entertainment, Inc., James Atchison, James M. Heaney, Marc Swanson, and The Blackstone Group L.P., Defendants, No. 3:14-cv-02129-MMA-KSC, United States District Court for the Southern District of California</u>. Filed expert rebuttal report May 19, 2017. Deposition July 20, 2017. Filed expert report September 14, 2017.

- Testifying expert in <u>Benjamin Gross, individually and on behalf of all others similarly situated, Plaintiff, v. GFI Group, Inc., Colin Heffron, and Michael Gooch, Defendants, No. 3:14-cv-09438-WHP, United States District Court for the Southern District of New York</u>. Filed expert report May 30, 2017. Filed expert report August 7, 2017. Filed expert rebuttal report August 28, 2017. Deposition September 27, 2017.

- Testifying expert in <u>Murray Rubinstein, Jeffrey F. St. Clair, William McWade, Harjot Dev and Vikas Shah, individually and on behalf of all others similarly situated, Plaintiffs, v. Richard Gonzalez and Abbvie Inc., Defendants, No. 14-cv-9465, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report December 21, 2017. Deposition February 22, 2018.

- Testifying expert in <u>In Re: SanDisk LLC Securities Litigation, No. 3:15-cv-01455-VC, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report January 19, 2018.

- Testifying expert in <u>In Re: EZCORP, Inc. Securities Litigation, No. 1:15-cv-00608-SS, United States District Court for the Western District of Texas.</u> Filed expert report January 31, 2018. Deposition March 6, 2018.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u>– Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value."  *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

Chad Coffman
Page 11 of 11

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

1994  Ford Fellowship Recipient for Summer Research.
1993  Arnold Prize for Best Research Proposal.
1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.